UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



R. DAVIS HOWE,

Plaintiff,

-against-

THE BANK OF NEW YORK MELLON, as
INDENTURE TRUSTEE, BIMINI CAPITAL
MANAGEMENT, INC., and HEXAGON
SECURITIES, LLC,

Defendants,

and PREFERRED TERM SECURITIES XX, LTD.,

Nominal Defendant.

 **CIV 10470**

09 Civ. 10470 (HB) (JCF)
ECF CASE

**JURY TRIAL DEMANDED**



## COMPLAINT

R. DAVIS HOWE ("Plaintiff"), by and through his attorneys, Butzel Long, a professional

corporation, alleges for his Complaint as follows:

## NATURE OF ACTION

1.     This action seeks recovery of the damages to Plaintiff from the loss of more than

$13 million in principal amount of performing collateral from the investment portfolio of

nominal defendant Preferred Term Securities XX, Ltd. ("PreTSL XX") and the resulting

diminished cash flow to PreTSL XX.  These losses are the direct and proximate result of the

wrongful conduct of defendants in permitting and causing the offer and purchase (the "Tender

Offer") at a steeply discounted price of all of the outstanding fixed/floating rate capital securities

of Bimini Capital Trust II (the "TruPS") to defendant Bimini Capital Management, Inc. ("Bimini

Capital"), in violation of the terms of the Indenture dated December 15, 2005 (the "Indenture"),

among PreTSL XX, as Issuer (the "Issuer"), Preferred Term Securities XX, Inc., as Co-Issuer,

and The Bank of New York, the predecessor in interest of defendant The Bank of New York Mellon ("BNYM"), as Indenture Trustee (the "Trustee").

2. This action also seeks recovery through derivative claims for the benefit of nominal defendant PreTSL XX of the over $13 million in collateral that was wrongly and unlawfully diverted by defendants from the trust assets and the over $3 million in improper payments made by Bimini Capital with the advice and assistance of defendant Hexagon Securities, LLC ("Hexagon") to induce certain of PreTSL XX's senior noteholders to approve the Tender Offer.

## JURISDICTION AND VENUE

3. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

4. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5. Venue is proper in this District under 28 U.S.C. § 1391(a) and (c) because a substantial part of the events giving rise to these claims occurred in this District. Defendants BNYM and Hexagon also conduct operations from offices in New York. Further, nominal defendant PreTSL XX has consented to jurisdiction in the United States District Court for the Southern District of New York.

## THE PARTIES

6. Plaintiff R. Davis Howe ("Howe"), through an Individual Retirement Account, at all relevant times owned and continues to own approximately $10,130,444 of the $42,200,000 of

Subordinate Income Notes (the "Income Notes") issued by PreTSL XX, due March 22, 2038. Howe is a citizen of the state of Tennessee and is a principal of the general partner and registered investment agent that manages Wolf River Master Fund I ("Wolf River"), which owns approximately $2,998,000 of the original face value of the $332,300,000 Floating Rate Class A-1 Senior Notes issued by PreTSL XX, due March 22, 2038. Wolf River acquired those Senior Notes after July 1, 2009, the record date for the consent solicitation of noteholders in connection with the Tender Offer.

7.    Upon information and belief, defendant BNYM is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

8.    Upon information and belief, nominal defendant PreTSL XX is a limited liability company incorporated under the laws of the Cayman Islands with its registered office in George Town, Grand Cayman, Cayman Islands.

9.    Upon information and belief, defendant Bimini Capital is a publicly traded real estate investment trust or REIT (Symbol BMNM: OTC Bulletin Board Market), which is incorporated under the laws of Maryland, and with its principal place of business in Vero Beach, Florida. Upon information and belief, Bimini Capital established Bimini Capital Trust II, which is a statutory business trust formed under the laws of Delaware, to finance its real estate-related investments through the issuance and sale of the TruPS or trust preferred securities.

10.    Upon information and belief, defendant Hexagon is an investment bank and securities firm formed under the laws of Delaware, with its principal place of business in New York, New York. Hexagon advised Bimini Capital in connection with the consent solicitation of noteholders and sale of the TruPs through the Tender Offer.

## FACTUAL BACKGROUND

11.     This case is centered on the wrongful sale of collateral securities held by PreTSL XX, which operates as a collateralized debt obligation or CDO.  CDOs are special purpose vehicles created to facilitate investments through the issuance of notes and equity that are entitled to a return from a pool of collateral investments held by the CDO.  In general, CDO collateral is composed of debt securities that generate a stream of cash flows in the form of interest payments as well as return of principal.  The cash flows from the collateral securities are used to repay the CDO's noteholders and provide a return to the equity holders.

12.     In the event, and to the extent, that particular investments in a CDO's investment portfolio are sold or liquidated for less than the par value of the principal, the CDO's cash flow, including interest payments, is diminished, and there are fewer funds available to repay the CDO's noteholders and equity holders.

13.     In this case, PreTSL XX issued notes to its investors, including plaintiff, that are structured in layers, or tranches, consisting of Senior Notes, Mezzanine Notes, and Income Notes (collectively the "Notes").  The various tranches correspond to the noteholders' respective priority in receiving payment from PreTSL XX's cash flows or, in the case of a sale or disposition of defaulted collateral, from the proceeds thereof.  PreTSL XX used the proceeds from the offering of the Notes to purchase various capital and other securities, including the TruPS issued by Bimini Capital Trust II in October 2005, that comprised the collateral securities (collectively the "Collateral Securities" and singularly a "Collateral Security") in the investment portfolio.  The Collateral Securities were pledged by PreTSL XX to secure the Notes.

## THE RESTRICTIVE TERMS OF THE INDENTURE

14.     The operation of PreTSL XX, including the duties of defendant BNYM as Trustee, is governed by the terms of the Indenture.[1]  A true copy of the Indenture is attached as Exhibit A hereto.

15.     PreTSL XX, through the Trustee, distributes on a quarterly basis the available principal and interest proceeds derived from its investment portfolio to the parties entitled to receive payments from those cash flows, including its noteholders.  This quarterly distribution is governed by the terms of the Indenture.  Section 8.4, which is titled "Distributions; Priority of Payments," and is commonly referred to as the "waterfall," sets forth the order in which parties are to receive payments.

16.     PreTSL XX is what is known as a "static" CDO, which does not allow the Trustee or collateral manager to trade the securities in the investment portfolio.  Thus, the Collateral Securities in PreTSL XX can only be sold or disposed of in very limited and narrowly prescribed circumstances, as set forth in the terms of the Indenture.

17.     In particular, the Indenture sets forth the remedies that are available to the Trustee upon the occurrence of an "Event of Default," as defined in Section 5.1 of the Indenture, in which case the Trustee may, subject to obtaining the consent of Requisite Noteholders, sell or otherwise liquidate the Trust Estate or any portion thereof.

18.     Furthermore, the Trustee may dispose of a defaulted Collateral Security, although the term "defaulted" is not defined in the Indenture.  Specifically, Section 5.16(b) states:

---

[1]  Unless expressly defined herein, capitalized terms shall have the same meaning as defined in the Indenture.

(b) If a breach of a representation or warranty in an Underlying Instrument for a Collateral Security (or the related Corresponding Debenture Indenture, the related placement agreement or certain other related documents) occurs and materially adversely affects the Issuer as the holder of such Collateral Security, then the Requisite Noteholders may direct the Indenture Trustee to exercise the Issuer's rights under those documents, which may include attempting to dispose of such Collateral Security. The net proceeds, if any, will be applied in accordance with Priority of Payments. However, no such disposition in connection with such a breach shall be made unless the Indenture Trustee receives a confirmation from each Rating Agency that such disposition will not result in the reduction, withdrawal or negative qualification of its then current ratings for the Senior Notes or Mezzanine Notes. **In addition, the Indenture Trustee may dispose of a defaulted Collateral Security at the direction of the Requisite Noteholders.** The net proceeds, if any, from such a disposition would be applied in accordance with the Priority of Payments (emphasis added).

19.    The "Requisite Noteholders" are defined in the Definitions Section of the Indenture as follows:

"Requisite Noteholders" shall mean for so long as any Senior Notes remain Outstanding, the Holders of more than 66?% [sic] of the Aggregate Principal Amount of the Senior Notes (the Class A-1 Senior Notes and the Class A-2 Senior Notes being considered together as one class for this purpose); thereafter, for so long as any Class B Mezzanine Notes remain Outstanding, the Holders of more than 66?% [sic] of the Aggregate Principal Amount of the Class B Mezzanine Notes; thereafter, for so long as any Class C Mezzanine Notes remain Outstanding, the Holders of more than 66?% [sic] of the Aggregate Principal Amount of the Class C Mezzanine Notes; thereafter, for so long as any Class D Mezzanine Notes remain Outstanding, the Holders of more than 66?% [sic] of the Aggregate Principal Amount of the Class D Mezzanine Notes; and thereafter the Holders of more than 66?% [sic] of the Aggregate Principal Amount of the Income Notes.

20.    The Trustee's obligations under Section 5.16 are also subject to the Trustee's duties with respect to any defaulted Collateral Security as set forth in Section 6.14 of the Indenture, which states:

> If a default occurs on any Collateral Security or
> Corresponding Debenture, the Requisite Noteholders will have the
> right to direct the Indenture Trustee with respect to any action to be
> taken by the Indenture Trustee, including, without limitation,
> engaging in restructuring efforts, bringing enforcement
> proceedings, engaging investment banking or asset management
> firms and/or taking any other measures. The Indenture Trustee
> will be fully protected with respect to any action taken by it in
> reasonable good faith at the direction of the Requisite Noteholders.

21.     Thus, the Trustee's right to dispose of a defaulted Collateral Security pursuant to Section 5.16 at the direction of the Requisite Noteholders and its duties with respect to a defaulted Collateral Security as set forth in Section 6.14 are limited to and predicated upon the occurrence of a default in the Collateral Security.

22.     Moreover, pursuant to Section 2.17 of the Indenture, the Holders of the Income Notes have an option to purchase a Collateral Security if it is a "Defaulted Security," as defined in the Indenture, at a price to be calculated in accordance with Section 2.17(a) of the Indenture.

23.     Accordingly, the Indenture does not grant the Trustee the discretion or authority to dispose of Collateral Security unless an Event of Default has occurred or it is a defaulted Collateral Security.

## THE WRONGFUL DEPLETION OF PreTSL XX'S INVESTMENT ASSETS RESULTING FROM BIMINI CAPITAL'S REPURCHASE OF THE TruPS IN BREACH OF THE INDENTURE AND AT A STEEPLY DISCOUNTED PRICE

24.     On or about June 19, 2009, the Trustee received a letter from Robert E. Cauley, the Chairman and CEO of Bimini Capital (the "Cauley Letter"), expressing outrage that the Trustee was apparently not willing to move forward with the transactions to permit Bimini Capital to repurchase the $50 million in TruPS held by PreTSL XX and another static CDO, PreTSL XXI. The Cauley Letter stated that "[w]hile we have managed to avoid bankruptcy so

far, we now need to repurchase our trust preferred debt (our TruPS) if we are to survive." The Cauley Letter then states: "I need you to understand two things: 1) I am extremely upset with the situation your company has recently put my company in and 2) I need your help to remedy the situation."

25.    After referring to two prior tender offers by Bimini Capital to repurchase the $50 million in TruPS held by PreTSLs XX and XXI for $7.5 million, which failed, the Cauley Letter stated:

> I just learned today that your company may have reversed its position and now contends that the indentures for the PreTSL deals do not permit cash repurchases to occur.  **THIS IS AN OUTRAGE.**  Relying on BoNY's earlier advice, we have incurred material costs—costs we are barely able to pay—in getting to this point, not to mention our considerable investment of time and effort.  We, as well as the AAA holders we have been able to locate (at considerable cost and effort), are ready to move forward but have just run into an abrupt, unnecessary and unfair about-face on the part of your company.  (emphasis in original.)

26.    The Trustee thereafter acceded to Bimini Capital's demands to move forward with the Tender Offer, and to permit Bimini Capital with the assistance of Hexagon to repurchase the TruPS at a substantial discount, notwithstanding that the sale or repurchase of such Collateral Security was not permitted under the terms of the Indenture. The Trustee could not have justifiably or reasonably relied upon the Cauley Letter as a basis for disposing of the TruPS because the Trustee lacked any discretionary authority to dispose of a Collateral Security based on a statement by Bimini Capital of what it needed to do to avoid bankruptcy or the threat of a prospective default. Bimini Capital has not filed for bankruptcy and, upon information and belief, the TruPS which were not repurchased by Bimini Capital, and which remain collateral

securities in the investment portfolio of PreTSL XXI, are continuing to perform without a default in payment of principal or interest.

27.     On or about June 30, 2009, BNYM sent a "Notice of Offer and Request for Direction" to the Holders of the Senior Notes as of July 1, 2009 that included the terms of the Tender Offer by Bimini Capital to purchase for cash all of the TruPS of Bimini Capital Trust II held by PreTSL XX (the "Offer and Request for Direction"). The Offer and Request for Direction was thereafter supplemented and amended by a "Notice of Increase in Offer Price and Extension of Response Time for Offer and Request for Direction" and a further "Notice of Extension of Response Time for Offer and Request for Direction" that extended the deadline to September 30, 2009 for the Holders of the Senior Notes to provide direction to the Trustee by voting to accept or reject the amended and restated Tender Offer dated August 26, 2009.

28.     The Offer and Request for Direction, as supplemented and amended, purported to base the Tender Offer to purchase the TruPS by Bimini Capital on Section 5.16(b) of the Indenture, stating in relevant part: "Pursuant to Section 5.16(b) of the Indenture, approval of the Offer requires the direction of Holders of more than 66-2/3% of the Aggregate Principal Amount of the Senior Notes (the Class A-1 Senior Notes and the Class A-2 Senior Notes being considered together as one class for this purpose) (the 'Requisite Noteholders')."

29.     At the time and continuing thereafter, the TruPS were performing securities. Thus, the Offer and Request for Direction, as supplemented and amended, was false and misleading in that it (a) misrepresented that the Tender Offer was based upon and authorized by the terms of Section 5.16(b) of the Indenture when in fact no default had occurred with respect to the Collateral Security and (b) contained material omissions of fact in failing to disclose any

information regarding the nature of the purported default, the manner of its determination, or the financial condition of Bimini Capital.

30.     On or about October 21, 2009, the Trustee, obtained an opinion from special counsel for Bimini Capital in connection with the Tender Offer, as amended (the "Opinion"). The Opinion failed to identify any default with respect to the TruPS that would trigger the Trustee's right and ability to dispose of the TruPS and instead stated that "we have assumed that the consent of the Requisite Noteholders has been obtained in accordance with Section 5.16(b) of the Indenture." Accordingly, the Trustee could not in good faith have relied upon that Opinion in connection with its solicitation of the direction of the Holders of the Senior Notes with respect to the Tender Offer.

31.     Pursuant to the terms of the Tender Offer, as amended, PreTSL XX sold to Bimini Capital all $24 million aggregate principal amount of TruPS for a discounted amount of only $10.8 million in cash, or approximately 45% of the par value of the principal amount.

32.     Furthermore, in addition to the $10.8 million discounted purchase price it paid for the TruPS, upon information and belief Bimini Capital paid separate, additional consideration of approximately $3.3 million directly to certain Holders of the Senior Notes (the "Consenting Senior Holders"), with the advice and assistance of Hexagon, as an inducement to the Consenting Senior Holders to consent to the sale, rather than to PreTSL XX for the benefit of all noteholders on a ratable basis.

33.     As a result of defendants' wrongful conduct in soliciting the sale of and purchasing the TruPS without the occurrence of a default and in breach of the Indenture, plaintiff has suffered the loss of his share of the income stream flowing from over $13 million in principal

through the PreTSL XX waterfall, PreTSL XX has been deprived of the benefit of the principal amount of over $13 million in the investment portfolio, and defendant Bimini Capital has been unjustly enriched in an amount in excess of $13 million.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

34.    Plaintiff brings certain of the claims set forth below derivatively in the right and for the benefit of PreTSL XX to redress injuries suffered and to be suffered by PreTSL XX as a result of the breaches of fiduciary duty and other violations of law by defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

35.    Plaintiff will adequately and fairly represent the interests of PreTSL XX and similarly situated noteholders in enforcing and prosecuting their rights.  At all relevant times, Plaintiff has acted equitably and in good faith, without any ulterior motive, and in the belief that PreTSL XX is entitled to the relief sought on its behalf.

36.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Trustee to institute this action.  Such demand would be a futile and useless act because the Trustee is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because the Trustee exhibited a sustained and systematic failure to fulfill its fiduciary duties by authorizing and permitting the diversion of collateral and wrongful conduct that is the subject of this action, notwithstanding the protests of Plaintiff.

## FIRST CLAIM FOR RELIEF

### Breach of Contract
### (Against Defendant BNYM)

37.     Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

38.     The Indenture is a valid and binding contract entered into between BNYM and PreTSL XX.  The Indenture provides, among other things, the terms on which BNYM acts as Trustee of the PreTSL Collateral Securities that comprise the trust assets.

39.     As a noteholder of PreTSL XX, Plaintiff is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary of the Indenture.

40.     BNYM materially breached its contractual obligations under the Indenture by permitting Bimini Capital to repurchase the TruPs, which were a performing, non-defaulted Collateral Security, in violation of the terms of the Indenture and at a substantially discounted price.

41.     Plaintiff has performed his obligations under the Indenture.

42.     As a direct result of BNYM's breach of the Indenture, Plaintiff has been damaged in the amount of the loss of his share of the income stream flowing from over $13 million in principal through the PreTSL XX waterfall.

## SECOND CLAIM FOR RELIEF

### Tortious Interference With Contract
**(Against Defendants Bimini Capital and Hexagon)**

43.     Plaintiff incorporates the allegations in paragraphs 1 through 42 as if fully set forth herein.

44.     The Indenture is a valid and binding contract between BNYM and PreTSL XX, and Plaintiff is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary of the Indenture.

45.     Bimini Capital and Hexagon were aware of the Indenture and its terms.

46.     Bimini Capital and Hexagon intentionally and improperly procured a breach of the Indenture by causing the Trustee to permit and authorize the purchase of the TruPS by Bimini Capital.

47.     As a direct and proximate result of Bimini Capital's and Hexagon's tortious interference, Plaintiff has been damaged in the amount of the loss of his share of the income stream flowing from over $13 million in principal through the PreTSL XX waterfall.

## THIRD CLAIM FOR RELIEF

### Derivative Claim for Tortious Interference With Contract
**(Against Defendants Bimini Capital and Hexagon)**

48.     Plaintiff incorporates the allegations in paragraphs 1 through 47 as if fully set forth herein.

49.     The Indenture is a valid and binding contract between BNYM and PreTSL XX and Plaintiff is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary of the Indenture.

50.     Bimini Capital and Hexagon were aware of the Indenture and its terms.

51.     Bimini Capital and Hexagon intentionally and improperly procured a breach of the Indenture by causing the Trustee to permit and authorize the purchase of the TruPS by Bimini Capital.

52.     As a direct and proximate result of Bimini Capital's and Hexagon's tortious interference, PreTSL XX has been damaged by the loss from its investment portfolio of over $13 million in principal as well as the failure to receive the more than $3 million that Bimini Capital and Hexagon caused to be paid to the Consenting Senior Holders rather to PreTSL XX for the benefit of all the noteholders.

## FOURTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against Defendant BNYM)

53.     Plaintiff incorporates the allegations in paragraphs 1 through 52 as if fully set forth herein.

54.     Plaintiff, as a noteholder of the PreTSL XX Income Notes, is a beneficiary of PreTSL XX. BNYM, as Trustee of PreTSL XX, owed fiduciary duties of loyalty and good faith to Plaintiff and all similarly situated noteholders.

55.     BNYM breached its fiduciary duties to Plaintiff, and all similarly situated noteholders, by, among other things, separate and apart from the terms of the Indenture, failing to protect and preserve the collateral in the trust estate of PreTSL XX and instead allowing the diversion from PreTSL XX of over $13 million in principal by Bimini Capital.

56.     As a proximate result of BNYM's breaches of its fiduciary duties, plaintiff has suffered the loss of his share of the income stream flowing from in excess of $13 million in principal through the PreTSL XX waterfall.

## FIFTH CLAIM FOR RELIEF

### Derivative Claim for Breach of Fiduciary Duty
### (Against Defendant BNYM)

57.     Plaintiff incorporates the allegations in paragraphs 1 through 56 as if fully set forth herein.

58.     BNYM, as Trustee of PreTSL XX, owed to PreTSL XX fiduciary duties of loyalty and good faith.

59.     BNYM breached its fiduciary duties to PreTSL XX by acceding to the wrongful demands of Bimini Capital and allowing the diversion from PreTSL XX of over $13 million in principal amount of TruPS, including obtaining the consent of the Requisite Noteholders by means of the Offer and Request for Direction, as supplemented and amended, that was false and misleading in that it (a) misrepresented that the Tender Offer was based upon and authorized by the terms of Section 5.16(b) of the Indenture when in fact no default had occurred with respect to the Collateral Security and (b) contained material omissions of fact in failing to disclose any

information regarding the nature of the purported default, the manner of its determination, or the financial condition of Bimini Capital.

60.     As a proximate result of BNYM's breaches of its fiduciary duties, PreTSL XX has been damaged by the loss from its investment portfolio of over $13 million in principal.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty
### (Against Defendants Bimini Capital and Hexagon)

61.     Plaintiff incorporates the allegations in paragraphs 1 through 60 as if fully set forth herein.

62.     Bimini Capital, as purchaser of the TruPS through the Tender Offer, and Hexagon, as adviser to Bimini Capital in connection with the consent solicitation and purchase of the TruPS, aided and abetted the breaches of fiduciary duty by BNYM by knowingly providing material and substantial assistance to such breaches of fiduciary duty.

63.     Bimini Capital and Hexagon were aware that, as a static CDO, PreTSL XX and the Trustee were restricted and prohibited from selling or disposing of the TruPS in the absence of a default and knew that the Offer and Request for Direction in connection with the solicitation of consent by the Requisite Noteholders was false and misleading in that it (a) misrepresented that the Tender Offer was based upon and authorized by the terms of Section 5.16(b) of the Indenture when in fact no default had occurred with respect to the TruPS and (b) contained material omissions of fact in failing to disclose any information regarding the nature of the purported default, the manner of its determination, or the financial condition of Bimini Capital.

64.     Bimini Capital assisted with the breaches of fiduciary duty of BNYM by purchasing the TruPS in violation of the terms of the Indenture and at a substantial discount and by paying additional consideration of approximately $3.3 million directly to Consenting Senior Holders as an inducement to the Consenting Senior Holders to consent to the wrongful sale. Hexagon assisted with those breaches of fiduciary duty by providing advice and assistance to Bimini Capital in connection with the consent solicitation and Tender Offer.

65.     As a proximate result of Bimini Capital's and Hexagon's aiding and abetting of BNYM's breaches of its fiduciary duties, plaintiff has suffered the loss of his share of the income stream flowing from over $13 million in principal through the PreTSL XX waterfall.

## SEVENTH CLAIM FOR RELIEF

### Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty
### (Against Defendants Bimini Capital and Hexagon)

66.     Plaintiff incorporates the allegations in paragraphs 1 through 65 as if fully set forth herein.

67.     Bimini Capital, as purchaser of the TruPS through the Tender Offer, and Hexagon, as adviser to Bimini Capital in connection with the consent solicitation and purchase of the TruPS, aided and abetted the breaches of fiduciary duty by BNYM by knowingly providing material and substantial assistance to such breaches of fiduciary duty.

68.     Bimini Capital and Hexagon were aware that, as a static CDO, PreTSL XX and the Trustee were restricted and prohibited from selling or disposing of the TruPS in the absence of a default and knew that the Offer and Request for Direction in connection with the solicitation of consent by the Requisite Noteholders was false and misleading in that it (a) misrepresented

that the Tender Offer was based upon and authorized by the terms of Section 5.16(b) of the Indenture when in fact no default had occurred with respect to the TruPS and (b) contained material omissions of fact in failing to disclose any information regarding the nature of the purported default, the manner of its determination, or the financial condition of Bimini Capital.

69.     Bimini Capital assisted with the breaches of fiduciary duty of BNYM by purchasing the TruPS in violation of the terms of the Indenture and at a substantial discount and by paying additional consideration of approximately $3.3 million directly to Consenting Senior Holders as an inducement to the Consenting Senior Holders to consent to the wrongful sale, and Hexagon assisted with those breaches of fiduciary duty by providing advice and assistance to Bimini Capital in connection with the consent solicitation and Tender Offer.

70.     As a proximate result of Bimini Capital's and Hexagon's aiding and abetting of BNYM's breaches of its fiduciary duties, PreTSL XX has been damaged by the loss from its investment portfolio of over $13 million in principal as well as the failure to receive the more than $3 million that Bimini Capital and Hexagon caused to be paid to the Consenting Senior Holders rather to PreTSL XX for the benefit of all the noteholders.

## EIGHTH CLAIM FOR RELIEF

### Derivative Claim for Rescission/Illegality
### (Against Defendants BNYM and Bimini Capital)

71.     Plaintiff incorporates the allegations in paragraphs 1 through 70 as if fully set forth herein.

72.     The Tender Offer pursuant to which the BNYM sold and Bimini Capital purchased the TruPS was unlawful because it included misrepresentations and material

omissions in violation of New York and federal law, including the New York Martin Act (N.Y.

Gen. Bus. Law § 352-c), General Business Law § 349, General Business Law § 350, and section

17 of the Securities Act of 1933, 15 U.S.C. § 77q, and the regulations promulgated thereunder.

73.   Because the Tender Offer was illegal, PreTSL XX is entitled to judgment

rescinding the sale of the TruPS to Bimini Capital and directing return of the TruPS to PreTSL

XX's investment portfolio, together with interest, in exchange for the purchase price, less

expenses incurred by PreTSL XX in connection with the Tender Offer.

### NINTH CLAIM FOR RELIEF

#### Derivative Claim for Unjust Enrichment
#### (Against Defendants Bimini Capital and Hexagon)

74.   Plaintiff incorporates the allegations in paragraphs 1 through 73 as if fully set

forth herein.

75.   As a result of their wrongful conduct, Bimini Capital and Hexagon have been

unjustly enriched.  It would be inequitable and unjust to permit Bimini Capital and Hexagon to

retain the proceeds of their wrongful conduct.

76.   PreTSL XX is entitled to judgment directing Bimini Capital to disgorge the over

$13 million in principal amount of TruPS obtained as a result of its wrongful conduct in

connection with the Tender Offer and directing Hexagon to disgorge the fees it received in

connection with the consent solicitation and Tender Offer.

WHEREFORE, Plaintiff demands judgment as follows:

(1) On the First and Fourth Claims for Relief, monetary damages against the defendant

Trustee in an amount sufficient to compensate Plaintiff for his losses;

(2)   On the Second and Sixth Claims for Relief, monetary damages against defendants Bimini Capital and Hexagon in an amount sufficient to compensate Plaintiff for his losses;

(3)   On the Fifth Claim for Relief, against the defendant Trustee and in favor of PreTSL XX for the amount of damages sustained by PreTSL XX;

(4)   On the Third, Seventh and Ninth Claims for Relief, against defendants Bimini Capital and Hexagon and in favor of PreTSL XX for the amount of damages sustained by PreTSL XX;

(5)   On the Eighth Claim for Relief, judgment determining that the sale of the TruPS by the Trustee to defendant Bimini Capital is rescinded, and directing Bimini Capital to return the TruPS to PreTSL XX;

(6)   Awarding Plaintiff interest, the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, and expenses; and

(7)   Granting such other and further relief as the Court deems just and proper.


Dated:  New York, New York
        December 22, 2009

BUTZEL LONG, a professional corporation

By: _____
         Robert D. Piliero
         Robert Sidorsky
     380 Madison Avenue
     New York, New York 10017
     (212) 818-1110
     piliero@butzel.com
     sidorsky@butzel.com

     Attorneys for Plaintiff R. DAVIS HOWE

## VERIFICATION

STATE OF MISSISSIPPI )
                              ) SS:
COUNTY OF DeSOTO )

      R. DAVIS HOWE, being duly sworn, deposes and says pursuant to Rule 23.1 of the

Federal Rules of Civil Procedure as follows:

      I am the Plaintiff in the within action. I have read the foregoing Complaint and know the

contents thereof. The contents are true to my own knowledge except as to the matters therein

stated to be alleged upon information and belief, and as to those matters I believe them to be true.

                                                R. DAVIS HOWE

Sworn to before me this
22 day of December 2009

                    **My Commission Expires**
                    **November 27, 2011**

Notary Public

ALFA RENEE KING
NOTARY PUBLIC
ID No 87807
My Comm Expires
November 27, 2011
DESOTO COUNTY
STATE OF MISSISSIPPI