UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

R. DAVIS HOWE, individually and derivatively,

                Plaintiff,

           -against-

THE BANK OF NEW YORK MELLON, as Indenture
Trustee, BIMINI CAPITAL MANAGEMENT, INC.,
and HEXAGON SECURITIES LLC,

                Defendants,

and THE BANK OF NEW YORK MELLON, as
Indenture Trustee, and PREFERRED TERM
SECURITIES XX, LTD.,

                Nominal Defendants.

09 Civ. 10470 (HB)

ECF CASE


# PLAINTIFF'S AMENDED CONSOLIDATED
# MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANTS' AND NOMINAL DEFENDANTS'
# MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

BUTZEL LONG,
   a professional corporation
Robert D. Piliero (piliero@butzel.com)
Robert Sidorsky (sidorsky@butzel.com)
380 Madison Avenue
New York, New York 10017
Tel.:  (212) 818-1110
Fax:  (212) 818-0494

*Attorneys for Plaintiff R. Davis Howe*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND......................................................................................1

    A.      The PreTSL XX CDO.................................................................1

    B.      The Indenture ............................................................................2

    C.      The Restrictions on Any Sale or Disposition of PreTSL XX's
           Collateral Securities...................................................................3

    D.      Bimini Capital Induces the Trustee to Authorize the Repurchase
           of the Performing, Non-Defaulted Bimini TruPS in Violation of
           the Indenture .............................................................................4

    E.      The Wrongful and Illegal Bimini Tender Offer and Consent
           Solicitation ................................................................................5

    F.      Bimini Capital's Remarkable Financial Recovery ...................7

Argument ....................................................................................................................8

POINT I
THE NO-ACTION CLAUSE IS INAPPLICABLE .............................................9

POINT II
PLAINTIFF HAS PROPERLY PLED THE DERIVATIVE CLAIMS
AND HAS STANDING TO BRING THEM ...................................................13

    A.      Derivative Claims in the Right of the Trustee ......................13

    B.      Derivative Claims on Behalf of the Issuer............................15

POINT III
PLAINTIFF HAS PLED COGNIZABLE CLAIMS FOR BREACH OF
FIDUCIARY DUTY........................................................................................20

POINT IV
PLAINTIFF HAS ALLEGED COGNIZABLE CLAIMS FOR
BREACH OF CONTRACT..............................................................................25

    A.      The "Reasonableness" of the Trustee's Acts Is Not Grounds for
           Dismissal..................................................................................25

    B.      The Trustee Was Not Entitled to Rely on the Opinion Letter ..............26

    C.      Plaintiff Has Adequately Alleged Damages .........................28

POINT V
PLAINTIFF HAS STATED A CLAIM AGAINST BIMINI CAPITAL
AND HEXAGON FOR TORTIOUS INTERFERENCE WITH
CONTRACT.....................................................................................................29

    A.      The Sale of the Non-Defaulted Bimini TruPS Was a Breach of
           the Indenture ...........................................................................29

B.      The "Economic Interest" Defense Does Not Apply ................................................31

POINT VI
        PLAINTIFF HAS STATED A CLAIM AGAINST BIMINI CAPITAL
        AND HEXAGON FOR AIDING AND ABETTING BREACH OF
        FIDUCIARY DUTY ....................................................................................................34

POINT VII
        PLAINTIFF HAS STATED A CLAIM AGAINST BIMINI CAPITAL
        AND HEXAGON FOR UNJUST ENRICHMENT ...........................................................36

POINT VIII
        PLAINTIFF HAS STATED A CLAIM FOR RESCISSION ...........................................38

CONCLUSION ...................................................................................................................40

# TABLE OF AUTHORITIES

Page

**Cases**

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust,*
  11 N.Y.3d 146, 866 N.Y.S.2d 578 (2008) ........................................................... 21

*Allied Irish Banks, P.L.C. v. Bank of America, N.A.,*
  No. 03 Civ 3748 (DAB), 2006 WL 278138 (S.D.N.Y. Feb. 2,
  2006) .................................................................................................................... 38

*AMBAC Indemnity Corp. v. Bankers Trust Co.,* 151 Misc.2d 334,
  573 N.Y.S.2d 204 (Sup. Ct. N.Y. County 1991) ................................................. 23

*American Medical Assoc. v. United Healthcare Corp.,*
  No. 00 Civ. 2800 (LMM), 2007 WL 683974 (S.D.N.Y. Mar. 5,
  2007) ............................................................................................................... 36, 37

*American Protein Corp. v. AB Volvo,* 844 F.2d 56 (2d Cir. 1988) ............................... 33

*Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009) ................................................................. 8, 9

*Ballow Brasted O'Brien & Rusin P.C. v. Logan,*
  435 F.3d 235 (2d Cir. 2006) ................................................................................ 39

*Bank of N.Y. v. Battery Park City Auth.,* 251 A.D.2d 211,
  675 N.Y.S.2d 860 (1st Dep't 1998) ..................................................................... 12

*Beck v. Manufacturers Hanover Trust Co.,* 218 A.D.2d 1,
  632 N.Y.S.2d 520 (1st Dep't 1995) ................................................................ 20, 22

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................... 8, 9

*Benjamin v. Koeppel,* 85 N.Y.2d 549, 626 N.Y.S.2d 982 (1995) ................................. 39

*Birn v. Childs Co.,* 37 N.Y.S.2d 689 (Sup. Ct. N.Y. County 1942) ............................. 13

*Briarpatch, Ltd., L.P. v. Phoenix Pictures, Inc.,*
  373 F.3d 296 (2d Cir. 2004) ................................................................................ 36

*Broad v. Rockwell Int'l Corp.,* 614 F.2d 418 (5th Cir. 1980) ...................................... 21

*Brooks v. Weiser,* 57 F.R.D. 491 (S.D.N.Y. 1972) ..................................................... 19

*Bullmore v. Ernst & Young Cayman Islands,* 45 A.D.3d 461,
  486 N.Y.S.2d 145 (1st Dep't 2007) ..................................................................... 24

*Campbell v. Hudson & Manhattan R. Co.,* 277 A.D. 731,
  102 N.Y.S.2d 878 (1st Dep't 1951) ........................................................... 12, 13, 15

iii

*Chadirjian v. Kanian*, 123 A.D.2d 596, 506 N.Y.S.2d 880
(2d Dep't 1986).................................................................................... 36

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403,
176 N.Y.S.2d 259 (1958)..................................................................... 24

*Cruden v. Bank of N.Y.*, 957 F.2d 961 (2d Cir. 1992)................................. 9, 11, 12, 15

*Dabney v. Chase Nat'l Bank*, 196 F.2d 668 (2d Cir. 1952) ......................... 20

*Dornberger v. Metropolitan Life Ins. Co.*, 961 F. Supp. 506
(S.D.N.Y. 1997)..................................................................................... 40

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66
(2d Cir. 1988)........................................................................................ 20

*Entel v. Guilden*, 223 F. Supp. 129 (S.D.N.Y. 1963) ................................. 19

*Ettlinger v. Persian Rug & Carpet Co.*, 97 Sickels 189,
36 N.E. 1055 (1894).............................................................................. 14

*Feder v. Union Carbide Corp.*, 141 A.D.2d 799, 530 N.Y.S.2d 165
(2d Dep't 1988)..................................................................................... 12

*Feiner Family Trust v. VBI Corp.*, No. 07 Civ. 1914 (RPP),
2007 WL 2615448 (S.D.N.Y. Sept. 11, 2007).................................... 16

*Feldbaum v. McCrory Corp.*, C.A. No. 11866, 1992 WL 119095
(Del. Ch. June 2, 1992) ........................................................ 11, 12, 14, 15

*Fin Hay Realty Co. v. United States*, 398 F.2d 694 (3d Cir. 1968) ............ 18

*Findley v. Giacobbe*, 79 F.3d 1285 (2d Cir. 1996)..................................... 29

*Gilbert v. Commissioner of Internal Revenue*,
262 F.2d 512 (2d Cir. 1959)................................................................. 18

*Gordon v. Dino De Laurentis Corp.*, 141 A.D.2d 435,
529 N.Y.S.2d 777 (1st Dep't 1998)..................................................... 28

*Gould v. J. Henry Schroder Bank & Trust Co.*, 78 A.D.2d 870,
433 N.Y.S.2d 32 (2d Dep't 1980).......................................... 12, 14, 15

*Greenspun v. Lindley*, 36 N.Y.2d 473, 369 N.Y.S.2d 123 (1975)............... 19

*Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897 (2d Cir. 1980) ..................... 24

*Hausman v. Buckley*, 299 F.2d 696 (2d Cir. 1962)..................................... 16

iv

*Hoff v. Sprayregan*, 52 F.R.D. 243 (S.D.N.Y. 1971)...................................................................... 19

*Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290
 (S.D.N.Y. 2006)......................................................................................................................... 37

*Imtrac Indus., Inc. v. Glassexport Co.*, No. 90 Civ. 6058 (LBS),
 1996 WL 39294 (S.D.N.Y. Feb. 1, 1996)................................................................................... 33

*In re BP P.L.C. Derivative Litig.*, 507 F. Supp. 2d 302
 (S.D.N.Y. 2007).................................................................................................................... 16, 19

*In re Globo Comunicacoes E Participacoes S.A.*,
 317 B.R. 235 (Bankr. S.D.N.Y. 2004)......................................................................................... 9

*In re Oakwood Homes Corp.*, No. 02-13396 (PJW), 2004
 Bankr. LEXIS 1385, 2004 WL 2126514 (Bankr. D. Del.
 Sept. 22, 2004) ......................................................................................................................... 11

*In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520
 (S.D.N.Y. 2006)......................................................................................................................... 27

*International Motor Sports Group, Inc. v. Gordon*,
 No. 98 Civ. 5611, 1999 WL 619633 (S.D.N.Y. Aug. 16, 1999) ............................................ 39

*Island Rehabilitative Services Corp. v. Maimonides Medical
 Center*, 19 Misc.3d 1108(A), 2008 WL 786507
 (Sup. Ct. Kings County 2008) ................................................................................................. 31

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
 263 B.R. 406 (Bankr. S.D.N.Y. 2001).................................................................................. 39, 40

*Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157
 (1st Dep't 2003) ....................................................................................................................... 34

*Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*,
 35 A.D.3d 317 (1st Dep't 2006) .............................................................................................. 32

*Ladenburg Thalmann & Co., Inc. v. Imagining Diagnostic
 Systems, Inc.*,
 176 F. Supp. 2d 199 (S.D.N.Y. 2001)....................................................................................... 39

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...................................................... 34, 35

*LNC Investments, Inc. v. First Fidelity Bank, Nat'l Assoc.*,
 935 F. Supp. 1333 (S.D.N.Y. 1996)................................................................................. 20, 22, 23

*Metropolitan West Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
    No. 03 Civ. 5539 (NRB), 2004 U.S. Dist. LEXIS 11761
    (S.D.N.Y. June 25, 2004) ............................................................................... 9, 10, 11

*Momentive Performance Materials USA, Inc. v. Astro Cosmos
    Metallurgical, Inc.*, 1:07-CV-567 (FJS/DRH),
    2009 U.S. Dist. LEXIS 45941 (N.D.N.Y. June 1, 2009) ...................................... 33

*Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*,
    768 F. Supp. 115 (S.D.N.Y. 1991) ....................................................................... 38

*NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*,
    87 N.Y.2d 614, 641 N.Y.S.2d 581 (1996) ............................................................ 32

*New York State Medical Care Facilities Finance Agency v. Bank of
    Tokyo Trust Co.*, 163 Misc.2d 551, 621 N.Y.S.2d 466
    (Sup. Ct. N.Y. County 1994) ................................................................................ 20

*New York University v. Continental Ins. Co.*, 87 N.Y.2d 308,
    639 N.Y.S.2d 283 (1995) ................................................................................. 24, 25

*Norlin v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir. 1984) ....................................... 19

*Ochs v. Simon*, 269 B.R. 502 (Bankr. E.D.N.Y. 2001) .............................................. 28

*Rabinowitz v. Kaiser-Frazer Corp.*, 111 N.Y.S.2d 539 (Sup. Ct.
    Kings County 1952) .............................................................................. 12, 14, 15, 21

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*,
    2010 N.Y. Slip Op. 02678, 2010 WL 1233516 (Apr. 1, 2010) ........................... 21

*S&K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir. 1987) ........................................ 36

*Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211
    (2d Cir. 2003) .......................................................................................................... 8

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37
    (S.D.N.Y. 1991) ...................................................................................................... 37

*Teachers Ins. & Annuity Ass'n of Am. v. Crimii Mae*, No. 06-0392
    (LAK), 2010 U.S. Dist. LEXIS 9210 (S.D.NY. Feb. 3, 2010) ...................... 12, 27

*Tenzer, Greenblatt, Fallon & Kaplan v. Ellenberg*, 199 A.D.2d 45,
    604 N.Y.S.2d 947 (1st Dep't 1993) ...................................................................... 28

*United States Trust Co. v. First Nat'l City Bank*, 57 A.D.2d 285,
    394 N.Y.S.2d 653 (1st Dep't 1977) ...................................................................... 20

*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375 (2d Cir. 1995) ........................... 8

*Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427 (S.D.N.Y. 2007)................................................. 29, 32

*Vitale v. Steinberg*, 307 A.D.2d 107, 764 N.Y.S.2d 236
    (1st Dep't 2003) ............................................................................................ 36, 37

*White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422,
    835 N.Y.S.2d 530 (2007).......................................................................................... 32

*Winn v. Shafer*, 499 F. Supp. 2d 390 (S.D.N.Y. 2007) ................................................. 16

## Statutes

Fed. R. Civ. P. 12(b)(6)............................................................................................ 8, 39

Fed. R. Civ. P. 23.1 ............................................................................................ 19

Fed. R. Civ. P. 8(d) ............................................................................................ 38

New York Martin Act (N.Y. Gen. Bus. Law §§ 352 *et seq.*) ....................................... 39

Securities Act of 1933 Section 17 (15 U.S.C. § 77q) ................................................. 39

## Other Authorities

D. Lucas, L. Goodman, F. Fabozzi, R. Manning, *Developments in
    Collateralized Debt Obligations* 141-42 (2007)....................................................... 2

Restatement, *Conflict of Laws* § 183, comment b (1934)........................................... 16

Plaintiff R. Davis Howe ("Plaintiff") respectfully submits this Memorandum of Law and the accompanying Declaration of Robert Sidorsky, executed on April 23, 2010 ("Sidorsky Decl.") in opposition to the motions to dismiss the First Amended Complaint herein ("Am. Compl.") filed by defendant and nominal defendant The Bank of New York Mellon, in its capacity as Indenture Trustee (the "Trustee" or "BNY Mellon"), and nominal defendant Preferred Term Securities XX, Ltd. ("PreTSL XX"), and the joint motion to dismiss filed by defendants Bimini Capital Management, Inc. ("Bimini Capital") and Hexagon Securities LLC ("Hexagon").

## PRELIMINARY STATEMENT

Plaintiff has stated claims for breach of contract and breach of fiduciary duty against the Trustee, which claims are brought both in Plaintiff's individual capacity and derivatively.[1] Am. Compl., First, Second, Fifth and Sixth Claims for Relief.  Plaintiff has also stated claims against Bimini Capital and Hexagon, both individually and derivatively, for tortious interference with contract (Third and Fourth Claims for Relief), aiding and abetting the Trustee's breach of fiduciary duty (Seventh and Eighth Claims for Relief), and unjust enrichment (Ninth and Tenth Claims for Relief).  The Amended Complaint also properly sets forth a derivative claim against Bimini Capital for rescission (Eleventh Claim for Relief).[2]

## FACTUAL BACKGROUND

### A.    The PreTSL XX CDO

PreTSL XX is a collateralized debt obligation ("CDO"), which issued $631,750,000 in Notes pursuant to an Offering Circular dated December 16, 2005.   *See* Am. Compl. ¶ 11;

---

[1]  Plaintiff is the owner through an IRA of $10,130,444 of Income Notes issued by PreTSL XX.  Am. Compl. ¶ 6. Plaintiff's holdings therefore represent just over 24 percent of the $42,200,000 in Income Notes issued by PreTSL XX.

[2]  Capitalized terms used herein and not otherwise defined are defined in the Indenture entered into among PreTSL XX, as Issuer, and BNY Mellon, as Indenture Trustee, dated as of December 15, 2005, a copy of which is Exhibit A to the Amended Complaint.

Declaration of Benjamin P. McCallen, executed on March 26, 2010 ("McCallen Decl."), Exh. C.

The Notes are structured in layers or tranches consisting of classes of Senior Notes, Mezzanine

Notes, and Income Notes (collectively the "Notes").[3]  *See* Am. Compl. ¶ 12.  PreTSL XX used

the proceeds from the offering to acquire a portfolio of securities, including the Bimini TruPS.[4]

*See* Am. Compl. ¶ 13.  PreTSL XX's investment assets, including the Bimini TruPS, were

pledged as collateral by PreTSL XX pursuant to the terms of the Indenture.  *See* Am. Compl. ¶

13.

**B.   The Indenture**[5]

Pursuant to the terms of the Indenture, PreTSL XX granted to the Trustee, for the benefit

of itself and the Holders of the Notes, including Plaintiff, all of PreTSL XX's right, title and

interest in the Collateral Securities, including the Bimini TruPS.  *See* Am. Compl. ¶ 15; Exh. A,

Indenture, at 1.  The Indenture therefore created a trust with the Collateral Securities, including

the Bimini TruPS, constituting and comprising the Trust Estate as defined in the Indenture.  *See*

Am. Compl. ¶ 15; Exh. A, Indenture, at 29.

The income stream from the Collateral Securities, including the proceeds from the sale or

liquidation of any of the Collateral Securities, is distributed to the tranches of noteholders in

---

[3]  The various tranches consist of $332,300,000 Floating Rate Class A-1 Senior Notes; $84,600,000 Floating Rate Class A-2 Senior Notes; $75,500,000 Floating Rate Class B Mezzanine Notes; $42,850,000 Floating Rate Class C Mezzanine Notes; $54,300,000 Floating Rate Class D Mezzanine Notes; and $42,200,000 Subordinate Income Notes.  All of the Notes are due March 22, 2038.  *See* Am. Compl., Exh. A, at cover page.

[4]  In general, trust preferred securities make periodic fixed or variable interest payments and mature at face value. Interest payments on TruPS are cumulative, meaning that if a TruPS misses its coupon one period, it has the obligation to make up the missed interest payment and pay interest on interest.  *See* D. Lucas, L. Goodman, F. Fabozzi, R. Manning, *Developments in Collateralized Debt Obligations* 141-42 (2007).

[5]  In their factual statement, Bimini Capital and Hexagon refer to certain "Risk Factors" that were identified in the Offering Circular.  *See* Memorandum of Law in Support of the Motion of Defendants Bimini Capital Management, Inc. and Hexagon Securities, LLC to Dismiss ("Def. Joint Mem.") at 4.  None of these risk factors, however, has any relevance to Plaintiff's claims.  On the contrary, the Offering Circular did not identify the risk that the Trustee would permit the sale of performing, non-defaulted Collateral Securities for less than their face value in breach of the Indenture and its fiduciary duties.  Pursuant to the Section 3.8 of the Indenture, the sale, transfer or exchange of any Collateral Securities is prohibited, except as expressly permitted in the Indenture.  *See* Am. Compl., Exh. A, Indenture, § 3.8, at 60.

accordance with their respective priority of payment as set forth in the Indenture, commonly referred to as the "waterfall." *See* Am. Compl. ¶ 16; Exh. A, Indenture, § 8.4. Thus, in the event that a Collateral Security is sold or liquidated prior to maturity and/or for less than the par value of the principal, the amount available for distribution as principal and interest to noteholders is diminished. *See* Am. Compl. ¶ 12.

Plaintiff's Income Notes are subordinate in priority of payment to the Holders of the Senior Notes and the Mezzanine Notes. *See* Am. Compl., Exh. A, Indenture, §§ 8.4 and 8.8. Accordingly, the Income Notes do not bear interest and represent a residual interest in any funds available for distribution in the waterfall after payment of principal and interest on the Senior Notes and Mezzanine Notes. *See* Am. Compl., Exh. A, Indenture, § 2.8; Affidavit of Stuart Rothenberg, sworn to March 24, 2010 ("Rothenberg Aff."), Exh. 3, Specimen Note, at 5. They are in essence the "equity" tranche of the CDO, recognized as such for income tax purposes. *See* Rothenberg Aff., Exh. 3 at 7, ¶ 9 ("The Co-Issuers will treat the Senior Notes and the Mezzanine Notes as debt for United States federal income tax purposes and the Issuer will treat the Income Notes as equity for United States federal income tax purposes.").

### C.   The Restrictions on Any Sale or <u>Disposition of PreTSL XX's Collateral Securities</u>

PreTSL XX is a "static" CDO in which the Collateral Securities are not traded by the Trustee or a collateral manager. *See* Am. Compl. ¶ 17. Accordingly, the Collateral Securities must be preserved and safeguarded in the Trust Estate by the Trustee and may only be sold or liquidated in the limited and narrowly prescribed circumstances set forth in the Indenture.[6] *See* Am. Compl. ¶ 17.

---

[6] In this regard, Section 3.8 of the Indenture provides that so long as any Notes are outstanding, the Issuer may not "except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of any of the properties or assets of the Issuer, including those included in the Trust Estate." Am. Compl., Exh. A, Indenture, § 3.8, at 60.

In particular, Article 5 of the Indenture sets forth the specific remedies that are available to the Trustee upon the occurrence of an "Event of Default" as identified in Section 5.1.  These Events of Default each involve or relate to an actual default by PreTSL XX as the Issuer, including a default in payment of any interest on the Senior or Mezzanine Notes, a default in the payment of principal of any Note at the stated maturity date, a covenant breach by the Issuer, or commencement of a bankruptcy proceeding by the Issuer.  *See* Am. Compl., Exh. A, Indenture, § 5.1, at 69-70.  Upon the occurrence of an Event of Default, the Trustee may sell the Collateral Securities in the Trust Estate, or any portion thereof.  *See* Am. Compl. ¶ 18; Exh. A, Indenture, § 5.4.  In addition, pursuant to Section 5.16(b) of the Indenture, the Trustee is permitted to "dispose of a defaulted Collateral Security at the direction of the Requisite Noteholders."  *See* Am. Compl. ¶¶ 19 and 20; Exh. A, Indenture, § 5.16(b).  The term "defaulted Collateral Security" is not defined in the Indenture.

Thus, the Trustee has no discretion, right or authority to sell, transfer, exchange or dispose of a Collateral Security, such as the Bimini TruPS, unless there is either (a) an Event of Default (*i.e.*, the occurrence of a default by PreTSL XX); or (b) the underlying security in the Trust Estate is a "defaulted Collateral Security."  *See* Am. Compl. ¶ 24.

### D.    Bimini Capital Induces the Trustee to Authorize the Repurchase of the Performing, Non-Defaulted Bimini TruPS in Violation of the Indenture

By letter dated June 19, 2009, Robert E. Cauley, the Chairman and CEO of Bimini Capital, wrote to Chris Grose of BNY Mellon (the "Cauley Letter"), stating that "we now need to repurchase our trust preferred debt (our TruPS) if we are to survive" and that it is an "**OUTRAGE**" that the Trustee "now contends that the indentures for the PreTSL deals do not permit cash repurchases to occur."  *See* Am. Compl. ¶¶ 25-26; Rothenberg Aff., Exh. 4.  The Cauley Letter, through thinly-veiled threats, sought to pressure the Trustee to bless Bimini

4

Capital's tender offer to repurchase the $50 million in Bimini TruPS held by PreTSL XX and PreTSL XXI, both of which, as acknowledged in the Cauley Letter, are static, non-trading CDOs.  *Id*.  After Mr. Grose[7] received the Cauley Letter, the Trustee thereafter acceded to the pressure and threats from Bimini Capital by permitting the tender offer to repurchase the Bimini TruPS to proceed, notwithstanding that the sale or repurchase of a non-defaulted Collateral Security is expressly prohibited under the terms of the Indenture.  *See* Am. Compl. ¶ 28.

### E. <u>The Wrongful and Illegal Bimini Tender Offer and Consent Solicitation</u>

On June 30, 2009, shortly after the date of the Cauley Letter, Bimini Capital made an offer to purchase (the "Tender Offer") for cash the $24 million of Bimini TruPS held by PreTSL XX for $8.5 million, and the Trustee solicited the consent of the Senior Noteholders pursuant to a Notice of Offer and Request for Direction (the "Notice of Offer").  *See* Am. Compl. ¶ 30; Rothenberg Aff., Exh. 5.

The Notice of Offer, which was subsequently supplemented and amended,[8] was false and misleading in that it (a) misrepresented that the Tender Offer was based upon and authorized by the terms of Section 5.16(b) of the Indenture, when in fact no default had occurred with respect to the Collateral Security and (b) contained material omissions of fact in failing to disclose any information regarding the nature of the purported default, the manner of its determination, or the financial condition of Bimini Capital.  *See* Am. Compl. ¶ 32.

Moreover, in order to induce the Holders of the Senior Notes to vote in favor of the Tender Offer, Bimini Capital paid separate, additional consideration of $3.3 million to certain of the Holders of the Senior Notes.  *See* Am. Compl. ¶ 35; McCallen Decl., Exh. O, Bimini Capital

---

[7]  Mr. Grose subsequently left BNY Mellon and is currently employed by Hexagon, defendant Bimini Capital's financial adviser.  *See* Am. Compl. ¶ 27.

[8]  The amendments to the Notice of Offer and Tender Offer extended the response time and increased the offer price, which eventually became $10.8 million.

Press Release dated October 21, 2009.  Thus, Bimini Capital, with the assistance of Hexagon, effectively paid-off the Holders of the Senior Notes to approve the sale of the Bimini TruPS to Bimini Capital for substantially less than the principal amount of the Bimini TruPS.[9]

Although Hexagon asks this Court to conclude that it was a mere bystander, Hexagon assisted Bimini Capital with every aspect of the Tender Offer and consent solicitation, including the payment of $3.3 million in separate consideration to the Holders of the Senior Notes consenting to the transaction.  *See* Am. Compl. ¶ 35; McCallen Decl., Exh. O, Bimini Capital Press Release dated October 21, 2009 ("Hexagon Securities LLC assisted Bimini Capital in the tender offer vote solicitation process.").  Indeed, Hexagon, in the words of its own Senior Vice President, Jason R. Norton, was "instrumental" in achieving the Tender Offer and "*ran the process from start to finish.*"  *See* Sidorsky Decl., Exh. 1 (Nov. 20, 2009 email from Jason R. Norton to Hugh Stephens) (emphasis added).

In connection with the Tender Offer, the Trustee obtained an opinion letter from Hunton & Williams LLP, as special counsel to Bimini Capital Trust II ("BCT II"), dated October 21, 2009 (the "Opinion Letter").  The Opinion Letter, issued at the end of the Tender Offer process, simply "assumed that the consent of the Requisite Noteholders has been obtained in accordance with Section 5.16(b)," without any discussion of whether a default had occurred for purposes of Section 5.16(b).  Accordingly, the Opinion Letter merely *assumed* the existence of the factual predicate that was required to justify the validity of the Tender Offer.  *See* Am. Compl. ¶ 33; Rothenberg Aff., Exh. 6.  As such, it was meaningless and worthy of no reliance by the Trustee.

---

[9]  The Trustee in its Memorandum of Law in Support of Its Motion to Dismiss ("BNY Mellon Mem.") at 6 observes that some 90.63% of the Requisite (Senior) Noteholders voted to accept the Tender Offer, but overlooks that the Tender Offer was an impermissible transaction under the terms of the Indenture since the Bimini TruPS had not defaulted, the information provided in connection with the Tender Offer was false and misleading, and the Requisite Noteholders were paid $3.3 million by Bimini Capital to vote in favor of the transaction.  Moreover, the Trustee does not reveal how many Senior Noteholders actually voted or whether any voted in favor of the transaction who were not paid directly by Bimini Capital to consent.

6

On October 21, 2009, Bimini Capital announced that it had acquired $24 million of Bimini TruPS from PreTSL XX for $10.8 million, or 45 percent of the principal amount of the Bimini TruPS.  *See* Am. Compl. ¶ 34; McCallen Decl., Exh. O.  Bimini Capital thereafter cancelled the TruPS and, in connection with the cancellation of the TruPS, cancelled its junior subordinated notes issued to BCT II.  *See* McCallen Decl., Exh. O.  As a result of this transaction, Bimini Capital anticipated recognizing a gain of $9.6 million (*see id.*), all at the expense of PreTSL XX's noteholders.  In contrast, the Trust Estate has been depleted of the income stream from the $24 million in Bimini TruPS that were removed from the waterfall and the $13.2 million in principal that has been wrongfully diverted from PreTSL XX's investment portfolio. *See* Am. Compl. ¶ 36.

### F.  **Bimini Capital's Remarkable Financial Recovery**

Despite its professed financial maladies, soon after the buy-back, Bimini Capital leaped from its sickbed without ever filing for bankruptcy and without any payment default by BCT II on the Bimini TruPS.  Moreover, the Bimini TruPS in the principal amount of $26 million are still held in the investment portfolio of PreTSL XXI, another static CDO, and are continuing to perform.  *See* Am. Compl. ¶ 29.

For a company supposedly at death's door, Bimini Capital has had a truly remarkable recovery.  On November 9, 2009, very shortly after completion of the Tender Offer, Bimini Capital declared a $0.50 per share dividend.  This cash dividend, totaling approximately $1.4 million, was paid on November 20, 2009.  *See* Sidorsky Decl., Exh. 2 (Bimini Capital News Release dated Nov. 9, 2009).  Also on November 9, 2009, Bimini Capital declared a $6.50 per share special dividend, and recorded a liability of $18.7 million consisting of both the cash portion of the dividend declared and the fair value of the stock to be issued.  *See* Sidorsky Decl., Exh. 2 and Exh. 3, at 85 (Bimini Capital Annual Report on Form 10-K filed March 15, 2010).

On January 19, 2010, Bimini Capital announced that it paid this special dividend, consisting of approximately $1.9 million in cash and 7,241,446 shares of Class A common stock.  *See* Am. Compl. ¶ 29; Sidorsky Decl., Exhs. 3 and 4 (Bimini Capital News Release dated Jan. 19, 2010). On March 15, 2010, after the filing of the Amended Complaint, Bimini Capital filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2009, in which Bimini Capital reported consolidated net income for 2009 of approximately $45.7 million.  *See* Sidorsky Decl., Exh. 3, at 52.  And on April 5, 2010, Bimini Capital declared a cash dividend of $0.03 per share of Class A and Class B Common Stock for the quarter ended March 31, 2010.  *See* Sidorsky Decl., Exh. 5 (Bimini Capital News Release dated Apr. 5, 2010).

Neither the professed imminent bankruptcy of Bimini Capital, nor the prophesied default of its TruPS ever occurred.  But concocting these risks enabled Bimini Capital to pay handsome dividends to its shareholders in November 2009 and January 2010 in the aggregate amount of $20.1 million, of which $3.3 million was paid in cash.

## <u>Argument</u>

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it is axiomatic that all factual allegations of the pleading are accepted as true, and all inferences are drawn in favor of the pleader.  *See Scutti Enters*., *LLC* v. *Park Place Entm't Corp*., 322 F.3d 211, 214 (2d Cir. 2003).  It is well settled that the issue on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (citation omitted).

While "[a] pleading that offers 'labels and conclusion' or a 'formulaic recitation of the elements of a cause of action will not do,'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and while a claimant's "factual allegations must be enough to raise the right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), a complaint should

nonetheless only be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face."  *Id.* at 570.  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).  In this case, as set forth below, Plaintiff has alleged facts that firmly support each claim with respect to the particular defendant and provide at least facial plausibility for those claims.

**POINT I:**        <u>**THE NO-ACTION CLAUSE IS INAPPLICABLE**</u>

The Trustee's attempt to invoke the "no-action" clause contained in Section 5.6 of the Indenture to bar Plaintiff's claims turns the language of this provision on its head and tosses aside the controlling case law.[10]  As set forth in the Amended Complaint, this provision is inapplicable by its terms and, in any event, is inapplicable because the Trustee's own misconduct is central to each of Plaintiff's claims.  *See* Am. Compl. ¶ 42.

No-action provisions apply according to their terms and are strictly construed.  *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) ); *Metropolitan West Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 U.S. Dist. LEXIS 11761, at *14 (S.D.N.Y. June 25, 2004) ("*Metropolitan West*"); *see also In re Globo Comunicacoes E Participacoes S.A.*, 317 B.R. 235, 248-49 (Bankr. S.D.N.Y. 2004).  Because the no-action clause, by its terms, applies only to claims relating to an "Event of Default," this provision is inapplicable in the circumstances at bar.  Indeed, the gravamen of the Amended Complaint is that no Event of Default occurred, and the Trustee failed to preserve and protect the value of the

---

[10]  Section 5.6 states in relevant part:

> Subject to the provisions of Section 11.5, no Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for any other remedy hereunder, unless:

> (i)  such Holder has previously given written notice to a Responsible Officer of the Indenture Trustee of a continuing Event of Default; . . .

Am. Compl., Exh. A, Indenture, Section 5.6.

Trust Estate by authorizing and participating in the removal of a non-defaulted Collateral Security from the Trust Estate.

The decision in *Metropolitan West* is on point and underscores the Trustee's upside down interpretation of Section 5.6, which would leave Plaintiff with no remedy whatsoever.  In that case, the plaintiff, a junior noteholder, asserted that the no-action provision applied by its terms only to claims relating to an "Event of Default" seeking payment on the notes themselves.[11] Judge Buchwald recognized that "such clauses do not prevent noteholders from bringing extra-contractual tort claims or breach of contract claims that are not of the type to which the 'no action' provision, by its terms, applies."  2004 U.S. Dist. LEXIS 11761, at *14 (citation omitted).

The plaintiff in *Metropolitan West* contended that it was not seeking damages as a result of an uncured Event of Default but was seeking damages based on a wrongful liquidation of collateral securities.[12]  Accordingly, the court held that a claim for mismanagement of the trust collateral and failure to safeguard the plaintiff's rights in connection with the sale or liquidation of that collateral fell outside the scope of the no-action provision.  *Id.* at *14-15.  Similarly, in this case Plaintiff asserts that that the Trustee wrongfully disposed of a Collateral Security that had not defaulted and without protecting Plaintiff's rights in connection with the sale.  The same conclusion therefore follows in this case based on the identical no-action language.  The no-action clause simply does not encompass the claims Plaintiff asserts in this case.  As in

---

[11]  The wording of the no-action clause in the governing indenture in *Metropolitan West* and the Indenture in this case are virtually identical.  *See* 2004 U.S. Dist. LEXIS 11761, at *14.

[12]  There is no meaningful distinction between this case and *Metropolitan West*, as the Trustee argues, based on an "Event of Default" having occurred in *Metropolitan West*.  In this case, PreTSL XX's sale of the TruPS to Bimini Capital in violation of section 3.8 of the Indenture was a breach of the Indenture and therefore a "Default," as defined in the Indenture, which would have triggered an "Event of Default" under section 5.1(v) of the Indenture. *See* Am. Compl., Exh. A, Indenture, at 10 ("'Default' shall mean any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.").  As a practical matter, however, given the Trustee's complicity in and authorization of the transaction constituting the breach, the Trustee obviously took no action to provide written notice of a breach to PreTSL XX as required under section 5.1(v) for purposes of establishing an "Event of Default." *See id.*, § 5.1(v), at 70.  Put another way, the only reason that Section 5.6(i) was not satisfied is that the Trustee did not notify the noteholders of its own breach.

10

*Metropolitan West*, Plaintiff in this case is not seeking to avoid or circumvent other noteholders' priority of payment.  Plaintiff is seeking to recover the value of the collateral improperly diverted from the Trust Estate for distribution in accordance with the waterfall, not to advance his own position at the expense of other noteholders.

Moreover, even assuming for the sake of argument that the no-action clause by its terms were applicable, this case falls squarely within the well-recognized exception carved out by courts for claims based on alleged misconduct by the Trustee.  *See, e.g., Cruden v. Bank of N.Y.*, 957 F.2d at 968 (finding no-action clause inapplicable where plaintiffs alleged breach of the indenture by the trustees); *Metropolitan West*, 2004 U.S. Dist. LEXIS 11761, at *14 n.4 (finding no-action clause inapplicable since alleged wrongdoing by the trustee was a central issue); *Feldbaum v. McCrory Corp.*, C.A. No. 11866, 1992 WL 119095, at *7 (Del. Ch. June 2, 1992) ("bondholders will be excused from compliance with a no-action provision where they allege specific facts which if true establish that the trustee itself has breached its duty under the indenture or is incapable of disinterestedly performing that duty"); *In re Oakwood Homes Corp.*, No. 02-13396 (PJW), 2004 Bankr. LEXIS 1385, 2004 WL 2126514, at *3 (Bankr. D. Del. Sept. 22, 2004) (explaining that "an exception to a no-action clause in an indenture may be found where the cause of action is against the trustee" and holding that although plaintiff was not asserting a claim against the Trustee, the defendant "may have liability exposure by reason of its relationship with the Trustee").[13]

In addition, as further discussed in Point II.A below, it is also well-entrenched in the New York case law that no-action provisions are inoperative with respect to derivative claims brought by noteholders in the right and on behalf of the indenture trustee, such as those asserted by

---

[13]   None of these cases suggests that the exception for Trustee misconduct is in any way tied to whether an Event of Default had occurred or, as here, where the Trustee thwarted the creation of an Event of Default by not providing notice of its own wrongdoing.

Plaintiff in this case (Am. Compl., Second, Fourth, Sixth, Eighth, Tenth and Eleventh Claims for Relief).  *See Campbell v. Hudson & Manhattan R. Co*., 277 A.D. 731, 734-35, 102 N.Y.S.2d 878, 881-82 (1st Dep't 1951); *Gould v. J. Henry Schroder Bank & Trust Co*., 78 A.D.2d 870, 870-71, 433 N.Y.S.2d 32, 34 (2d Dep't 1980).  *See also Rabinowitz v. Kaiser-Frazer Corp*., 111 N.Y.S.2d 539, 547 (Sup. Ct. Kings County 1952).

Finally, the cases cited by the Trustee in its memorandum are readily distinguishable. *Teachers Ins. & Annuity Ass'n of Am. v. Crimii Mae*, No. 06-0392 (LAK), 2010 U.S. Dist. LEXIS 9210 (S.D.NY. Feb. 3, 2010), was decided on cross-motions for summary judgment, not a motion to dismiss.  In that case, plaintiffs asserted neither tort claims nor contract claims that were beyond the scope of the no-action provision.  Moreover, the complaint in *Teachers Ins*. was directed at defendant Crimii Mae Services Limited Partnership ("CMSLP"), which acted as a special servicer of the trust, and was not based on misconduct on the part of the trustee itself. The plaintiff in *Teachers Ins*. was not asking the trustee to sue itself or to sue third parties for misconduct that arose out of the trustee's own actions, but that is exactly the nonsensical situation that would result from the application of Section 5.6 in the context of this case.  Judge Kaplan recognized the Second Circuit's refusal to countenance such an illogical construction, refusing by analogy to require CMSLP's parent to join in the demand to sue its own subsidiary. *See* 2010 U.S. Dist. LEXIS 9219, at *17 (citing *Cruden*, 957 F.2d at 967-68 (it would be "absurd to require the debenture holders to ask the Trustee to sue itself" pursuant to a no-action provision)).  The other authorities cited by the Trustee are equally inapposite.[14]

---

[14]  In the one-paragraph affirmance in *Bank of N.Y. v. Battery Park City Auth*., 251 A.D.2d 211, 675 N.Y.S.2d 860 (1st Dep't 1998), there is no mention of any allegation of misconduct on the part of the trustee, nor are the terms of the no-action clause at issue discussed or spelled out.  Instead, the Court cited *Cruden* and *Feldbaum* approvingly, both of which recognized the well-established exception for claims based on trustee misconduct.  Similarly, in *Feder v. Union Carbide Corp*., 141 A.D.2d 799, 530 N.Y.S.2d 165 (2d Dep't 1988), there was no alleged misconduct by the trustee and plaintiff's claims were lodged against the issuer of the debentures.

In sum, the no-action clause has no applicability here because Plaintiff's claims do not arise from a continuing "Event of Default," nor is Plaintiff unilaterally seeking to improve his position at the expense of other noteholders.  Second, in any event, given that Plaintiff is suing the Trustee for its own misconduct and is suing Bimini Capital and Hexagon for aiding and abetting or otherwise inducing and enabling the misconduct of the Trustee, the well-settled exception to no-action clauses based on the Trustee's own misconduct and dereliction of duty is applicable.  Third, the no-action provision does not apply to the derivative claims brought by Plaintiff in the right and acting in the status of the Trustee.  The Trustee therefore may not shield itself from liability based on Section 5.6 of the Indenture.

## POINT II:    PLAINTIFF HAS PROPERLY PLED THE DERIVATIVE CLAIMS AND HAS STANDING TO BRING THEM

Plaintiff has properly pled its derivative claims on behalf of and in the right of the Trustee and on behalf of PreTSL XX, and has standing to bring those derivative claims.

### A.    Derivative Claims in the Right of the Trustee

The principle that bondholders may bring a derivative action in the right of the trustee was clearly and cogently enunciated by the Appellate Division in *Campbell v. Hudson & Manhattan R. Co.*, 277 A.D. 731, 734-35, 102 N.Y.S.2d 878, 881-82 (1st Dep't 1951) as follows:

> *If a trustee under such an indenture acts in bad faith, or, abdicating its function with respect to the point in question, declines to act at all, bondholders for themselves and others similarly situated may bring a derivative action in the right of the trustee, rather than in their own individual rights as bondholders.*  In that event they are not subject to the limitations of Article Seventh of the Indenture [no-action provision], which are not imposed on the trustee or on bondholders acting in the status of the trustee.  (emphasis added.)

The Court in *Campbell* in turn relied on the earlier opinion of Justice Walter in *Birn v. Childs Co.*, 37 N.Y.S.2d 689 (Sup. Ct. N.Y. County 1942), which drew the parallel between shareholder derivative suits and derivative suits by noteholders as beneficiaries under an indenture.  The court in *Birn* reasoned:

> Suits by stockholders in the right of their corporation upon causes of action vested in the corporation are the creatures and inventions of courts of equity.  Equity also allows other beneficiaries to sue upon causes of action vested in their trustees when the trustee unreasonably refuses to sue.  It sometimes is stressed that these restrictive or no-action clauses are matters of contract and that security holders must be held to their contract, but *the contract, in its entirety, is one which gives rise to a trust, and upon the question of allowing a beneficiary to sue upon a showing of an unreasonable refusal of the trustee to sue I can perceive no difference between a trust based upon contract and one based on status or one arising by operation of law.  <u>In each instance the principle is the same, that equity will not permit a wrong to go unredressed because the trustee unreasonably refuses to sue.</u>*

*Id.* at 697 (emphases added) (citations omitted).  *See also Gould v. J. Henry Schroder Bank & Trust Co.*, 78 A.D.2d 870, 870, 433 N.Y.S.2d 32, 34 (2d Dep't 1980) (recognizing bondholders' right to bring derivative actions arising out of alleged misconduct by indenture trustee); *Rabinowitz v. Kaiser-Frazer Corp.*, 111 N.Y.S.2d 539 (Sup. Ct. Kings County 1952).[15]

The Trustee's contention that Plaintiff lacks standing to bring a derivative claim in the right of the Trustee because he is a noteholder and not a shareholder is simply wrong, and turns a blind eye to the line of cases validating bondholder derivative actions dating back more than 100 years to *Ettlinger v. Persian Rug & Carpet Co.*, 97 Sickels 189, 36 N.E. 1055 (1894).  Plaintiff has properly pled such a claim (*See* Am. Compl. ¶¶ 2, 51, 65, 78, 90, 100 and 106) and has standing to assert it.

Lastly, it is clear in the context of the case law addressing noteholder derivative actions that the Amended Complaint adequately pleads demand futility.  The Trustee mistakenly seeks to graft the requirements of a shareholder derivative action directed at the conduct of the board of directors onto a claim against the Trustee.  Here, it is not the directors' conduct but BNY Mellon's over misconduct in its capacity as Indenture Trustee that is at issue.  Plaintiff has amply

---

[15]   The Delaware Chancery Court has also recognized the appropriateness of bondholder derivative actions in circumstances such as this case, where the facts alleged the Trustee's breach of its duty under the Indenture.  *See Feldbaum v. McCrory Corp.*, C.A. No. 11866, 1992 WL 119095, at *7 (Del. Ch. June 2, 1992) (drawing an analogy between shareholder derivative actions in which demand to sue upon corporate directors is excused and excusing bondholders from compliance with no action provision based on trustee's breach of its duty under the indenture).

alleged facts demonstrating misconduct by the Trustee and its inability to disinterestedly prosecute this action, on behalf of the noteholders, against itself and the other defendants. Based on the factual allegations of this case, demand futility has been amply alleged. *See* Am. Compl. ¶ 40.

In these factual circumstances, demand on the trustee by the individual noteholder is excused.[16] *See Campbell*, 277 A.D. at 734-35; *Gould*, 78 A.D.2d at 870; *see also Cruden*, 957 F.2d at 967-68 (it would be "absurd to require the debenture holders to ask the Trustee to sue itself" pursuant to a no-action provision); *Rabinowitz*, 111 N.Y.S.2d at 543-44, 547; *Feldbaum*, 1992 WL 119095, at *7.

Plaintiff has properly alleged and has standing to bring his claims derivatively in the right and on behalf of the Trustee.

**B.     Derivative Claims on Behalf of the Issuer**

PreTSL XX's arguments are constructed on the faulty foundation that Cayman Islands law governs whether Plaintiff has standing. *See* Memorandum of Law in Support of the Motion of Nominal Defendant Preferred Term Securities XX, Ltd. to Dismiss ("PreTSL XX Mem.") at 3. That is simply incorrect. As agreed by the parties, the internal law of New York, exclusive of its conflicts of law principles, governs resolution of the standing issue. Moreover, even if the parties had not already agreed to that, application of New York's conflict rules would still not lead to the application of foreign law under the "internal affairs" doctrine.

Section 11.11 of the Indenture, to which PreTSL XX is itself a party, expressly states: "This Indenture shall be construed in accordance with the laws of the State of New York *without regard to conflicts of laws principles thereof.*"  Am. Compl., Exh. A, Indenture, § 11.11, at 102

---

[16]   As a practical matter, counsel for Plaintiff did discuss Mr. Howe's intention to assert claims based on the improper sale of the TruPS with counsel for BNY Mellon in advance of filing the original complaint, and BNY Mellon's counsel made it clear that, as Trustee, it would oppose this lawsuit.

(emphasis added).  Having agreed to be bound by the substantive law of New York, PreTSL XX may not now seek to invoke Cayman Islands law to avoid involvement as a nominal defendant in this action.  PreTSL XX has offered no justification for disregarding the plain language of the contract to which it is a party.

Moreover, even if New York conflicts rules were applicable—which they manifestly are not—the "internal affairs" doctrine would nonetheless be inapplicable because none of the Plaintiff's claims implicates the internal conduct or operation of PreTSL XX.  Plaintiff has not accused the directors or officers of PreTSL XX of any misconduct, nor is he seeking to bring claims against them derivatively for breach of fiduciary duty or corporate waste.[17]  As PreTSL XX itself recognizes, "none of Plaintiff's assertions allege any wrongdoing" by PreTSL XX. PreTSL XX Mem. at 1.  Nor is Plaintiff objecting to any conduct occurring in the operation of the corporate enterprise, which is the starting point for application of the "internal affairs" doctrine.  *See Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962) (summarizing New York's "internal affairs" choice of law rule to mean that "[t]he right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation") (quoting Restatement, *Conflict of Laws* § 183, comment b (1934)).

In this case, Plaintiff is bringing claims derivatively against third parties based on his status and rights under the Indenture and the Income Notes, which are governed by substantive New York law, and are contractually binding on PreTSL XX.  Contrary to the suggestion made by PreTSL XX on this motion, Plaintiff's action in suing derivatively on behalf of PreTSL XX

---

[17]  This case is thus readily distinguished from the three cases cited by PreTSL XX, in which the shareholders were seeking to bring claims on behalf of the corporation against current and former directors and officers of the corporation for breach of fiduciary duty.  *See In re BP P.L.C. Derivative Litig.*, 507 F. Supp. 2d 302, 309 (S.D.N.Y. 2007) (Baer, J.); *Feiner Family Trust v. VBI Corp.*, No. 07 Civ. 1914 (RPP), 2007 WL 2615448 (S.D.N.Y. Sept. 11, 2007); *Winn v. Shafer*, 499 F. Supp. 2d 390 (S.D.N.Y. 2007).

would not infringe on, or in any way supplant the role that would otherwise be fulfilled by, PreTSL XX's shareholders because *there are no shareholders* in any meaningful sense of the word.  In order to explain why this is so, it is important to understand the nature of the entity that is PreTSL XX.

PreTSL XX does not function as a conventional corporation with the traditional demarcation between debt and equity. Instead, it is a passive or static investment vehicle— without any management role in investment decisions or trading discretion—and serves as a mere conduit and vessel for the distribution of income through the Indenture waterfall. As a matter of economic reality, PreTSL XX was created, exists and is overseen by the Trustee for the sole benefit of its noteholders.

Although PreTSL XX claims that only shareholders can assert derivative claims under Cayman law, it neglects to point out PreTSL XX *has no shareholders with any beneficial or equity interest*.   Indeed, all of PreTSL XX's ordinary shares are owned by Maples Finance Limited, which holds such shares in a charitable trust, and has no beneficial interest in such shares.  As set forth in the Offering Circular:

> All of the Issuer's issued and allotted Ordinary Shares . . . will be legally owned by Maples Finance Limited (acting in such capacity, the "Share Trustee"), to be held under the terms of a Declaration of Trust under which the Share Trustee will hold such shares on charitable trust . . . .   The Share Trustee will have no beneficial interest in and derive no benefit other than its fees from its holding of the Ordinary Shares . . . .

Sidorsky Decl., Exh. 6, Offering Circular, at 37.  As such, the owner of the ordinary shares is simply paid a fee to serve as "Share Trustee," and has absolutely no economic interest or incentive to bring any action seeking to recover investment assets, such as the Bimini TruPS, which have been wrongfully diverted from PreTSL XX and the Trust Estate in breach of the Indenture.

In terms of economic substance, it is only Plaintiff and the other Holders of the Income Notes who have any genuine "equity" or beneficial ownership interest in PreTSL XX, because it is only these noteholders who have a residual interest in the income generated by PreTSL XX.[18] The true "equity owners," therefore, are Plaintiff and the other Income Note Holders.[19]

This economic reality is reflected in the manner in which the Income Notes are treated for federal income tax purposes.  Reflecting the economic substance of Plaintiff's interest in PreTSL XX, the Income Notes are treated as equity. *See Gilbert v. Commissioner of Internal Revenue*, 262 F.2d 512, 513 (2d Cir. 1959) (tax courts apply a test of "substantial economic reality" to determine the nature of the contribution).  The Offering Circular, relying on the opinion of PreTSL XX's counsel, confirms this as follows:

> Because there is a strong likelihood that under U.S. federal income tax principles the income notes, although denominated as debt, will be treated as equity, the Issuer [PreTSL XX] will treat, and the holders of these Notes by their purchases will agree to treat, the Income Notes as equity for U.S. federal income tax purposes.

*See* Sidorsky Decl., Exh. 6, Offering Circular, at 138.

In assessing whether the true nature of an investment is equity from the standpoint of economic substance, courts have balanced a number of criteria.  *See Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968).  In this case, Plaintiff's residual interest in the income stream that remains after payment of the other tranches of Notes and the absence of any right to payment of interest and principal are hallmarks of an equity investment.

---

[18]  As set forth in the Offering Circular, the Income Notes account for $42,200,000 of the aggregate of $631,750,000 in total notes.  In contrast, PreTSL XX's authorized share capital is only $50,000, none of which constitutes any beneficial interest or "equity" in any meaningful sense of the word. Furthermore, the actual value of the ordinary shares issued and allotted is $250, representing 250 shares at $1 par value.  *See* Sidorsky Decl., Exh. 6, Offering Circular, at 37-38.

[19]  As noted above, the Income Notes carry no fixed coupon, and Holders of those Notes, such as Plaintiff, will receive a return on their investment only if, and to the extent that, the more senior noteholders have received all principal and interest on their notes.

Accordingly, under applicable New York law, Plaintiff has standing to bring claims derivatively in accordance with Fed. R. Civ. P. 23.1(b)(1) based on the equity interest represented by his ownership of the Income Notes. *See Hoff v. Sprayregan*, 52 F.R.D. 243, 247 (S.D.N.Y. 1971) (sustaining derivative standing of holders of convertible debentures for purposes of Rule 23.1); *Entel v. Guilden*, 223 F. Supp. 129, 131-32 (S.D.N.Y. 1963) (upholding derivative standing of owners of corporate warrants).[20]   As stated by the court in *Entel*, 223 F. Supp. at 132:

> if equity content is poured into the mold of warrants by investors and investment bankers, the courts should not be reluctant to deny a measure of protection to holders of warrants which is adequate to sustain such use of the form. . . . The facts that warrants traditionally, albeit somewhat loosely, have been deemed more akin to options than to shares of stock and that only holders of the latter class of security have usually instituted derivative suits cannot and should not bar this court from assessing the features of these warrants which render them essentially equity securities and the concomitant legal rights of their owners.

It is well established that "the internal affairs doctrine is not automatically applied." *In re BP P.L.C. Derivative Litig.*, 507 F. Supp. 2d 302.  *See also Norlin v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984) (rejecting any automatic application of the "internal affairs" choice of law rule); *Greenspun v. Lindley*, 36 N.Y.2d 473, 478, 369 N.Y.S.2d 123 (1975).  It should not be applied in this case.

Plaintiff has standing to bring claims derivatively on behalf of PreTSL XX.[21]

---

[20]  PreTSL XX relies on *Brooks v. Weiser*, 57 F.R.D.  491, 494 (S.D.N.Y. 1972), in which the court distinguished *Hoff* on the ground that it determined standing under the Securities Exchange Act of 1934 for purposes of Rule 23.1, but the court in *Brooks* did not point to any distinction between New York law and federal law with respect to the definition of a shareholder.

[21]  Plaintiff has properly and adequately alleged demand futility.  *See* Am. Compl. ¶ 41. In its memorandum (PreTSL XX Mem. at 5), PreTSL XX tries to dismiss the comment of its counsel that PreTSL XX does not wish to participate in this litigation as a "single alleged off-handed comment," but PreTSL XX's instant motion to dismiss confirms that this off-handed comment did indeed express the Issuer's unwillingness to prosecute these claims.

19

**POINT III:    PLAINTIFF HAS PLED COGNIZABLE
              CLAIMS FOR BREACH OF FIDUCIARY DUTY**[22]

First, as discussed below, it is deeply rooted in New York law that indenture trustees owe a common law fiduciary duty of loyalty to bondholders.  The Trustee cites cases that stand for the unremarkable proposition that the pre-default duties of an indenture trustee "generally are limited to the duties imposed by the indenture."  *See LNC Investments, Inc. v. First Fidelity Bank, Nat'l Assoc*., 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996) (quoting *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co*., 838 F.2d 66, 71 (2d Cir. 1988)).  This does not mean, however, that an indenture trustee is absolved of all extra-contractual fiduciary duties.  As stated in *LNC Investments*: "an indenture trustee must avoid conflicts of interest and discharge its obligations 'with absolute singleness of purpose,' because of the inability of dispersed investors to enforce their rights."  *LNC Investments*, 935 F. Supp. at 1347 (quoting *Dabney v. Chase Nat'l Bank*, 196 F.2d 668, 669-71 (2d Cir. 1952) (L. Hand, J.)).

In *Beck v. Manufacturers Hanover Trust Co*., 218 A.D.2d 1, 11, 632 N.Y.S.2d 520 (1st Dep't 1995), the Appellate Division observed that "it has more recently been held that fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries."  *See also United States Trust Co. v. First Nat'l City Bank*, 57 A.D.2d 285, 295-97, 394 N.Y.S.2d 653, 660-61 (1st Dep't 1977) (holding that the Trust Indenture Act does not abrogate an indenture trustee's common law fiduciary duty of loyalty); *New York State Medical Care Facilities Finance Agency v. Bank of Tokyo Trust Co*., 163 Misc.2d 551, 556, 621 N.Y.S.2d 466 (Sup. Ct. N.Y. County 1994) ("the courts have not been reluctant to impose liability upon indenture trustees [for breach of common law fiduciary duty] in certain circumstances");

---

[22] *See* Am. Compl., Fifth and Sixth Claims for Relief.

*Rabinowitz*, 111 N.Y.S.2d at 546 (denying motion to dismiss claim for breach of fiduciary duty against defendant indenture trustee, finding that the trustee "placed itself in a position which was antagonistic to and in conflict with the interests of the debenture holders."). *See also Broad v. Rockwell Int'l Corp.*, 614 F.2d 418, 432 (5th Cir. 1980)  (analyzing New York law and holding that the indenture trustee "was cloaked with a fiduciary duty to the debentureholders" and whether it "violated that duty is for the jury").[23]

In sum, BNY Mellon as Trustee had a fiduciary duty of loyalty to Plaintiff, and Plaintiff has specifically alleged facts supporting a breach of that duty.  *See* Am. Compl. ¶¶ 72-75.  Here, the Trustee advanced the interests of Bimini Capital at the expense of all the PreTSL XX noteholders, including Plaintiff, by allowing Bimini Capital to repurchase the non-defaulted Bimini TruPS for only 45 percent of their face value.

The Cauley Letter clearly evidences that the Trustee was pressured by Bimini Capital, which was motivated by its own financial self-interest and not the best interests of the noteholders, into a fundamentally conflicted position regarding the legality of the Tender Offer. Yet, rather than commence a declaratory judgment action or seek the approval of all of the noteholders to resolve the conflicting interests, the Trustee authorized the Tender Offer, in spite of its own position as the time, as reflected in the Cauley Letter, "that the indentures for the PreTSL deals do not permit cash purchases to occur."  *See* Rothenberg Aff., Exh. 4.  In caving to

---

[23]  *AG Capital Funding Partners, L.P. v. State Street Bank & Trust*, 11 N.Y.3d 146, 157, 866 N.Y.S.2d 578 (2008), cited by the Trustee, is plainly distinguishable, since the Court granted summary judgment where the breach of fiduciary duty claim was based on failure to perform a ministerial function prescribed by the Indenture with due care.  In this case, the breach of fiduciary duty claims are based on misconduct by the Trustee and not merely on failure to perform ministerial functions, such as failure to provide notice of default, or the filing of false reports by the issuer.  *See Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*, 2010 N.Y. Slip Op. 02678, 2010 WL 1233516 (Apr. 1, 2010).

Bimini Capital's demands, the Trustee assumed a position inconsistent with or in opposition to its duty of loyalty to Plaintiff.[24]

Indeed, subsequent to the sale of the Bimini TruPS, the Trustee has recognized its obligation pursuant to Section 3.8 of the Indenture to solicit the approval of 100% of the noteholders within each class of notes with respect to a proposed repurchase of non-defaulted TruPS securities.  In particular, in connection with a recent offer made by Sterling Financial Corporation ("Sterling") to repurchase all of its outstanding TruPS held by PreTSL XVIII, the Trustee solicited the consent of "100% of the Holders of each Outstanding Note of each Class."[25] Thus, in this case, the Trustee should have solicited the consent of all of the noteholders, including Plaintiff, but failed to do so.

Second, after an Event of Default, the more limited nature of an indenture trustee's duties no longer applies.  This distinction was explained in *LNC Investments*, since "[a]fter an event of default, 'it is . . . only the trustee who is able to act swiftly and effectively to assure . . . that the right of the bondholders to recover what they are owed will ultimately be vindicated.'"  *LNC Investments*, 935 F. Supp. at 1347 (quoting *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d at 12, 632 N.Y.S.2d 520) (after an event of default "it is clear that the indenture trustee's

---

[24]   The Trustee not only allowed itself to be pressured into authorizing a transaction that was contrary to the Indenture and the best interests of Plaintiff, but also effectively allowed itself to be improperly influenced by its own financial interest.  In this regard, the Cauley Letter not so subtly suggests that if the Trustee did not permit the Tender Offer to proceed, Bimini Capital would seek to hold the Trustee liable for Bimini Capital's "material costs" incurred in the offer process and for putting Bimini Capital "in an even shakier financial position."  *See* Rothenberg Aff, Exh. 4.  Confronted with a choice between its own financial interest and that of the noteholders for whom it was supposed to act, the Trustee chose to protect itself.

[25]   The "Notice of Consent Request and Offer to Repurchase" issued by BNY Mellon to the holders of the notes of PreTSL XVIII soliciting their consent to Sterling's repurchase of its TruPS stated:

> Pursuant to Section 3.8 of the Indenture, so long as any Notes are Outstanding, the Issuer is prohibited from selling, transferring, exchanging or otherwise disposing of any of the properties or assets of the Issuer, including those in the Trust Estate. To allow the Issuer to accept the Offer, the Trustee is soliciting the consent and direction of 100% of the Holders of each Outstanding Note of each Class.

*See* Sidorsky Decl., Exh. 7, at 2.

obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture").

Furthermore, the Trustee's post-default duty, "although defined by reference to the indenture, is imposed by operation of New York common law." *LNC Investments*, 935 F. Supp. at 1348. *See also AMBAC Indemnity Corp. v. Bankers Trust Co*., 151 Misc.2d 334, 340, 573 N.Y.S.2d 204, 208 (Sup. Ct. N.Y. County 1991) (Baer, J.) ("After an event of default, [the indenture trustee] concedes, it would have fiduciary obligations."). Thus, BNY Mellon had a pre-default duty of loyalty and, additionally, a post-default fiduciary duty of prudence or due care imposed by operation of New York common law.[26]

Here, the Trustee is afforded no cover by the distinction between its pre-default and post-default fiduciary duties. As discussed, the Amended Complaint alleges facts that establish a claim for breach of the Trustee's fiduciary duty of loyalty. Furthermore, as noted above, the sale of the non-defaulted Bimini TruPS was a breach of the Indenture and therefore a "Default." It is only the Trustee's own failure to act as required by sending a notice of breach to PreTSL XX that prevented the triggering of an Event of Default pursuant to Section 5.1(v) of the Indenture.[27] The Trustee should not be permitted to rely in its defense on the non-occurrence of a condition that was of its own making and is part and parcel of the misconduct at issue. It clearly makes no

---

[26] The Trustee's fiduciary duty following an Event of Default, as defined in the Indenture but imposed by common law, is set forth in Section 6.1(a) as follows:

> (a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

Am. Compl., Exh. A, Indenture, § 6.1(a), at 79.

[27] *See* Am. Compl., Exh. A, Indenture, at § 6.5, at 80 ("If a Default occurs and is continuing and if it is actually known to a Responsible Officer of the Indenture Trustee, the Indenture Trustee shall mail to each Noteholder notice of such Default within thirty (30) days after it is actually known and shall mail to each Rating Agency within three Business Days after it is actually known."). Thus, the Event of Default would have resulted from the Default caused by the unauthorized sale of the Bimini TruPS in breach of the Indenture.

23

sense to predicate the extent of the Trustee's fiduciary duties on whether the Trustee in effect called a default on itself.

Third, Plaintiff's fiduciary duty claims are not duplicative of his breach of contract claims.  As stated in *Hargrave v. Oki Nursery, Inc*., 636 F.2d 897, 899 (2d Cir. 1980), "it does not follow that because acts constitute a breach of contract they cannot also give rise to liability in tort."  Thus, "[w]here the conduct alleged breaches a legal duty which exists 'independent of contractual relations between the parties' a plaintiff may sue in tort."  *Id*. (quoting *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 263 (1958)).  *See New York University v. Continental Ins. Co*., 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283 (1995) ("defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations").  *See also Bullmore v. Ernst & Young Cayman Islands*, 45 A.D.3d 461, 463, 486 N.Y.S.2d 145, 148 (1st Dep't 2007) ("conduct amounting to breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract") (citation omitted).

The Amended Complaint alleges misconduct by the Trustee that is extraneous to the Indenture and that effectively violated the Indenture's prohibition against the sale or disposition of non-defaulted Collateral Securities such as the Bimini TruPS.  Thus, the scope of the fiduciary duty claims is not co-extensive with that of the breach of contract claims.  Specifically, the Amended Complaint alleges wrongful conduct by the Trustee in response to the threat of litigation by Bimini Capital and in connection with the consent solicitation process for the Tender Offer that is beyond the scope of the breach of contract claims.  The Amended Complaint alleges that the Trustee misrepresented "that the Tender Offer was based upon and authorized by

24

the terms of Section 5.16(b) of the Indenture, when in fact no default had occurred with respect to the Collateral Security" and "fail[ed] to disclose any information regarding the nature of the purported default, the manner of its determination, or the financial condition of Bimini Capital." *See* Am. Compl. ¶ 74. *See also New York University*, 87 N.Y.2d at 316 ("where a party engages in conduct outside the contract but intended to defeat the contract, its extraneous conduct may support an independent tort claim").

Accordingly, Plaintiff has stated a claim against the Trustee for breach of fiduciary duty both directly and derivatively.

**POINT IV:   PLAINTIFF HAS ALLEGED COGNIZABLE CLAIMS FOR BREACH OF CONTRACT**[28]

### A.   The "Reasonableness" of the Trustee's Acts Is Not Grounds for Dismissal

The Trustee's initial argument is that it acted "reasonably" at the direction of the Requisite Noteholders, who voted to accept the Tender Offer. *See* BNY Mellon Mem. at 16-17. First, this argument assumes that the Tender Offer was a permissible transaction under the terms of the Indenture when the central allegation of the Amended Complaint is that the Trustee had no right to authorize and solicit consent to the sale of non-defaulted Collateral Securities. Indeed, according to the Cauley Letter, the Trustee had been taking the position that the Tender Offer was not permitted under the terms of the Indenture, much to Mr. Cauley's dismay. *See* Rothenberg Aff., Exh. 4. Second, whether or not the Trustee acted reasonably is not a defense to a claim for breach of contract. Third, whether or not the Trustee in fact acted reasonably by definition raises a series of factual issues, which are disputed and inappropriate for a motion to dismiss.

---

[28]   *See* Am. Compl., First and Second Claims for Relief. The Trustee's arguments are based on the purported "reasonableness" of its conduct, while Bimini Capital and Hexagon also seek to argue that the Bimini TruPS were a "defaulted Collateral Security" for purposes of Section 5.16(b) of the Indenture, despite the absence of any payment default or bankruptcy filing by Bimini Capital. The arguments of Bimini Capital and Hexagon are addressed in Point V.A below.

The Trustee's factual argument that it acted reasonably is based on the unspecified "financial difficulties" that Bimini Capital had been experiencing, as referred to in the Cauley Letter.  *See* Rothenberg Aff., Exh. 4.   Here, Bimini Capital was threatening to cause a prospective default in the Bimini TruPS issued by BCT II if it did not get its way, even though the Bimini TruPS were a performing Collateral Security and had not defaulted.   A generalized threat of a prospective default was not a default under Section 5.16(b), and therefore the approval of the transaction by the Requisite Noteholders, who were paid $3.3 million by Bimini Capital in return for their consent, is no grounds for dismissal of Plaintiff's claims for breach of contract.[29]

Finally, the Trustee's asks the Court to take judicial notice of the financial pressures facing investors in mortgage-backed securities as an excuse for its decision to acquiesce in Bimini Capital's impermissible request.  But Bimini Capital not only never filed for bankruptcy, but on November 20, 2009, it paid a cash dividend of $1.4 million, and on January 19, 2010, it paid a special dividend of $1.9 million in cash and 7,241,446 shares of stock.  Moreover, in its recently-filed 10-K, Bimini Capital reported net income of $45.7 million for 2009.  *See* Sidorsky Decl., Exhs. 2 to 5.   Indeed, the $26 million in Bimini TruPS in the investment portfolio of PreTSL XXI have not defaulted and are continuing to perform.  *See* Am. Compl. ¶ 29.

Rumors of Bimini Capital's imminent demise proved to be greatly exaggerated, if not outright fabrications.

**B.      The Trustee Was Not Entitled to Rely on the Opinion Letter**

The Trustee's argument that it was entitled to rely on the opinion of Bimini Capital's counsel for its authority to act under the Indenture is based on Sections 6.1 and 6.2 of the

---

[29]  The Trustee refers to the statement in the Cauley Letter that the "BBB pieces of these PreTSLs are trading at four cents on the dollar" while the initial tender offer for the Bimini TruPS was for 35 cents on the dollar.  BNY Mellon Mem. at 16-17.  This, however, is a false correlation.  The fact that the lowest-rated piece of the PreTSLs was trading at four cents was all the more reason not to sell performing collateral at such a substantial discount to par value, thereby ensuring that there would be no distribution to the lower tranches of noteholders.

Indenture.   Section 6.1(b)(ii) is conditioned on the "absence of bad faith" on the part of the Trustee, and Section 6.2 requires "good faith" reliance by the Trustee.  *See* Am. Compl., Exh. A, Indenture, §§ 6.1(b)(ii) and 6.2.   The Amended Complaint alleges point blank that the Trustee could not in good faith have relied on the Opinion Letter and acted in bad faith.  *See* Am. Compl. ¶¶ 2, 33, 36.  Plaintiff has pled specific facts to back up its assertion that the Trustee lacked good faith in pretending to rely upon it.  The Opinion Letter is clear on its face that it merely *assumed* the existence of the factual predicate necessary to justify the sale of the Bimini TruPS, without identifying or describing any default for purposes of Section 5.16(b) or any factual basis for the opinion.[30]  *See* Am. Compl. ¶ 33.  The Trustee, given its own knowledge of the prohibition on any sale or disposition of the Collateral Securities, could not in good faith have relied on such a completely circular and unsupported opinion.[31]

Thus, having properly alleged a lack of good faith reliance by the Trustee on the Opinion Letter, this issue is not subject to resolution on a motion to dismiss.  *See, e.g., In re World Trade Ctr. Disaster Site Litig*., 456 F. Supp. 2d 520, 555-56 (S.D.N.Y. 2006) ("Whether Plaintiffs will be able to make a showing of bad faith is a question of fact for the jury that may not be summarily determined.")  *See also Teachers Ins.*, 2010 U.S. Dist. LEXIS 9219, at *24 (defendants failed to demonstrate the absence of a genuine issue of material fact as to whether the special servicer acted in good faith).

---

[30]   The Opinion Letter states: "In addition, we have assumed that the consent of the Requisite Noteholders has been obtained in accordance with Section 5.16(b) of the Indenture."  *See* Rothenberg Aff., Exh. 6.  But consent solicitations are only permissible under Section 5.16(b) if there is a "defaulted Collateral Security."  In effect, therefore, the Opinion Letter *assumed* that a favorable opinion could be rendered.

[31]   This is not a "mere difference of opinion on a legal issue," as the Trustee seeks to characterize it (BNY Mellon Mem. at 19), but rather an issue of whether the Trustee could justifiably rely on an opinion without factual or legal substance, that merely refers to Section 5.16(b) in passing.

### C.     <u>Plaintiff Has Adequately Alleged Damages</u>

Plaintiff has pled facts supporting his damages and from which damages can certainly be reasonably inferred.  It is not the least implausible that Plaintiff has been damaged from the loss of his residual interest in the income stream from the $24 million of Bimini TruPS and the principal amount $13.2 million flowing through the Indenture waterfall.

Plaintiff has also alleged damages derivatively based upon the depletion of both the Trust Estate and PreTSL XX's investment assets in the principal amount of $13.2 million, as well as the loss to the Trust Estate of the stream of income that would have accrued from the $24 million in Bimini TruPS.  *See* Am. Compl. ¶¶ 56, 70, 82, 94 and 103.

As a general matter, damages are "a factual matter that cannot be determined on a motion to dismiss."  *Ochs v. Simon*, 269 B.R. 502, 514 (Bankr. E.D.N.Y. 2001).  *See also Tenzer, Greenblatt, Fallon & Kaplan v. Ellenberg*, 199 A.D.2d 45, 604 N.Y.S.2d 947 (1st Dep't 1993) (counterclaim-plaintiff was not obliged to show at the pleading stage that she actually sustained damages if damages might be reasonably inferred).  The Trustee pins its argument on the absence of any entitlement to payment of interest or principal under the terms of the Income Notes but that does not mean Plaintiff has not been damaged by the loss of quantifiable amounts from the Trust Estate in which he has a stake.  Plaintiff is entitled to prove the value of his damages allocable to the loss of income from the Indenture waterfall in which he has a residual or equity interest as the holder of Income Notes.  *See* Am. Compl. ¶¶ 48, 62, 75, and 87.[32]

---

[32]  In *Gordon v. Dino De Laurentis Corp.*, 141 A.D.2d 435, 529 N.Y.S.2d 777 (1st Dep't 1998), the one case cited by the Trustee, no facts showing damages were alleged.

**POINT V:**     **PLAINTIFF HAS STATED A CLAIM AGAINST BIMINI CAPITAL AND HEXAGON FOR <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>**

Plaintiff has clearly pled claims for tortious interference with contract against Bimini Capital and Hexagon,[33] both directly and derivatively, based on (1) the Trustee's breach of the Indenture, (2) Bimini Capital's and Hexagon's knowledge of the breach of the Indenture, (3) and their intentional and improper procurement of the breach (*i.e.*, without justification) through, *inter alia*, the Cauley Letter, payments of consideration directly to the Senior Noteholders, and their involvement in the consent solicitation process leading to the repurchase of the Bimini TruPS in violation of the Indenture.[34]   As set forth in *Findley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996), under New York law the elements of a claim for tortious interference with contract are: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of that contract; and (d) that the breach resulted in damage to the plaintiff."  *See also Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007) (Baer, J.).

**A.     The Sale of the Non-Defaulted Bimini <u>TruPS Was a Breach of the Indenture</u>**

Plaintiff has incontrovertibly alleged a breach of the Indenture for purposes of stating a claim for tortious interference with contract.  *See* Am. Compl. ¶¶ 46, 54.  The indisputable fact is that the Bimini TruPS had not defaulted with respect to payment of interest or principal and were a performing Collateral Security.  *See* Am. Compl. ¶¶ 35-36.  Defendants' contention that nevertheless the Bimini TruPS constituted a "defaulted Collateral Security" for purposes of Section 5.16 of the Indenture is contradicted by the language of the Indenture itself, and is replete with factual arguments regarding Bimini Capital's possible development of restructuring

---

[33]  Bimini Capital and Hexagon are also collectively referred to as "defendants" in Points V through VIII.

[34]  *See* Am. Compl., Third and Fourth Claims for Relief.

alternatives that are outside the scope of the Amended Complaint and provide no support for defendants' position.

Defendants acknowledge that the term "defaulted Collateral Security" is not defined in the Indenture, but nevertheless argue that there need not be a "formal default in the payment of interest or principal," by analogy to the definition of the term "Defaulted Security" in the Indenture.  *See* Def. Joint Mem. at 15; Am. Compl., Exh. A, Indenture, at 10.  The open-ended interpretation of the term "default" would invest the Trustee with broad discretion to authorize the disposition of Collateral Securities that are fully performing, which would be flatly in conflict with Section 3.8 and the defined exceptions.[35]

In any event, the definition of a "Defaulted Security" undercuts defendants' argument, since the Bimini TruPS would not have fallen within even this more expansive definition.  Of the various circumstances giving rise to a "Defaulted Security," the only one singled out by defendants as purportedly applicable is a "DS Avoidance Event," which is defined with respect to any Collateral Security as follows:

> any (i) bankruptcy, insolvency or receivership proceeding has been initiated with respect to the related Collateral Security Issuer or the related Corresponding Debenture Issuer, if applicable, or (ii) *proposed or effected distressed exchange or other debt restructuring in which the related Collateral Security Issuer or the related Corresponding Debenture Issuer, if applicable, has offered the holder of such Collateral Security*, the related Corresponding Debenture or any debt ranking *pari passu* or senior to such security *a new security or package of securities that, in the reasonable judgment of the Rating Agencies, has the purpose of helping such Collateral Security Issuer or the related Corresponding Debenture Issuer to avoid default thereunder.*

*See* Am. Compl., Exh. A, Indenture, at 12 (emphasis added).

---

[35]  Moreover, consistent with this interpretation of "default," Section 5.16(b) provides that with respect to a more technical type of default, *i.e.*, a "breach of a representation or warranty" in the underlying indenture for a Collateral Security that materially adversely affects the Issuer, then the Requisite Noteholders may direct the Indenture Trustee to exercise the Issuer's rights but not "unless the Trustee receives a confirmation from each Rating Agency that such disposition will not result in the reduction, withdrawal or negative ratings of its then current ratings for the Senior Notes or Mezzanine Notes."  *See* Am. Compl., Exh. A, Indenture, § 5.16.  This provision further reinforces that a "defaulted Collateral Security" was intended to be read narrowly.

Thus, even under the overly expansive and inapplicable interpretation urged by defendants, there was no "DS Avoidance Event" with respect to the Bimini TruPS. Bimini Capital did not file for bankruptcy and did not propose a debt restructuring in which it offered a new security or package of securities that, in the reasonable judgment of the Rating Agencies, had the purpose of helping Bimini Capital avoid default.[36]

Plaintiff has properly alleged that the Trustee's action in permitting repurchase of the Bimini TruPS constitutes a breach of the Indenture.

## B.   The "Economic Interest" Defense Does Not Apply

Defendants incorrectly invoke the "economic interest" defense in an ill-considered attempt to hold Plaintiff to a higher standard that would require allegations that defendants acted with malice, fraud or illegality. *See* Def. Joint Mem. at 16. As discussed below, the economic interest defense is inapplicable to this case, and, in any event, it is a defense, not a pleading standard.

The economic interest or economic justification defense "is not applicable, however, where the contract is valid and enforceable and known to the defendant that intentionally seeks its breach for its own economic advantage." *See Island Rehabilitative Services Corp. v. Maimonides Medical Center*, 19 Misc.3d 1108(A), 2008 WL 786507, at *8 (Sup. Ct. Kings County 2008). *See also Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317,

---

[36]   In their brief, Bimini Capital and Hexagon conveniently omit this requirement of offering a new security or package of securities subject to evaluation by the Rating Agencies, so as to create the misimpression that any proposal by the issuer of a Collateral Security to restructure would constitute a "Defaulted Security." *See* Def. Joint Mem. at 15. Moreover, the requirement of review by the Rating Agencies is clearly intended to insure an objective analysis of the transaction so as to achieve the intended purpose. The definition of a "DS Avoidance Event" therefore only underscores that the Bimini TruPS were not a "defaulted Collateral Security." Finally to support its erroneous argument, Bimini Capital and Hexagon refer to press releases and announcements issued by Bimini Capital in *The Wall Street Journal* inviting noteholders of PreTSL XX and PreTSL XXI to participate in conference calls. *See* McCallen Decl., Exhs. F to I. These documents raise factual issues outside the scope of the Amended Complaint and, in any event, they certainly do not constitute a formal restructuring proposal for purposes of establishing a "Defaulted Security." Rather, these documents merely refer to "the possible formation of an informal working group that could facilitate discussions," among noteholders, which "may include the development and consideration of restructuring alternatives . . . ." *See, e.g.*, McCallen Decl., Exh. F.

318 (1st Dep't 2006) ("Since the cause of action is for interference with an existing contract, rather than a prospective economic relationship, the defense of economic justification is inapplicable.").

The rationale for distinguishing between interference with an existing contract as opposed to a prospective economic relationship was explained in *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc*., 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581 (1996), in which the Court of Appeals stated:

> Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior.  Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant [citations omitted].

Moreover, as discussed by this Court in *Vinas v. Chubb Corp*., the economic interest defense is limited to a third party that "act[s] to protect its legal or financial stake in the breaching party's business."  499 F. Supp. 2d at 431 (quoting *White Plains Coat & Apron Co. v. Cintas Corp*., 8 N.Y.3d 422, 835 N.Y.S.2d 530 (2007)).  Here, Bimini Capital and Hexagon have no legal or financial stake in BNY Mellon's business or the operation of the Indenture akin to an ownership interest or parent-subsidiary relationship.  Nor is there any relationship between defendants and BNY Mellon, as the breaching party, of the type giving rise to the economic interest defense.[37]  Accordingly, it is abundantly clear that the economic interest defense has no applicability in this case.  *See Vinas*, 499 F. Supp. 2d at 434 (denying motion to dismiss tortious

---

[37]  As recognized in *Vinas*, the application of the economic interest defense has been limited to situations "where defendants were significant stockholders of the breaching party's business, where defendant and the breaching party had a parent-subsidiary relationship, where defendant was the breaching party's creditor, and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff."  499 F. Supp. 2d at 432 (quoting *White Plains Coat*, 8 N.Y.3d at 426).

interference claims since relationship between issuer of surety bond and contractor did not qualify for economic interest defense).[38]

Even if the economic interest defense did apply, which it definitely does not, it is, by definition, an affirmative defense on which defendants have the burden of proof. *See Momentive Performance Materials USA, Inc.* v. *Astro Cosmos Metallurgical, Inc.*, 1:07-CV-567 (FJS/DRH), 2009 U.S. Dist. LEXIS 45941, at *14-15 (N.D.N.Y. June 1, 2009) ("fatal flaw" of relying on the economic interest defense to support a motion to dismiss is that it is a defense to plaintiff's claims, on which defendant has the burden of proof). Thus, "as long as Plaintiff's allegations are sufficient to state facially plausible claims for tortious interference, the Court cannot grant [defendant's] motion to dismiss based on [defendant's] mere assertion of the business justification defense."[39] *Id.* at *15.

Lastly, the allegations of tortious interference with contract sufficiently identify the conduct of Hexagon, which advised and assisted Bimini Capital with the impermissible Tender Offer and, by its own admission, was "instrumental" in procuring the repurchase of the Bimini TruPS by Bimini Capital—the transaction that is the focus of the allegations of breach—and "ran the process from start to finish." *See* Am. Compl. ¶¶ 35-36; Sidorsky Decl., Exh. 1.

Accordingly, Plaintiff has stated cognizable claims for tortious interference with an existing contract against both Bimini Capital and Hexagon.

---

[38]  In *Imtrac Indus., Inc.* v. *Glassexport Co.*, No. 90 Civ. 6058 (LBS), 1996 WL 39294, at *8 (S.D.N.Y. Feb. 1, 1996), cited by defendants, the parties accused of tortious interference were shareholders and a wholly owned subsidiary of the breaching party. In *American Protein Corp.* v. *AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988), the defendants were directors of the Swedish parent corporation whose subsidiary had contracted with the allegedly breaching party. These cases therefore exemplify the typical situation where the economic interest defense is applied in the context of a shareholder or parent-subsidiary relationship.

[39]  In any event, the Amended Complaint does allege facts that support an inference of fraud or malice, including that the consent solicitation documents contained knowing misrepresentations or material omissions of fact and that Bimini Capital and Hexagon improperly arranged to pay consideration directly to the Senior Noteholders to procure their consent to the Tender Offer. *See* Am. Compl. ¶¶ 32, 35.

**POINT VI:     PLAINTIFF HAS STATED A CLAIM AGAINST
                BIMINI CAPITAL AND HEXAGON FOR AIDING
                AND ABETTING BREACH OF FIDUCIARY DUTY**[40]

Under New York law, a claim for aiding and abetting breach of fiduciary duty requires: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (citations omitted). A defendant, in turn, knowingly participates in a breach of fiduciary duty by providing "substantial assistance" to the primary violator. *See Kaufman v. Cohen*, 307 A.D.2d 113, 126, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) (citations omitted). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.*

First, as set forth in Point III above, Plaintiff has more than adequately pled a primary claim for breach of fiduciary duty against the Trustee.

Second, Plaintiff has alleged that Bimini Capital and Hexagon had actual knowledge of the Trustee's breach of fiduciary duty, *i.e.*, that defendants "*knowingly* provided material and substantial assistance to such breaches of fiduciary duty." *See* Am. Compl. ¶ 84 (emphasis added). Bimini Capital and Hexagon knew full well that PreTSL XX was a static CDO that could not trade or sell its Collateral Securities and, as acknowledged in the Cauley Letter, "[w]e know that our options are very limited for dealing with the static CDOs . . . ." *See* Rothenberg Aff., Exh. 4. Although defendants knew that the Trustee had a duty to prevent diversion of non-defaulted Collateral Securities from the Trust Estate, by Hexagon's own admission, it was running the Tender Offer from start to finish, and Bimini Capital actively instigated and induced the Trustee to change its position that the "PreTSL deals do not permit cash repurchases to

---

[40] *See* Am. Compl., Seventh and Eighth Claims for Relief.

occur." *Id.*  The high-pressure tactics of Bimini Capital and Hexagon ultimately resulted in the repurchase of the Bimini TruPS for less than half their face value, after some of the Senior Noteholders were paid directly by Bimini Capital for their consent.  *See* Am. Comp. ¶¶ 85-86. These facts are sufficient to infer actual knowledge by both defendants of the Trustee's breach of its fiduciary duty to Plaintiff and other noteholders.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d at 294 (bank's knowledge of lawyer's commingling of funds provided basis for aiding and abetting claims).

Third, the Amended Complaint pleads facts establishing a claim for aiding and abetting based on both knowing inducement of the Trustee's breach of fiduciary duty and the provision of substantial assistance.  Plaintiff alleges that Bimini Capital induced the Trustee to authorize the impermissible Tender Offer by means of the Cauley Letter.  *See* Am. Compl. ¶¶ 28, 74.  The Amended Complaint spells out that "Bimini Capital assisted with the breaches of fiduciary duty of BNYM by purchasing the TruPS in violation of the terms of the Indenture and at a substantial discount and by paying additional consideration of approximately $3.3 million directly to Consenting Senior Holders as an inducement to the Consenting Senior Holders to consent to the wrongful sale."  *See* Am. Compl. ¶ 93.

Hexagon assisted with those breaches of fiduciary duty by providing advice and assistance to Bimini Capital in connection with the consent solicitation and Tender Offer.  *See* Am. Compl. ¶ 93.  Hexagon was "instrumental" in achieving Bimini Capital's repurchase of the Bimini TruPS and "ran the process from start to finish."  *See* Sidorsky Decl., Exh. 1.  There is simply no denying that Hexagon provided substantial assistance to the Trustee's alleged breaches of fiduciary duty through its structuring of the Tender Offer and involvement in the consent solicitation process, including arranging for payments to the Senior Noteholders to obtain their consent.  *See* Am. Compl. ¶¶ 92-93; *S&K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 848-49 (2d Cir.

1987) (factfinder was required to do no more than find that the third party knew of the breach of duty and participated in it, as the "tort of participation in a fiduciary's breach of duty simply does not require proof of an intent to harm").

The Amended Complaint therefore states claims for aiding and abetting breach of fiduciary duty against Bimini Capital and Hexagon.

## POINT VII:  PLAINTIFF HAS STATED A CLAIM AGAINST BIMINI CAPITAL AND HEXAGON FOR UNJUST ENRICHMENT[41]

To state a claim for unjust enrichment under New York law, plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch, Ltd., L.P. v. Phoenix Pictures, Inc*., 373 F.3d 296, 306 (2d Cir. 2004).

In this case, there is no express contract between Plaintiff and either Bimini Capital or Hexagon that would serve to bar a quasi-contractual claim.  Nevertheless, defendants rely on cases that hold that a claim for unjust enrichment may be precluded by the existence of a contract that explicitly covers the specific subject matter of the plaintiff's claims, even if one of the parties to the lawsuit is not a party to the contract.

The cases relied on by defendants[42] are easily distinguished, and involved circumstances, unlike here, where the underlying contract contained specific payment terms that governed the parties' rights and the allowable recovery, and therefore negated a claim for unjust enrichment. In *American Medical Assoc*., the case defendants principally rely upon, there was an identity of issue between the terms of the underlying contract and the claim for unjust enrichment.  In that case, the underlying contract between the counterclaim-plaintiff insurers and the insurance

---

[41]  *See* Am. Compl., Ninth and Tenth Claims for Relief.

[42]  *American Medical Assoc. v. United Healthcare Corp*., No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) (citing *Vitale v. Steinberg*, 307 A.D.2d 107, 111, 764 N.Y.S.2d 236, 239 (1st Dep't 2003)); *see also Chadirjian v. Kanian*, 123 A.D.2d 596, 598, 506 N.Y.S.2d 880 (2d Dep't 1986).

beneficiaries included terms setting the reimbursements payable for the provision of medical services.  Thus, the unjust enrichment claim against the counterclaim-defendant physician was based on and specifically sought to enforce the contractual reimbursement rates, which the court found governed the terms of reimbursement for the medical services provided by the physician.  *See* 2007 WL 683974, at *11.  Similarly, in *Vitale*, the calculation of profits for which plaintiff sought recovery was governed by the plan agreement.  *See* 307 A.D.2d at 109.

This case therefore involves a very different situation from cases in which a claim for unjust enrichment was precluded because the underlying contract specifically provided the mechanism for the calculation of plaintiff's claim.  This situation, where Plaintiff alleges that Bimini Capital, with the valuable assistance of Hexagon, wrongfully obtained assets that were part of the Trust Estate, for an amount far less than par value, is very similar to the circumstances in *Hughes v. BCI Int'l Holdings, Inc*., 452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006) (Baer, J.).  In *Hughes*, this Court found that the agreements governing defendants' investment in BCI International Holdings, Inc. ("BCI") "do not set forth plaintiffs' rights and obligations with respect to [defendants]."  The Court concluded:

> If in fact the [defendants] wrongfully obtained assets plaintiffs intended for BCI, thereby depriving plaintiffs of the value of their investment, plaintiffs' binding agreement with BCI should not preclude plaintiffs from proceeding in equity against the [defendant] entities.  To hold otherwise would subvert the "logic of [this] equitable doctrine . . . which is designed to prevent unjust enrichment where the absence of an enforceable contract otherwise prevents recovery from [the culpable] parties."

*Id*. (quoting *Seiden Assoc., Inc. v. ANC Holdings, Inc*., 754 F. Supp. 37, 41 (S.D.N.Y. 1991)).

Defendants' interpretation of the law of unjust enrichment would leave plaintiffs with no remedy in cases where the underlying contract provided the right to and terms of payment, and in any case where a factual predicate for the claim for unjust enrichment is breach of an underlying contract to which the defendants are not a party.

37

Bimini Capital's assertion that its retention of the benefits from its wrongful repurchase of the Bimini TruPS is not "unjust" because the benefit was obtained in compliance with the terms of the Indenture is simply circular reasoning.  The sale of the Bimini TruPS occurred in violation of the terms of the Indenture, and the Tender Offer process (in which Hexagon was instrumental and involved with at every stage) was based on false and misleading statements, material omissions of fact, and improper payment of $3.3 million directly to the Requisite Noteholders to induce their consent.  Accordingly, Plaintiff has pled facts demonstrating that "[i]t would be inequitable and unjust to permit Bimini Capital and Hexagon to retain the proceeds of their wrongful conduct."  Am. Compl. ¶¶ 97, 102.

Hexagon was also unjustly enriched because it received large fees for running the Tender Offer process that were based on and paid out of the funds received by Bimini Capital.  *See* Am. Compl. ¶ 103.

## POINT VIII:  <u>**PLAINTIFF HAS STATED A CLAIM FOR RESCISSION**</u>[43]

First, Bimini Capital mistakenly argues that rescission is unavailable because Plaintiff's other derivative claims seek monetary damages.  It is hornbook law, however, that a plaintiff may plead legal and equitable claims as alternative causes of action.  *See* Fed. R. Civ. P. 8(d); *Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, No. 03 Civ. 3748 (DAB), 2006 WL 278138, at *13 (S.D.N.Y. Feb. 2, 2006) ("tort and rescission claims may be pleaded simultaneously as alternative causes of action"); *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 768 F. Supp. 115, 117 (S.D.N.Y. 1991) ("Under New York law, fraud and rescission are separate causes of action, which may be pleaded in the alternative even though legally inconsistent.").

Bimini Capital's second argument, that Plaintiff unreasonably delayed in bringing his rescission claim, also fails.  In this case, the initial Notice of Offer, which was subsequently

---

[43]  *See* Am. Compl., Eleventh Claim for Relief.

amended, was issued on or about June 30, 2009, and the Tender Offer was completed on October 21, 2009, only two months before Plaintiff filed this action in December 2009.[44]  Under New York law, it is clear that "whether a delay is reasonable or not is a factual question for a jury and is not the proper basis for a Motion to Dismiss under Rule 12(b)(6)."  *See Ladenburg Thalmann & Co., Inc. v. Imagining Diagnostic Systems, Inc.*, 176 F. Supp. 2d 199, 205 (S.D.N.Y. 2001) (whether nine months was an unreasonable delay is not subject to determination on a Rule 12(b)(6) motion); *International Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611, 1999 WL 619633, at *5 (S.D.N.Y. Aug. 16, 1999) ("'[o]rdinarily, the question of what is a reasonable time for rescission is a question of fact for the jury'").  Here, the facts support that Plaintiff acted reasonably promptly in bringing his rescission claim a short time after Bimini Capital's repurchase of the Bimini TruPS.[45]

Finally, Plaintiff has alleged violations of the underlying statutes that he claims rendered the Tender Offer to repurchase the Bimini TruPS an illegal transaction, including the New York Martin Act (N.Y. Gen. Bus. Law §§ 352 *et seq.*) and Section 17 of the Securities Act of 1933 (15 U.S.C. § 77q).[46]  *See* Am. Compl. ¶¶ 107-108.  It is axiomatic that "[u]nder both federal and New York law, illegal contracts are unenforceable."  *See*, *e.g.*, *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 493 (Bankr. S.D.N.Y. 2001) (citing *Benjamin v. Koeppel*, 85 N.Y.2d 549, 626 N.Y.S.2d 982 (1995)).

Plaintiff's ability to state a claim for rescission or unwinding of the alleged illegal transaction does not hinge, as defendants seem to suggest, on whether the underlying statutes

---

[44]  Moreover, counsel for Plaintiff contacted counsel for BNY Mellon in advance of filing the action.

[45]  In *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 239-40 (2d Cir. 2006), cited by Bimini Capital, the district court granted summary judgment, finding based on a consideration of the facts that a delay of at least four years in bringing a rescission claim was untimely.

[46]  Plaintiff has not pled separate claims for violation of these statutes but, as discussed below, this is not a requirement for purposes of pleading a separate claim for rescission based on illegality.

giving rise to the claim of illegality provide for a private right of action.  Indeed, it is typically the case that a rescission claim based on illegality arises out of violation of underlying criminal or civil regulatory statutes for which there are no private rights of action.  For example, in *Jackson v. Mishkin*, the district court affirmed the bankruptcy court's grant of the bankruptcy trustee's application to rescind the challenged trades involving various securities "on the grounds that the transactions violated the criminal provisions of three securities statutes and New York's Martin Act." 263 B.R. at 493 (citations omitted).  Similarly, in *Dornberger v. Metropolitan Life Ins. Co.*, 961 F. Supp. 506, 533-35 (S.D.N.Y. 1997), the court concluded that plaintiff had stated a claim for rescission on the ground of illegality based on defendants' alleged violation of European laws designed to regulate the merits and subject matter of insurance transactions, finding that "the party seeking to rescind the contract is within the class which the laws were undoubtedly designed to protect."  *Id*. at 535.

Accordingly, Plaintiff has stated a derivative claim against Bimini Capital for rescission based on illegality.

## <u>CONCLUSION</u>

Defendants' motions to dismiss should be denied in their entireties.

Dated:   New York, New York
         May 4, 2010

                                   BUTZEL LONG, a professional corporation

                                   By:  s/ Robert D. Piliero_____
                                             Robert D. Piliero
                                             Robert Sidorsky
                                        380 Madison Avenue
                                        New York, New York 10017
                                        Tel.: (212) 818-1110
                                        Fax:  (212) 818-0494
                                        piliero@butzel.com
                                        sidorsky@butzel.com

                                   *Attorneys for Plaintiff R. DAVIS HOWE*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 4, 2010, I caused the foregoing Plaintiff's Amended Consolidated Memorandum of Law in Opposition to Defendants' and Nominal Defendants' Motions to Dismiss the First Amended Complaint, to be served pursuant to the Court's  CM/ECF system.


By: <u>s/ Robert Sidorsky                </u>
     Robert Sidorsky