UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————x
R. DAVIS HOWE, individually and derivatively,    :
                                                 :
                    Plaintiff,                   :
                                                 :
            - against -                          :
                                                 :
THE BANK OF NEW YORK MELLON, as                  :    No. 09-CV-10470 (HB)
Indenture Trustee, BIMINI CAPITAL               :
MANAGEMENT, INC., and HEXAGON                    :    ECF Case
SECURITIES LLC,                                  :
                    Defendants,                  :
                                                 :
and THE BANK OF NEW YORK MELLON, as              :
Indenture Trustee, and PREFERRED TERM            :
SECURITIES XX, LTD.,                             :
                    Nominal Defendants.          :
                                                 :
—————————————————————x


## JOINT MEMORANDUM OF LAW OF DEFENDANT AND NOMINAL DEFENDANT THE BANK OF NEW YORK MELLON AND DEFENDANT BIMINI CAPITAL MANAGEMENT, INC. IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WILLKIE FARR & GALLAGHER LLP          SEWARD & KISSEL LLP
Kelly M. Hnatt (khnatt@willkie.com)   Dale C. Christensen Jr. (christensen@sewkis.com)
Benjamin P. McCallen (bmccallen@willkie.com)  Brian P. Maloney (maloney@sewkis.com)
787 Seventh Avenue                    One Battery Park Plaza
New York, New York 10019              New York, New York 10004
Phone:  (212) 728-8000                Phone:  (212) 574-1200
Fax:    (212) 728-8888                Fax:    (212) 480-8421

*Attorneys for Defendant Bimini*      *Attorneys for Defendant and Nominal*
*Capital Management, Inc.*            *Defendant The Bank of New York Mellon, as*
                                      *Indenture Trustee*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ..................................................................................................................... 7

I.   Plaintiff Fails to Move Upon or Even Support Several of His Claims Including His
     Claims for Derivative Relief and for Breach of Fiduciary Duty ............................................. 8

II.  Plaintiff's Motion for Summary Judgment on His Claim for Breach of Contract
     Should Be Denied (First and Second Claims for Relief). .................................................... 10

     A.   Plaintiff Cannot Properly Show Any Breach of the Indenture. ................................. 10

     B.   Section 5.16(b) Did Not Prohibit the Sale of the Bimini TruPS. ............................ 13

          1.   Basic Principles of Contract Interpretation Support the Conclusion
               that the Bimini TruPS Were "defaulted Collateral Securities." ................... 14

          2.   Plaintiff Cannot Show That The Definition of "defaulted Collateral
               Securities" Unambiguously Excluded the Bimini TruPS ............................ 16

III. Plaintiff's Motion for Summary Judgment on His Claim for Tortious Interference
     With Contract Against Bimini Should Be Denied (Third and Fourth Claims for
     Relief). ................................................................................................................... 20

CONCLUSION ............................................................................................................... 24

TABLE OF AUTHORITIES

CASES                                                                    Page

AHEPA 91, Inc. v. U.S. Dep't of Hous. & Urban Dev.,
    43 F. App'x 450 (2d Cir. 2002) ............................................................. 20

Bank of New York v. Bearingpoint, Inc.,
    No. 600169/06, 2006 WL 2670143 (Sup. Ct. N.Y. Cnty. Sept. 18, 2006) ......................... 17

Beal Sav. Bank v. Sommer,
    834 N.Y.S.2d 44 (2007) ...................................................................... 8

Beecher v. Feldstein,
    780 N.Y.S.2d 153 (2d Dep't 2004) .......................................................... 20

Bradbury v. Woller Cope-Schwarz,
    798 N.Y.S.2d 207 (3d Dep't 2005) .......................................................... 20

Bijan Designer for Men, Inc. v. Fireman's Fund Ins. Co.,
    705 N.Y.S.2d 30 (App. Div. 2000) ........................................................... 7

Cooperatieve Centrale Raiffeisen-Boerenleenbank v. Brookville CDO I Ltd.,
    No. 08 Civ. 9565, 2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008) ............................... 17

Craig v. Bank of New York,
    59 F. App'x 388 (2d Cir. 2003) ............................................................ 13

Cruden v. Bank of New York,
    957 F.2d 961 (2d Cir. 1992) ...................................................... 10, 13, 16

Don King Prods., Inc. v. Smith,
    47 F. App'x 12 (2d Cir. 2002) ............................................................. 22

Finley v. Giacobbe,
    79 F.3d 1285 (2d Cir. 1996) .............................................................. 20

Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,
    406 N.E.2d 445 (N.Y. 1980) .............................................................. 21

Highland Capital Mgmt. v. Schenider,
    198 F. App'x 41 (2d Cir. 2006) ........................................................... 20

International Salt Co. v. Geostow,
    697 F. Supp. 1258 (W.D.N.Y. 1988) ........................................................ 7

Lama Holding Co. v. Smith Barney Inc.,
    646 N.Y.S.2d 76 (1996) .................................................................. 20

LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,
    424 F.3d 195 (2d Cir. 2005).................................................................7

Law Debenture Trust Co. v. Maverick Tube Corp.,
    595 F. 3d 458 (2d Cir. 2010)..............................................................17

Lee v. Marvel Enter., Inc.,
    386 F.Supp. 2d 235, (S.D.N.Y. 2005)................................................17

Lennon v. Seaman,
    63 F. Supp.2d 428 (S.D.N.Y. 1999)....................................................20

Kass v. Kass,
    673 N.Y.S.2d 350 (1998)..............................................................7, 14

In re Payment Interchange Fee and Merchant Discount Antitrust Litig.,
    No. 05-MD-1720 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008)..................8

Popkin v. Security Mutual Ins. Co. of New York,
    367 N.Y.S.2d 492 (1st Dept 1975)..................................................8, 14

Rezende v. CitigroupGlobal Mkts., Inc.,
    No. 09 Civ 9392, 2010 U.S. Dist. 122346 (S.D.N.Y. Nov. 18, 2010)......7

Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.,
    892 N.Y.S.2d 303 (2009).....................................................................7

Robins v. Max Mara, U.S.A., Inc.,
    923 F. Supp. 460 (S.D.N.Y. 1996).....................................................20

Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.,
    579 N.Y.S.2d 353 (1st Dep't 1992)....................................................22

U.S. Trust Co. of N. Y. v. Exec. Life Ins. Co.,
    602 F. Supp. 930 (S.D.N.Y. 1984).....................................................17

U.S. Trust Co. of N. Y.  v. Jenner,
    168 F.3d 630 (2d Cir. 1999)...............................................................16

Vinas v. Chubb Corp.,
    499 F. Supp.2d 427 (S. D.N.Y. 2007).................................................22

Williams v. Barber,
    770 N.Y.S.2d 477 (3d Dep't 2004).....................................................22

W.W.W. Assoc. Inc. v. Giancontieri,
    565 N.Y.S.2d 440 (1990)......................................................................7

## STATUTES

Fed. R. Civ. P. 56(c) .................................................................................................................. 7

## OTHER AUTHORITIES

Restatement (Second) of Contracts § 202 3 (b) ............................................................. 8

Defendant Bimini Capital Management, Inc. ("Bimini") and Defendant and Nominal Defendant The Bank of New York Mellon ("BNY Mellon"), as Indenture Trustee, respectfully submit this joint memorandum of law in opposition to Plaintiff R. Davis Howe's motion for summary judgment ("Pl. Mem.") and in further support of Defendants' joint motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff's motion for summary judgment is based on a simple but flawed premise: that Section 5.16(b) of the PreTSL XX Indenture unambiguously prohibited the sale of the Bimini TruPS and that all of the lawyers involved in the transaction knew as much, but permitted the transaction regardless. The record, however, provides no factual support for this theory. Indeed, all the factual evidence adduced yields a contrary result.

Plaintiff's motion is rife with accusations of bad faith on the part of BNY Mellon, Bimini and their respective outside counsel, who advised both parties on the transaction from its outset.[1] Yet, notably, Plaintiff cannot cite to any factual support for these accusations. Rather, the record is clear that BNY Mellon and Bimini effected the transaction having concluded that it was permitted by the Indenture. This conclusion was premised on the fact that lawyers with significant experience in the CDO industry, applying – after much analysis – well-established principles of contract interpretation, issued a formal legal opinion that the transaction was permissible. Indeed, Plaintiff's argument that the term "defaulted Collateral Security" – even though undefined in the

---

[1]     See, e.g., Pl. Mem. at 22 n.20 (BNY Mellon "will be unable to shoulder its burden of proving [the] defense [of good faith reliance on the Opinion of Counsel]. . . because [it] incontrovertibly knew that the Opinion was unsupported by the plain and unambiguous language of the Indenture."), at 11 ("[Compliance with the Indenture] was apparently immaterial to Bimini and its counsel, and ultimately the Trustee and its counsel."), at 7 ("Notwithstanding that Indenture Section 5.16(b) could not properly support the proposed transaction because the Bimini TruPS were not 'defaulted Collateral Securities,' BNYM's counsel, Gardere, continued to collaborate with Hunton in its 'very creative' effort to create a false appearance of compliance with the Indenture.").

documents – has a "plain meaning" that should control as a matter of law, is not based on the operative contractual documents and is in fact refuted by the evidence adduced here.

Thus, Plaintiff's motion for summary judgment should be denied for several reasons.  At the outset, Plaintiff moves for summary judgment (both directly and derivatively) on only two of his claims (i.e., breach of contract and tortious interference with contract).  He does not even endeavor to address the undisputed facts demonstrating that he cannot sustain any of his derivative claims (including those moved upon) because, among other reasons, he is not a shareholder or member of PreTSL XX.  For this reason alone, Plaintiff's motion as to those derivative claims should be denied.  Likewise, Plaintiff also ignores here the law, not to mention other undisputed facts that render most of his alleged causes of action (on which he has not even moved for judgment) dismissable.

Plaintiff's motion for summary judgment on his breach of contract against BNY Mellon (both individually and derivatively) is similarly deficient.  Plaintiff cannot show any breach of the Indenture where, as here, the Indenture Trustee received an opinion of counsel (on which it relied) and where it acted at the direction of the Requisite Noteholders.  Because there is no evidence that the legal opinion was insufficient under the Indenture or that BNY Mellon did not act in good faith, Plaintiff is unable to sustain a breach of contract claim, let alone prevail on a motion for summary judgment on that claim.

Even if Plaintiff could sustain a claim for breach of contract despite these facts – which he cannot – the sole basis for his motion is not supported by the Indenture or the relevant evidence.  In particular, Plaintiff argues that because the term "defaulted Collateral Security" was undefined, as a matter of law the word "defaulted" must be given its "plain meaning" – by which Plaintiff means the definition attributed to that word in the dictionary to which he cites.  However, this theory (for which Plaintiff cites no legal authority) is contrary to basic and well-established

principles of contract interpretation, including that an undefined and here disputed contractual term must be read in the context of the document as a whole and with the related associated terms in that contract.  When that type of analysis is done here – as Hunton & Williams LLP ("Hunton") did prior to the issuance of its opinion – the Indenture is properly read to have permitted the transaction.  Indeed, such an interpretation is supported by expert testimony adduced in this case, which clearly established that, as a matter of custom and practice in the CDO industry, the term "defaulted" has no such "plain meaning" as Plaintiff contends.

Plaintiff's claim for tortious interference against Bimini depends entirely on its claim for breach of a contract, and accordingly fails for all of the above reasons.  In addition, among other things, Plaintiff cannot point to any conduct by Bimini that can be said to have "procured" the breach, as Bimini did nothing more than offer to purchase its securities and rely on the advice of counsel that it believed was proper.  Similarly, Hunton's issuance to BNY Mellon of its opinion letter does not create liability for Bimini under a tortious interference theory, as that opinion was issued in good faith and only after extensive internal review.

For all of the foregoing reasons, Plaintiff's motion for summary judgment on its claim for breach of contract and tortious interference with contract should be denied.

## STATEMENT OF FACTS[2]

In April 2009, Bimini (through its counsel at Hunton), approached BNY Mellon (through its counsel at Gardere Wynne Sewell LLP ("Gardere")) about obtaining noteholder approval to restructure Bimini's debt held by PreTSL XX.  (Def. Mem. at 9; Ex. 18 (Deposition Transcript of Stephen Elison ("Elison Tr.") at 14:5-14:18)).[3]  Bimini decided in June to make a cash tender offer for its securities, and Hunton accordingly sent to Gardere a draft offer reflecting this proposed structure, stating that the offer was being made pursuant to Section 5.16(a).  (Ex. 21; Ex. 20 (Wickersham Tr.) at 123:8-123:13.)  On June 17, Gardere let Hunton know that it believed Section 5.16(a) did not permit the cash tender proposed by Bimini, but noted that Section 5.16(b) of the Indenture might provide a basis for noteholder consent and direction.  (Ex. 21.)  That Section states, "the Indenture Trustee may dispose of a defaulted Collateral Security at the direction of the Requisite Noteholders."

After additional discussions concerning the requirements of the Indenture, Bimini was informed that BNY Mellon required an opinion of counsel stating that the Indenture Trustee was authorized to act at the direction of the Requisite Noteholders before the transaction could proceed.  (Ex. 20 (Wickersham Tr.) at 90:3-91:7; see Ex. 28.)  David McIndoe, a partner at Hunton

---

[2]  This section recites only those facts necessary to address the arguments raised in Plaintiff's motion for summary judgment.  Bimini and BNY Mellon submit this memorandum of law jointly as required by paragraph 5.C of this Court's individual rules of practice.  Unless otherwise stated herein, each party's specific knowledge is limited to their own conduct, although each has had the benefit of discovery.  A more complete recitation of facts relevant to this transaction is contained in the Joint Memorandum of Law in Support of the Motion of Defendant and Nominal Defendant BNY Mellon and Defendant Bimini for Summary Judgment ("Defendants' Joint Motion" or "Def. Mem."), as well as the Joint Statement of Undisputed Material Facts of Defendant and Nominal Defendant BNY Mellon and Defendant Bimini ("Def. 56.1"), and the Responses and Objections of Defendant and Nominal Defendant BNY Mellon and Defendant Bimini to Plaintiff's Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried ("Def. 56.1 Resp."), and those facts are incorporated herein.

[3]  All references to "Ex." herein refer either to the Declaration of Benjamin P. McCallen, filed December 10, 2010 (Exhibits 1-91), or to the Supplemental Declaration of Benjamin P. McCallen (Exhibits 92-102), filed simultaneously herewith.

and member of that firm's structured finance group, thereafter undertook to analyze the Indenture and other relevant facts to determine whether the proposed transaction was permissible.  (Exs. 30-49.)

Following extensive analysis and reports to the various parties, including BNY Mellon's outside counsel and counsel for the Issuer, Sidley Austin LLP, Mr. McIndoe drafted a memorandum to the firm's opinion committee.  (See id.)  That memorandum detailed the analysis for Hunton's conclusion that the proposed sale of the TruPS was permitted under the Indenture upon receipt of Requisite Noteholder consent.  (See Ex. 50.)

The memorandum stated, among other things, that while "there is no clear or separate definition of 'defaulted Collateral Securities' . . . . 'defaulted Collateral Securities' are those in which the issuer(s) of such securities are in a distressed situation such that [they] . . . are imminently about to default." (Id.)  The memo was scrutinized by two other partners at Hunton who were members of the firm's opinion committee, and was revised several times over a three week period before it was submitted for final approval.  Hunton's opinion committee agreed with Mr. McIndoe's analysis that the Bimini TruPS qualified as "defaulted Collateral Securities."

Hunton's analysis of the term "defaulted Collateral Security" was based in part on the meaning accorded similar terms in the Indenture.  (See Ex. 50)  ("There is support for this [] interpretation in the inclusion of the concept of DS Avoidance Event in the definition of 'Defaulted Security'…")  At his deposition, Mr. McIndoe testified concerning his interpretation of the Indenture:

> The first method of interpretation is to take a look and see if there are defined terms that circumscribe the words used in the operative provision.  "[d]efaulted Collateral Security" is not a separately defined term, which leaves the interpreting party the question "what does it mean."  The first bases on which, particularly for opinion practices, that we look [to] when trying to interpret an undefined term, is to look and see what other terms are similar and how they are used in the indenture.  There is a similar term [in the Indenture] which is "Defaulted Securities"…[W]e

[therefore] look to the definition of "Defaulted Securities" to suggest how "defaulted Collateral Securities" might be interpreted.

(Ex. 12 (McIndoe. Tr.) at 61:3-61:21.)  Mr. McIndoe then described how the term "Defaulted Security" informed his view of the proper interpretation of "defaulted Collateral Security."

> When we look at the definition of "Defaulted Securities," without going through the definition in minute detail, it generally encompasses two things.  [First], defaults under the underlying indenture pursuant to which a TruPS security was issued and, [second,] the DS Avoidance Event. . . . [A]s we reviewed earlier, there are two disjunctive prongs [of the definition of DS Avoidance Event].  The first being insolvency.  The second, essentially being a distressed exchange that if completed would help the issuer avoid default. . . . We looked at the elements of the DS Avoidance Event in the second prong. . . .  I would say there are three elements inside the second prong.  First, is the offer of a distressed issuer.  The second one, is the rating agency's letter.  And the third, is that it would be for the benefit of the issuer.

(Id. at 61:22-63:13).  Mr. McIndoe went on to describe how obtaining Requisite Noteholder approval was an appropriate substitute for rating agency approval, which is required for transactions effected pursuant to Section 2.17 (but was not required here):

> On your earlier question as to "[was] the DS Avoidance Event found [to have occurred]," I answered "no," because no rating agency letter was achieved.  However the other two elements existed.  You had a distressed issuer making an exchange offer that would allow that party to avoid an ultimate default.  We found those elements to exist.  We reasoned that the rating agency letter was not applicable … [to] the "defaulted Collateral Security" definition because the standard, which was much [lower] in our view [than obtaining approval from] two-thirds of the Requisite Noteholders, . . . [this] allowed us to read "defaulted Collateral Securities" as including a collateral security for which a distressed exchange offer was made."

 (Id. at 63:14-64:8).

Hunton's opinion committee, after an extensive and iterative review process, ultimately agreed with Mr. McIndoe's interpretation, and authorized the firm's issuance of the opinion of counsel.  In order to issue its opinion, the only fact assumed by Hunton was the obvious one: that the consent of the Requisite Noteholders would be obtained – which ultimately it was,

when over 90% of the senior noteholders voted in favor of the transaction.  (Ex. 12 (McIndoe Tr. 58:6-58:16; 400:23-403:24); Ex. 50.)

## ARGUMENT

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories and admissions, along with the affidavits, if any, show there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); see also Rezende v. Citigroup Global Mkts., Inc., No. 09 Civ. 9392, 2010 U.S. Dist. LEXIS 122349, at *10-11 (S.D.N.Y. Nov. 18, 2010) (Baer, J.) (citing Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009)).  The court must construe the evidence in the light most favorable to, and draw all inferences and resolve all ambiguities in favor of, the nonmovant.  LaSalle Bank Nat'l. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005).

When a motion involves the interpretation of a contract, as is the case here, that contract should be examined in its entirety, and particular words should be considered not in isolation "but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  Kass v. Kass, 673 N.Y.S.2d 350, 357 (1998); Riverside South Planning Corp. v. CRP/Extell Riverside, L.P., 892 N.Y.S.2d 303, 308 (2009) (same); see also W.W.W. Assoc. Inc. v. Giancontieri, 565 N.Y.S.2d 440, 443 (1990) (reading the contract "as a whole to determine its purpose and intent"); Bijan Designer for Men, Inc. v. Fireman's Fund Ins. Co., 705 N.Y.S.2d 30, 33 (App. Div. 2000) ("[w]ords considered in isolation may have many and diverse meanings.  In a written document, the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document.") (quoting Eighth Ave. Coach Corp. v. City of New York, 286 N.Y. 84, 88-89 (1941)).

Moreover, courts should consider associated or similarly-defined terms when interpreting a disputed term in a contract.  See Int'l Salt Co. v. Geostow, 697 F.Supp. 1258, 1266-

67 (W.D.N.Y. 1988) (interpreting the meaning of "mines" together with similarly defined terms in light of particular mining industry custom and practice); Popkin v. Security Mutual Ins. Co. of New York, 367 N.Y.S.2d 492, 495 (1st Dept. 1975) ("[T]he meaning of a word in a provision may be ascertained by a consideration of the company in which it is found and the meaning of the words which are associated with it."); see also Restatement (Second) of Contracts § 202 3(b), cmt. f (1981) (noting that otherwise common words may have a variety of technical or other meanings in a particular industry).

If the overall intent of the parties is clear from the face of a contract, the court should "choose that construction which will carry out the plain purpose and object of the [agreement]." In re Payment Interchange Fee and Merchant Discount Antitrust Litig., No. 05-MD-1720, 2008 WL 115104, at *10 (E.D.N.Y. Jan. 8, 2008) (quoting Kass, 91 N.Y.2d at 567); Beal Sav. Bank v. Sommer, 834 N.Y.S.2d 44, 48 (2007) (finding loan documents unambiguous because the overall purpose was to permit collective action).

## I.   PLAINTIFF FAILS TO MOVE UPON OR EVEN SUPPORT SEVERAL OF HIS CLAIMS, INCLUDING HIS CLAIMS FOR DERIVATIVE RELIEF AND FOR BREACH OF FIDUCIARY DUTY.

While Plaintiff moves "both individually and derivatively" on his claims for breach of contract and tortious interference with contract, he has not established the material facts that would support his ability to pursue either these or any of his claims derivatively. Specifically, all of Plaintiff's derivative claims should be dismissed as a matter of law because there is no evidence (1) that Plaintiff is a shareholder or member of the Indenture Trustee or the Issuer or has any shareholder or membership interest in the transaction (Def. Mem. at 18-19; Def. 56.1 ¶ 30), (2) that his failure to make any demand on BNY Mellon or PreTSL XX could be excused under the circumstances here (Def. Mem. at 19; Def. 56.1 ¶ 31, 33-34), and (3) that he could simultaneously pursue direct and derivative relief, as his individual interests place him in conflict with the interests

of the Trust Estate and its investors.  (Def. Mem. at 19-20; FED. R. CIV. P. 23.1(a); Def. 56.1 ¶¶ 35-41.)  As a result, the record and undisputed facts confirm that Plaintiff is not entitled to relief on any of his derivative claims.

Furthermore, Plaintiff only moves for summary judgment as to liability on his breach of contract and tortious interference with contract claims.  Plaintiff did not seek summary relief on or provide any support for his remaining claims.

As discussed in detail in Defendants' Joint Motion, Plaintiff's claims for breach of fiduciary duty must also fail.  Significantly, Plaintiff offers no facts supporting any of the predicates for a fiduciary relationship, but nevertheless purports to claim a breach of the same.  In fact, BNY Mellon's duties as Indenture Trustee are limited to the contractual duties specifically set forth in the Indenture in the absence of an Event of Default, and no Event of Default has occurred or is continuing.  (Def. Mem. at 26-27; Def. 56.1 ¶¶ 42-44.)  Moreover, BNY Mellon did not have any legally cognizable relationship of confidence or trust with Plaintiff or breach any relevant duty.  (Def. Mem. at 27-28; Def. 56.1 ¶¶ 45-51.)  Without a claim for breach of fiduciary duty, the aiding and abetting claim must also be dismissed as a matter of law, and, in any event, there is no evidence that Bimini had actual knowledge of any alleged breach or provided BNY Mellon with "substantial assistance."  (Def. Mem. at 29-30.)

Plaintiff's claims for unjust enrichment are equally deficient because the subject matter of the dispute is governed by a contract – here, the Indenture.  (E.g., Def. 56.1 ¶¶ 12, 42; Ex. 3; Def. Mem. at 30-31.)  Finally, Plaintiff's claim for rescission/illegality should be dismissed because, among other things, it is undisputed that Plaintiff could be made whole with monetary damages for any alleged harm suffered.   (Def. Mem. at 31-33; Def. 56.1 ¶¶ 148-157.)

Accordingly, the Court should dismiss all of Plaintiff's derivative claims, as well as those claims on which he has not moved for summary judgment.  (Def. Mem. at 18-20, 26-33; Def. 56.1 ¶¶ 12, 25-51; 148-157.)

## II.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON HIS CLAIM FOR BREACH OF CONTRACT SHOULD BE DENIED (FIRST AND SECOND CLAIMS FOR RELIEF).

### A.   Plaintiff Cannot Properly Show Any Breach of the Indenture.

Plaintiff's motion seeks to establish liability for breach of contract against BNY Mellon by arguing that the Bimini TruPS cannot be a "defaulted Collateral Security" under the supposed "plain meaning" of that term in the Indenture.  (See Pl. Mem. at 16-22.)  But Plaintiff's urged interpretation of a "defaulted Collateral Security" is, at best, a red herring, because it is wholly unrelated to the determinative question of whether the Indenture Trustee was authorized to act at the direction of the Requisite Noteholders under these circumstances.[4]

As detailed in Defendants' Joint Motion, Plaintiff simply ignores the undisputed material facts that confirm that the Trustee received overwhelming noteholder direction, and also was fully entitled to rely on the legal opinion proffered to it by Hunton in seeking that direction. (Def. Mem. at 20-24.)  Among other things, the Requisite Noteholders (which do not include the Plaintiff) possess superior rights under the Indenture, and indisputably have the right to direct the Indenture Trustee to dispose of a "defaulted Collateral Security."  (Def. Mem. at 21-22.)  Sections 6.1 and 6.2 of the Indenture allow the Indenture Trustee to accept representations and conclusively rely in the absence of bad faith on the correctness of opinions and certificates that it receives.

---

[4]   Because there has been no Event of Default, the Indenture Trustee's rights and duties are unambiguously defined by Sections 6.1(b)(i) and (ii) of the Indenture.  (Def. Mem. at 22.)  Moreover, because there has concededly been no default in amounts due and payable on Plaintiff's income notes (e.g., Def. 56.1 ¶ 133), Section 5.6 of the Indenture independently bars this action, or at minimum, bars the derivative claims.  Cruden v. Bank of N.Y., 957 F.2d 961, 968-69 (2d Cir. 1992) (finding that prior to default on amounts due and payable, noteholders are not entitled to a remedy under analogous indenture provisions, and that allowing action to proceed would also frustrate the expectations of the noteholders and harm the trust estate); (Def. 56.1 ¶¶ 25-29.)

(Def. Mem. at 22; Ex. 3 (Indenture §§ 6.1, 6.2 at pp. 78-79)).  Here, the Indenture Trustee requested and received an opinion that speaks expressly to the transaction at issue -- that is, whether the Indenture Trustee was authorized to act at the direction of the Requisite Noteholders to accept Bimini's offer to purchase.  (Def. Mem. at 23-24 (describing the undisputed material facts concerning the receipt and drafting of the opinion of counsel and the closing of the transaction following receipt of Requisite Noteholder direction); Ex. 52).  Accordingly, BNY Mellon was entitled to rely on that opinion.

Because it is undisputed that BNY Mellon received the consent and direction of the Requisite Noteholders to effect the transaction, along with the formal legal opinion provided by Hunton, Plaintiff alternatively argues (i) that the opinion was not sufficient under Section 11.1 of the Indenture, or (ii) that "BNYM incontrovertibly knew" that Hunton's opinion was incorrect. (Pl. Mem. at 22 n. 20).  Both arguments, however, are wholly unsupported by the record.

First, Plaintiff's argument that the opinion could not be relied on because it does not meet the requirements of Section 11.1 fails because Section 11.1 relates only to Issuer requests, not actions taken at noteholder direction as occurred here.  Section 11.1 states in relevant part:

> SECTION 11.1  Compliance Certificates and Opinions, etc.  Upon any application or request by the Issuer or the Co-Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with meeting the applicable requirements of this Section 11.1, except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished…

(Def. Ex. 3 § 11.1) (emphasis added).

The record confirms that Section 11.1 is inapplicable here.  First, Section 11.1 plainly applies only to an application or request "by the Issuer or the Co-Issuer to the Indenture

Trustee," and is therefore irrelevant to this action.  Id. (emphasis added).  Second, BNY Mellon's counsel testified that the "conditions precedent" language typically applies only where the Issuer provides an "Opinion of Counsel" (as defined), certifying that all conditions precedent have been met.  (Elison Tr. 171-173; see Ex. 3 § 9.3 ("Execution of Supplemental Indentures")).  Hunton itself also recognized that the opinion was not in the nature of an Issuer's Opinion of Counsel.  (See Ex. 50 at 1 ("The CDO Indenture itself does not require our opinion.  The CDO Trustee requires that we provide the opinion before they will permit the transaction to proceed.").)  Plaintiff offers no evidence that Section 11.1 should be interpreted as he suggests, and thus both the terms of the Indenture and the record confirm that the provision is inapplicable.[5]

Likewise, Plaintiff ignores that Section 6.1(b)(ii) is a stand-alone provision that defines the Indenture Trustee's rights and duties in the absence (as is undisputed here) of an Event of Default as expressly defined by the Indenture.  Section 6.1(b)(ii) expressly states that "in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and, if required by the terms of this Indenture, conforming to the requirements of this Indenture." (Ex. 3 § 6.1(b)(ii)).  Simply stated, the terms of the Indenture (i.e., Sections 5.16(b) or 6.14) do not require a Section 11.1 "Opinion of Counsel" for the trustee to act at noteholder direction.  However, if (as happened here) the Indenture Trustee requests and receives an opinion concerning the Trustee's authority to act under the Indenture, Section 6.1(b)(ii)

---

[5]     Plaintiff attempts to manufacture controversy by alleging that the Issuer was in some way misled about the requirements of the Indenture, despite Issuer's counsel's own prior representations that noteholder consent was "self-directing" where provided pursuant to provisions such as Sections 5.16 and 6.14.  Plaintiff's arguments mischaracterize the facts and simply are of no evidentiary effect.  (See Pl. Mem. at 9, note 9; compare Def. 56.1 ¶¶ 84-88; Def. 56.1 Resp. ¶ 29.)  They are also immaterial to the Indenture Trustee's ability to conclusively rely on the correctness of the Hunton opinion and Requisite Noteholder direction.  (Ex. 3 § 6.1(b)(ii).)

entitles the Indenture Trustee, in the absence of bad faith, to rely conclusively on the correctness of that opinion.

Second, Plaintiff asserts – <u>wholly</u> conclusorily and without any record support – that "BNYM incontrovertibly knew that the Opinion was unsupported by the plain and unambiguous meaning of the Indenture." (Pl. Mem. at 22.) This misrepresents both the role of BNY Mellon as Indenture Trustee under these circumstances, and the careful and considered process that occurred here. (Def. Mem. at 22-24 (describing undisputed material facts concerning the receipt and drafting of Hunton's opinion and the closing of the transaction following receipt of Requisite Noteholder consent); Ex. 3 (Indenture §§ 6.1, 6.2 at pp. 78-79); Def. 56.1 ¶¶ 62-131.)) In fact, Plaintiff has offered no admissible evidence to support his conjecture. Plaintiff's speculation and insinuation simply do not supply any basis upon which a summary judgment motion may be granted. (<u>See</u> Def. 56.1 ¶¶ 62-131 (reciting undisputed material facts concerning Bimini's offer to purchase.) In fact, and as more fully supported by the discussion below, the Indenture Trustee was fully justified in relying on the legal opinion from Hunton, and no breach can be properly stated under these circumstances. <u>See</u> <u>Cruden</u>, 957 F.2d at 972; <u>Craig v. Bank of N.Y.</u>, 59 F. App'x 338, 390 (2d Cir. 2003).

In sum, Plaintiff fails to create a genuine issue of material fact, and BNY Mellon is entitled to dismissal of Plaintiff's breach of contract claim for failure to properly show any breach of the Indenture.

**B.     Section 5.16(b) Did Not Prohibit the Sale of the Bimini TruPS.**

Plaintiff cannot support his main contention on this motion that Section 5.16(b) unambiguously prohibited the sale of the Bimini TruPS. In fact, basic principles of contract interpretation as well as the transaction documents support the conclusion, as ultimately reached by Hunton, that Section 5.16(b) permitted the sale.

1.     <u>Basic Principles of Contract Interpretation Support the Conclusion that the Bimini TruPS Were "defaulted Collateral Securities."</u>

Plaintiff acknowledges, as he must, that "defaulted Collateral Security" is not defined in the Indenture.  (Pl. Mem. at 17.)  It is well-established that where a term is undefined, associated terms in the contract should be consulted to determine the undefined term's meaning.  <u>See</u> <u>Popkin</u>, 367 N.Y.S.2d at 495 ("The meaning of a word in a provision may be ascertained by a consideration of the company in which it is found and the meaning of the words which are associated with it.").  Here, as Hunton noted, the Indenture employs the associated and similar term "Defaulted Security."

The definition of this associated term is probative.  A security becomes a "Defaulted Security" – and therefore subject to sale and removal from the collateral pool – under any of four circumstances.  One of those circumstances is where "a DS Avoidance Event has occurred."  The Indenture defines a "DS Avoidance Event" as follows:

> with respect to any Collateral Security, any . . . proposed or effected distressed exchange or other debt restructuring in which the related Collateral Security Issuer . . . has offered the holder of such Collateral Security . . .  a new security or package of securities that, in the reasonable judgment of the Rating Agencies, has the purpose of helping such Collateral Security Issuer or the related Corresponding Debenture Issuer to avoid default thereunder.

(Ex. 3 § 1.1 at 12.)  Taken together, Hunton concluded that the definitions of "Defaulted Security" and "DS Avoidance Event" demonstrate that the Indenture permits the removal of a security from the collateral pool where the proposed transaction "has the purpose of helping such Collateral Security . . . avoid default."  (<u>Id.</u>; <u>see</u> Ex. 12 (McIndoe Tr.) at 61:3-64:8.)

The purpose of Section 5.16(b) supports Hunton's conclusion that the term "defaulted Collateral Security" should be read to include circumstances as broad, if not broader, than those included in the term "Defaulted Security."  <u>See</u> <u>Kass</u>, 673 N.Y.S.2d at 357 ("Where the document makes clear the parties' overall intention, courts examining isolated provisions 'should

then choose that construction which will carry out the plain purpose and object of the [agreement],'" (quoting Williams Press v. State of New York, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (1975))).  Section 5.16(b) generally provides the Requisite Noteholders the authority to provide direction to the Indenture Trustee when a Collateral Security might impair their interest.  For example, under the first part of Section 5.16(b), the Requisite Noteholders may dispose of Collateral Securities where a breach of any representation or warranty in any of the documents pursuant to which the Collateral Security was issued occurs and  "materially adversely affects" PreTSL XX as the holder of such Collateral Security.  Similarly, under the second part of Section 5.16(b), the Requisite Noteholders may direct the Indenture Trustee to remove or otherwise dispose of another type of troubled collateral: a "defaulted Collateral Security."

These provisions of Section 5.16(b) are designed to empower the Requisite Noteholders to protect the value of their invested principal in PreTSL XX when faced with problem collateral, and are thus defensive in nature.[6]  Interpreting the phrase "defaulted Collateral Security" to include only those securities which have already actually defaulted in their obligations, as Plaintiff argues that this Court should do, would contravene this purpose. Moreover, such a reading would fly in the face of common sense:  if the Requisite Noteholders had no authority to direct the disposal of distressed securities that had not technically defaulted, the PreTSL XX noteholders (the only parties who stand to gain or lose based on the performance of

---

[6]     It should be noted, for example, that dispositions of Collateral Securities in connection with breaches of representations or warranties must be accompanied by Rating Agency confirmation "that such disposition will not result in the reduction, withdrawal or negative qualification of its then current ratings for the Senior Notes or the Mezzanine Notes."  (Ex. 3 § 5.16(b).)  The Income Notes, by contrast, are not rated – and any impairment resulting from such Requisite Noteholder disposition is simply not actionable.

the collateral) would be powerless to act in the face of an impending default of a Collateral Security.[7]

When the purpose of Section 5.16(b) is considered in the context of the entire Indenture, it is clear that Hunton properly concluded that the term "defaulted Collateral Security" encompasses more than just securities that have already defaulted in their obligations to PreTSL XX.  It also includes securities that, in the judgment of the Requisite Noteholders, pose a sufficient risk of default to warrant disposal to protect the Trust Estate.  This conclusion was, as a practical matter, further validated by the vote of more than 90% of the senior noteholders to approve the transaction.

Section 5.16(b) should therefore be read to permit the transaction in dispute here, as Hunton concluded.  Plaintiff's motion for summary judgment must therefore be denied.

    2.    <u>Plaintiff Cannot Show That The Definition of "defaulted Collateral Securities" Unambiguously Excluded The Bimini TruPS.</u>

Plaintiff offers several arguments in support of its contention that the definition of "defaulted Collateral Securities" unambiguously includes only those securities that have already defaulted on their obligations to PreTSL XX.  Each of these arguments is unavailing.[8]

The first (and primary) argument advanced is that the word "defaulted" must be given the "plain meaning" accorded it in the dictionary – which, Plaintiff notes, is "a failure to pay

---

[7]    Like Section 5.16(b), Section 2.17(a) gives the power to certain trusted authorities to exercise judgment about when a Collateral Security should be sold.  In Section 5.16(b), the judgment lies with the Requisite Noteholders – here, the senior noteholders – who may authorize the Indenture Trustee, through a vote by no less than 66-2/3% of the aggregate principal amount of their holdings, to dispose of a "defaulted Collateral Security."  In the case of Section 2.17(a), that judgment is given to authorized Rating Agencies.

[8]    Although Plaintiff correctly notes that extrinsic evidence generally is not admissible in considering whether a contract is ambiguous (Pl. Mem. at 16), it nevertheless extensively discusses such evidence, such as drafts of the Hunton memoranda and internal communications among the parties to the transaction.  Although this evidence actually demonstrates the good faith of those parties, it is entirely irrelevant to Plaintiff's motion.  <u>See</u> <u>U.S. Trust Co. of N.Y. v. Jenner</u>, 168 F.3d 630, 632 (2d Cir. 1999) (citing <u>Consarc Corp. v. Marine Midland Bank, N.A.,</u>, 996 F.2d 568, 573 (2d Cir.1993)); <u>Cruden</u>, 957 F.2d at 976.

a debt when due."  (Pl. Mem. at 17  ("[a]s an undefined term in the contract, [the word 'defaulted']

should be read in accordance with its plain and ordinary meaning."))  Because Bimini had paid its

interest when due (a fact which Bimini and BNY Mellon do not dispute), Plaintiff contends that

the sale of the Bimini TruPS was not permitted by Section 5.16(b).

        Plaintiff's argument suffers from several critical flaws.  First, it is not the law in

New York that where a term in a contract is undefined, the Court must resort exclusively to its

dictionary meaning.  See e.g., Cooperatieve Centrale Raiffeisen-Boerenleenbank v. Brookville

CDO I Ltd., No. 08 Civ. 9565, 2008 WL 5170178 at *11 (S.D.N.Y. Dec. 10, 2008) (rejecting

dictionary definition of undefined term where meaning could be inferred from entire agreement).

Notably, Plaintiff does not cite any cases to support this principle, even though it is the cornerstone

of his legal argument.  In fact, as discussed above, when basic and well-established principles of

contract interpretation are applied (such as the rule that terms should be defined with reference to

the contract as a whole), the Indenture is properly interpreted to have permitted the transaction.[9]

        Second, Plaintiff's proposed "plain meaning" interpretation also does not comport

with accepted use of the term "default" in the CDO industry.[10]  During discovery in this action,

---

[9]     None of the cases cited elsewhere in Plaintiff's brief support the conclusion that the Indenture is susceptible
to the meaning ascribed to it by Plaintiff, especially when there is a well-reasoned legal opinion and
memorandum supporting the interpretation upon which the transaction was actually effected.  See, e.g., U.S.
Trust Co. of N.Y. v. Exec. Life Ins. Co., 602 F. Supp. 930, 938 (S.D.N.Y. 1984) (cited by Plaintiff for the
quote that "[f]or purposes of determining 'default' . . ., this court finds that the Chase Indenture is
unambiguous," but failing to note that, in that case, "default" was a defined term in the Chase Indenture);
Bank of N.Y v. Bearingpoint, Inc., No. 600169/06, 2006 WL 2670143 at *3 (Sup. Ct. N.Y. Sept. 18, 2006)
(rejecting an interpretation that an indenture did not require the filing of annual report with the trustee where
the indenture stated "[t]he company shall file with the Trustee. . . copies of its annual report. . . which the
Company is required to file with SEC.")

[10]    Expert testimony on industry custom and practice may be considered on summary judgment to inform the
Court's interpretation of a disputed contractual term.  Lee v. Marvel Enter., Inc., 386 F.Supp.2d 235, 246 n.5
(S.D.N.Y. 2005); see also Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir.
2010).

John Costango, a practitioner with over ten years of experience working with CDOs and CDO
Indentures, stated:

> [B]ased on my experience, not all CDO indentures are identical, and
> accordingly terms used in CDO indentures can have different
> meanings depending on the context in which those words are used.
> The word 'default' (or 'defaulted') is one such word that in my
> experience does not necessarily have a common meaning.

(Ex. 102 (Costango Rept.) at 16.)  This testimony directly contradicts Plaintiff's contention that
"defaulted" is susceptible to the so-called "plain meaning" that Plaintiff ascribes to it.  Moreover,
Mr. Costango stated that he has "frequently seen in CDO indentures such specific terms as 'default
in the payment of principal or interest' or 'actually defaulted in the payment of interest." Were
Plaintiff's interpretation of the word "default" correct, neither of these specific terms would be
necessary, as both would be incorporated by the "plain meaning" of "defaulted."[11]

Plaintiff next argues that when the Indenture allows "for disposition of Collateral
Securities" under "non-standard or more extensive events or types of default . . . the circumstances
constituting default are expressly spelled out" in the document.  (Pl. Mem. at 19.)  Plaintiff ignores
that, here, the Indenture did expressly provide for the circumstances of the disposition of
"defaulted Collateral Securities":  they could only be released "at the direction of the Requisite
Noteholders."  Thus, the Indenture does "expressly spell[] out" how "defaulted Collateral
Securities" are disposed.

Plaintiff also argues that the "plain meaning" of "defaulted" should be applied as a
matter of law because "the terminology of Section 5.16(b) is not the result of deal-specific

---

[11]     The analysis followed by Mr. McIndoe at Hunton is consistent with Mr. Costango's testimony.  When
questioned at his deposition whether he should have applied the "plain meaning" of the term "defaulted" in
isolation of the words "Collateral Security," Mr. McIndoe replied:  "No.  Because you have an adjective and
a noun.  You need to put them together."  (Ex. 12 (McIndoe Tr.) at 66-67).  As a result, Mr. McIndoe's
interpretation of the term "defaulted Collateral Security" was informed by the definition of the term
"Defaulted Security."  (Supra at 4-6.)

bargaining between the parties but rather appears in numerous other PreTSL Indentures." (Pl. Mem. at 21 (citing Indentures of PreTSL XVIII and XIX.))  However, Plaintiff's citation to other PreTSL indentures is selective.  In fact, there is no uniformity to this provision across all PreTSL indentures.  (See, e.g., Exs. 96 and 97 (Indenture excerpts for PreTSL XIV and XV, respectively) ("In addition, the Indenture Trustee may dispose of a Defaulted Security at the direction of the Requisite Noteholders")); Ex. 98 (Indenture excerpt for PreTSL XXV) ("In addition, the Indenture Trustee may dispose of a defaulted Capital Security at the direction of the Requisite Noteholders."))  In short, these indentures vary in their description of which securities could be removed from the collateral pool, and thus are distinguishable from the cases cited by Plaintiff, in which multiple contracts contained identical and truly boilerplate language.  (Pl. Mem. at 21 (citing cases).)  Such variance demands a contract-by-contract interpretative approach, and not the one-definition rule Plaintiff seeks to apply.[12]

Plaintiff's sole argument that "default" only means "default" as a dictionary might define it is not consistent with principles of contract construction, industry custom and usage, or the facts and circumstances of this matter.  As Plaintiff cannot show that there is no question of disputed fact concerning whether the Bimini TruPS qualified as "defaulted Collateral Securities," Plaintiff's motion should be denied.

---

[12]    At his deposition, Plaintiff stated that transactions like the sale of the Bimini TruPS were generally prohibited in PreTSL CDOs, even though the language of each respective indenture (many of which Howe likely does not even possess) varies from deal to deal.  (Def. 56.1 Resp. ¶ 3; Ex. 93 (Howe Tr. at 85:7-88:4).)  It is clear from this testimony that Howe is effectively seeking an advisory opinion concerning the permissibility of similar transactions as they relate to all PreTSL CDOs.  Moreover, he is doing so in order to push his own understanding of what the indentures permit on all PreTSL noteholders (many of whom voted in favor of this transaction) without any analysis of what the documents actually say.

III.    **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON HIS CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT AGAINST BIMINI SHOULD BE DENIED (THIRD AND FOURTH CLAIMS FOR RELIEF).**

To succeed on a claim for tortious interference, Plaintiff is required to show: (1) the existence of a valid contract between Plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional and improper procurement of a breach of the contract; and (4) damages resulting to Plaintiff therefrom.  Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996). Plaintiff will be unable to prove each of these elements, and certainly cannot show that he is entitled to judgment on this claim as a matter of law.

As an initial matter, without an underlying breach of contract, a claim for tortious interference cannot lie.  AHEPA 91, Inc. v. U.S. Dep't of Hous. & Urban Dev., 43 F. App'x 450, 454 (2d Cir. 2002); Robins v. Max Mara, U.S.A., Inc., 923 F. Supp. 460, 468 (S.D.N.Y. 1996); Lennon v. Seaman, 63 F. Supp. 2d 428, 433-34 (S.D.N.Y. 1999); Lama Holding Co. v. Smith Barney Inc., 646 N.Y.S.2d 76, 81 (1996).  Here, as discussed, Plaintiff cannot succeed on its claim for breach of contract against BNY Mellon.  (See supra at 9-19; see also Def. Mem. at 20-24.) Accordingly, Plaintiff's motion on its tortious interference claim must be denied.

Even if Plaintiff could show an underlying breach of contract, which it cannot, the tortious interference claim would still fail because neither Bimini nor Hunton procured that alleged breach improperly.  See Highland Capital Mgmt. v. Schneider, 198 F. App'x 41, 46 (2d Cir. 2006). Bradbury v. Woller Cope-Schwarz, 798 N.Y.S.2d 207, 209 (3d Dep't 2005) (stating that "a defendant must induce or intentionally procure a third-party's breach of its contract with the plaintiff"); Beecher v. Feldstein, 780 N.Y.S.2d 153, 154 (2d Dep't 2004) (dismissing tortious interference claim on ground that "defendant's actions did not procure, and were merely incidental, to the [third party's] breach of the lease").

First, Bimini did not engage in <u>any</u> conduct that could be categorized as "procuring" the alleged breach.  As the record demonstrates, the only action taken by Bimini – transmitting a letter to BNY Mellon requesting that it evaluate Bimini's offer in light of its worsening financial condition – was not the basis for the Indenture Trustee's decision to act at noteholder direction.  (<u>See</u> Def. Mem. at 24-25.)[13]  Moreover, it is undisputed that Bimini at all times relied on the advice of its counsel, and there is no evidence that Bimini knew (or even believed) that counsel's advice was not proper.  (<u>See</u> Ex. 99 (Cauley Tr.) at 209:4-211:6).

As to the conduct of Hunton, Plaintiff claims that its opinion constituted tortious interference with the Indenture, and that Bimini is liable for that conduct.  Whether conduct that procures a breach of contract is improper, however, "depends upon a judgment and choice of values in each situation," including such factors as "the nature of the conduct of the person who interferes" and that party's motives.  <u>Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.</u>, 406 N.E.2d 445, 448 (N.Y. 1980).  Here, a partner at Hunton and member of the firm's structured finance group engaged in a thorough analysis of the Indenture.  On the basis of that analysis, along with representations and facts demonstrating that Bimini was financially distressed, the conclusion was reached that the Bimini TruPS held by PreTSL XX were "defaulted Collateral Securities."

---

[13]     Plaintiff's description of Bimini's letter to BNY Mellon contorts the record.  (<u>See</u> Pl. Mem. at 14 ("After effectively being told that the transaction was 'not doable,' Cauley wrote to BNYM on June 19 urging to allow the Tender Offer – not based on any provision in the Indenture that permitted the transaction – but on the grounds of estoppel and that BNYM's position was 'unfair.'")  First, discovery has shown that Mr. Cauley was not told on June 17 that the transaction was "not doable," whatever he personally may have believed.  In fact, as of June 17, BNY Mellon had not determined whether the transaction was permissible.  (<u>See</u> Ex. 18 (Elison Tr.) at 119:10-121:7, 122:19-126:11, 181:7-82:12).  Second, Mr. Cauley is not a lawyer, and in any event, had not yet received the analysis and advice of his counsel as ultimately embodied in the opinion letter.  Thus, the statement that he urged BNY Mellon to permit the transaction "on the grounds of estoppel" misleadingly suggests that Mr. Cauley had an independent understanding of what the Indenture legally permitted, and that he was attempting to procure a breach contrary to that understanding.  There is no record support for either proposition.

The firm's opinion committee approved issuance of the opinion only after extensive review and discussion.  (See Def. Mem. at 11-13.)

Despite Plaintiff's gross mischaracterization of this process, Hunton's conduct – issuing an opinion letter interpreting a complex indenture agreement – simply does not rise to the level of impropriety that a claim for tortious interference requires.  See Williams v. Barber, 770 N.Y.S.2d 477, 479 (3d Dep't 2004) (upholding summary judgment dismissing tortious interference with contract claim where record indicated no wrongdoing by attorney).  There is simply no evidence in the record to support Plaintiff's conjecture that Hunton and BNY Mellon "collaborate[d] on an end-run around the terms of the Indenture – and Plaintiff cites none."  (Pl. Mem. at 24.)

Finally, where a defendant has an "economic interest" in a contract, a plaintiff must show that defendant's actions were "malicious or involved conduct rising to the level of criminality or fraud."  Vinas v. Chubb Corp., 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007) (quoting Masefield AG v. Colonial Oil Indus., No. 05 Civ. 2231, 2006 WL 346178, at *5 (S.D.N.Y. Feb. 15, 2006).  Plaintiff contends that the economic interest defense does not apply here because there is no relationship between Bimini and BNY Mellon "akin to an ownership interest or parent-subsidiary relationship."  However, the law does not impose such a specific requirement.  Don King Prods., Inc. v. Smith, 47 F. App'x 12, 15-16 (2d Cir. 2002) (finding that promoter who convinced boxer to breach a contract with another promoter was protected by his economic interest in gaining a new client); Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 579 N.Y.S.2d 353, 354 (1st Dep't 1992) (creditor's economic interest in debtor sufficient to trigger heightened pleading standard); see Vinas, 499 F. Supp. 2d at 433 (recognizing that economic interest defense has not been limited to direct ownership).

Bimini's interest in repurchasing its own TruPS to avoid bankruptcy gave Bimini a sufficient financial stake to trigger the economic interest defense.  (See Def. Mem. at 8-11.) Plaintiff clearly cannot meet the heightened burden of showing that there is no issue of fact that Bimini's conduct was malicious, criminal or fraudulent.

Accordingly, Plaintiff's motion for summary judgment must be denied on this claim as well.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment should be

denied.

Dated: New York, New York                                    Respectfully submitted,
      December 30, 2010

| | |
|---|---|
| _____/s/  Kelly H. Hnatt_____ | _____/s/  Dale C. Christensen_____ |
| WILLKIE FARR & GALLAGHER LLP | SEWARD & KISSEL LLP |
| Kelly M. Hnatt (khnatt@willkie.com) | Dale C. Christensen Jr. (christensen@sewkis.com) |
| Benjamin P. McCallen (bmccallen@willkie.com) | Brian P. Maloney (maloney@sewkis.com) |
| 787 Seventh Avenue | One Battery Park Plaza |
| New York, New York 10019 | New York, New York 10004 |
| Phone: (212) 728-8000 | Phone:   (212) 574-1200 |
| Fax:    (212) 728-8888 | Fax:      (212) 480-8421 |

Attorneys for Defendant Bimini                       Attorneys for Defendant and Nominal
Capital Management, Inc.                               Defendant The Bank of New York Mellon, as
                                          Indenture Trustee