UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

R. DAVIS HOWE, individually and derivatively,

Plaintiff,

-against-

THE BANK OF NEW YORK MELLON, as Indenture Trustee, BIMINI CAPITAL MANAGEMENT, INC., and HEXAGON SECURITIES LLC,

Defendants,

and THE BANK OF NEW YORK MELLON, as Indenture Trustee, and PREFERRED TERM SECURITIES XX, LTD.,

Nominal Defendants.

09 Civ. 10470 (HB)

ECF CASE

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

BUTZEL LONG,
a professional corporation
Robert D. Piliero (piliero@butzel.com)
Robert Sidorsky (sidorsky@butzel.com)
380 Madison Avenue
New York, New York 10017
Tel.: (212) 818-1110
Fax: (212) 818-0494

*Attorneys for Plaintiff R. Davis Howe*

# TABLE OF CONTENTS

THE RELEVANT MATERIAL FACTS ..... 1

A. The Bimini TruPS Had Not Defaulted and Were a Performing Collateral Security ..... 1

B. The Initial Cash Tender Offer and Proposed Exchange Offer ..... 2

C. Gardere's Negative Response to the Proposed Cash Offer ..... 3

D. Bimini Fires Back ..... 3

E. BNYM Backs Down and Permits the Bimini Offer to Proceed ..... 4

F. The Unsuccessful Search for a Default Under Section 5.16(b) ..... 6

G. The Hunton Draft Memo: "One-time Interpretation and Opportunity" ..... 7

H. The Hunton Memo: "defaulted Collateral Security" *Most Likely* Means a Security in Which the Issuer Is Financially Distressed and "imminently about to default" ..... 9

I. Hunton's Final Opinion Letter ..... 11

J. Bimini Was In No Danger of Default in March 2009, and Its Financial Position Improved Dramatically Throughout 2009 ..... 12

POINT I: PLAINTIFF HAS STANDING TO BRING DERIVATIVE CLAIMS IN THE RIGHT OF THE TRUSTEE AND ON BEHALF OF PreTSL XX ..... 14

A. Plaintiff Has Standing to Bring Claims Derivatively in the Right of the Trustee ..... 14

B. Derivative Claims on Behalf of PreTSL XX ..... 18

C. Plaintiff Can Fairly and Adequately Represent the Interests of the Trust Estate ..... 20

POINT II: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BNYM FOR BREACH OF CONTRACT (FIRST AND SECOND CLAIMS FOR RELIEF) ..... 21

A. The Requisite Noteholders Had No Right to Consent to a Tender in Violation of the Indenture ..... 22

B. The Trustee Did Not Rely in Good Faith on the Hunton Opinion ..... 22

1. The Hunton Opinion Does Not Satisfy the Requirements of the Indenture ..... 23

2. The Issue of Good Faith Reliance Is Unsuitable for Summary Adjudication ..... 25

3. There Is Overwhelming Evidence of Bimini's Bad Faith ..... 26

POINT III: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BIMINI FOR TORTIOUS INTERFERENCE WITH CONTRACT (THIRD AND FOURTH CLAIMS FOR RELIEF)........................28

POINT IV: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BNYM FOR BREACH OF FIDUCIARY DUTY (FIFTH AND SIXTH CLAIMS FOR RELIEF)..................................................30

POINT V: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BIMINI FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (SEVENTH AND EIGHTH CLAIMS FOR RELIEF) ..........................................................................................................32

POINT VI: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BIMINI FOR UNJUST ENRICHMENT (NINTH AND TENTH CLAIMS FOR RELIEF) .........................................................34

POINT VII: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIM AGAINST BIMINI FOR RESCISSION/ILLEGALITY (ELEVENTH CLAIM FOR RELIEF)..................................................................34

CONCLUSION...........................................................................................................35

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, No. 03 Civ. 3748 (DAB), 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006) ..... 34

*AMBAC Indemnity Corp. v. Bankers Trust Co.*, 151 Misc.2d 334 (Sup. Ct. N.Y. Cty 1991) ..... 31

*Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1 (1st Dep't 1995) ..... 30

*Campbell v. Hudson & Manhattan R. Co.*, 277 A.D. 731 (1st Dep't 1951) ..... 14, 18

*Chemical Bank & Trust Co. v. Prudence-Bonds Corp. (New Corp.)*, 207 F.2d 67 (2d Cir. 1953) ..... 27, 28

*Cruden v. Bank of New York*, 957 F.2d 962 (2d Cir. 1992) ..... 18, 27

*Entel v. Guilden*, 223 F. Supp. 129 (S.D.N.Y. 1963) ..... 19-20

*Feldbaum v. McCrory Corp.*, C.A. No. 11866, 1992 WL 119095 (Del. Ch. June 2, 1992) ..... 15, 18

*Gould v. J. Henry Schroder Bank & Trust Co.*, 78 A.D.2d 870 (2d Dep't 1980) ..... 14-15, 18

*Hoff v. Sprayregan*, 52 F.R.D. 243 (S.D.N.Y. 1971) ..... 19

*Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290 (S.D.N.Y. 2006) ..... 34

*In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520 (S.D.N.Y. 2006) ..... 25

*LNC Investments, Inc. v. First Fidelity Bank*, 935 F. Supp. 1333 (S.D.N.Y. 1996) ..... 30, 31

*LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1997 WL 528283 (S.D.N.Y. Aug. 27, 1997) ..... 22-23

*Markowski v. SEC*, 34 F.3d 99 (2d Cir.1994) ..... 22

*Morrissey v. Segal*, 526 F.2d 121 (2d Cir. 1975) ....................23

*Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*,
768 F. Supp. 115 (S.D.N.Y. 1991) ....................34

*Rabinowitz v. Kaiser-Frazer Corp.*,
111 N.Y.S.2d 539 (Sup. Ct. Kings Cty 1952) ....................15, 18

*Ryan v. Aetna Life Ins. Co.*,
765 F. Supp. 133 (S.D.N.Y. 1991) ....................20

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
353 F. Supp. 2d 460 (S.D.N.Y. 2005) ....................25

*Teachers Ins.& Annuity Ass'n of Am. v. Crimii Mae Svcs. L.P.*,
No. 06-0392 (LAK), 2010 U.S. Dist. LEXIS 9219 (S.D.N.Y. Feb. 3, 2010)....................25

*Terrydale Liquidating Trust v. Barnes*,
611 F. Supp. 1006 (S.D.N.Y. 1984) ....................28

Plaintiff R. Davis Howe ("Plaintiff" or "Howe"), in his individual capacity and derivatively, respectfully submits this Memorandum of Law, the accompanying Counter-Statement pursuant to Local Civil Rule 56.1, the Declaration of Robert D. Piliero ("Piliero Decl."), and the Supplemental Declaration of Robert Sidorsky ("Sidorsky Supp. Decl.") and the exhibits annexed thereto,[1] in opposition to the joint motion of defendant and nominal defendant The Bank of New York Mellon ("BNYM" or the "Trustee") and defendant Bimini Capital Management, Inc. ("Bimini") (collectively "Defendants") for summary judgment.

## THE RELEVANT MATERIAL FACTS

### A. The Bimini TruPS Had Not Defaulted and Were a Performing Collateral Security

It is undisputed that Bimini had not defaulted prior to its repurchase of the Bimini TruPS at a substantial discount in October 2009, and that the Bimini TruPS at all times remained a performing Collateral Security, generating interest payments for distribution through the PreTSL XX waterfall. In short, at no time did Bimini default on a payment or breach any covenant or other obligation under the underlying Bimini TruPS indenture. It is also beyond dispute that Bimini and its counsel, and BNYM and its counsel, all knew this.[2] *See* Exh. 12 (e-mail dated May 14, 2009 from M. Wickersham to S. Elison) ("Bimini hasn't defaulted"); Exh. 32 at 2 ("BNYM confirmed that a default had <u>not</u> occurred on the Bimini security.") (emphasis in original). In addition, Bimini was not listed as defaulted on any of the quarterly reports issued

---

[1] All references to Exhibits are to the Exhibits annexed to the Declaration of Robert Sidorsky in Support of Plaintiff's Motion for Summary Judgment as to Liability (Exhs. 1-78) and to the Exhibits annexed to the Sidorsky Supp. Decl. (Exhs. 79-93).

[2] Numerous witnesses, including Christoper Grose of BNYM, have testified that Bimini had not defaulted, either through a payment default or as a result of a breach of a covenant in the underlying indenture governing the Bimini TruPS. *See* Exh. 24 (Cauley Dep. Tr. at pp. 178-80 and 280); Exh. 27 (Cope Dep. Tr. at pp. 83-84); Exh. 28 (Elison Dep. Tr. at pp. 28-31 and 96); Exh. 29 (Grose Dep. Tr. at pp. 48, 58-59, 76-77) ("As far as I know, at the time that I left, the security was not in default."); Exh. 25 (McIndoe Dep. Tr. at p. 45) ("To my knowledge, there was no default under the indenture by which Bimini issued its TruPS security."); Exh. 30 (Wickersham Dep. Tr. at pp. 43-44) ("As far as I know, Bimini was not in breach of its TruPS indenture.").

by BNYM to the Noteholders. Exh. 29 (Grose Dep. Tr. at p. 77) ("As of the individual reporting dates, Bimini is not listed as defaulted on any of these reports.").

Recognizing that Bimini had not defaulted, on June 23, 2009, Grose, the BNYM relationship manager responsible for PreTSL XX, sent an e-mail to Stephen Elison, a partner at Gardere, asking: "point of interest: can we even do this with them NOT being in deferral/default??" Elison replied: "That's where Hunton has to be very creative." Exh. 31 (emphasis added).

**B. The Initial Cash Tender Offer and Proposed Exchange Offer**

In September 2008, Bimini made an initial tender to purchase for cash, in an amount corresponding to 12.5% of par value, the Bimini TruPS held by both PreTSL XX and PreTSL XXI. This initial tender offer was made pursuant to an "Offer to Purchase" dated September 18, 2008 but the offer failed. *See* Exhs. 6, 7 and 8. After this cash offer failed, Bimini considered the possibility of an exchange offer involving the exchange of the Bimini TruPS for other debt securities. After consulting with Gardere, however, Bimini decided not to pursue an exchange offer because the substitution of different securities in the Trust Estate would have required an amendment to the Indenture and presented various legal obstacles.[3] *See* Exh. 11.

During the May and June 2009 time frame, Gardere and Hunton discussed the options. On May 14, 2009, Stephen Elison of Gardere e-mailed Mark Wickersham of Hunton: "Do you think the Bimini securities in the PretSL 20 deal are 'defaulted Collateral Securities'?"

3 In particular, Gardere, in an e-mail dated May 26, 2009 to Hunton, provided comments to the draft consent solicitation materials provided by Hunton and advised Hunton that BNYM required a series of nine "deliveries." These included an Officer's Certificate from PreTSL XX and an Opinion of Counsel complying with Section 11.1 of the Indenture (pursuant to Section 2.10 of the Indenture). Exh. 11. In addition, BNYM required, among other things, an Opinion of Counsel that the supplemental indenture would not have any material adverse affect on the federal income taxation of any Notes; an Opinion of Counsel that the supplemental indenture would not impair or adversely affect the Trust Estate; and an Opinion of Counsel that the supplemental indenture is authorized or permitted by the Indenture and that all conditions precedent have been satisfied. *Id.*

Wickersham responded: "Is that a defined term? Bimini hasn't defaulted, though they are not well capitalized at this point." Exh. 12 (emphasis added).

**C. Gardere's Negative Response to the Proposed Cash Offer**

Bimini decided to drop the proposed exchange offer based on the legal hurdles in favor of a cash offer, and on June 12, 2009, Hunton submitted a draft offer to purchase for cash to Gardere for its review. The accompanying draft "Notice of Offer" or "Consent Solicitation" was made pursuant to Section 5.16(a) of the Indenture and was based on a sales price of $8.5 million for the $24 million face value of Bimini TruPS. Exh. 14.

Elison of Gardere, BNYM's counsel, responded to Wickersham of Hunton in an e-mail dated June 17, 2009, in which he explained that Section 5.16(a) of the Indenture, relied upon by Hunton as the basis for the offer, was not applicable to the proposed transaction. Exh. 15. Rather than simply rejecting the proposed transaction on that basis, however, and notwithstanding that he knew that Bimini had not defaulted, Elison set out an alternative route under Section 5.16(b), in which the only permitted release of the Bimini TruPS "would be in the context of a breach of a representation or warranty in an Underlying Instrument for the Bimini Collateral Security or in the event the Bimini TruPS were a defaulted Collateral Security." *Id.*

**D. Bimini Fires Back**

Bimini and its counsel immediately recognized that the practical effect of Gardere's advice—pointing to the defaulted security provisions of the Indenture as the only way the Trustee could release the Bimini TruPS—was that a cash tender was "not doable" because Bimini had not defaulted. Exh. 16 (e-mail dated June 17, 2009 from R. Cauley to M. Wickersham) ("So you are telling me a cash tender is not doable") and (e-mail dated June 17, 2009 from M. Wickersham to R. Cauley) ("I am very disappointed with Gardere's response. . . . . I do wish the news had been different and not surprising in such a negative way.").

Robert Cauley, Bimini's Chairman and CEO, drafted an angry letter to BNYM, beginning with the salutation "F***K YOU!!," which he sent to Hunton on June 18, 2009. Exh. 17. Hunton revised the letter, seeking to make it more "actionable" based on arguments that BNYM should be estopped because Bimini had relied to its detriment on BNYM's earlier advice.[4] *See* Exh. 79 (e-mail dated June 18, 2009 from D. McIndoe to M. Wickersham) ("He [Cauley] should emphasize Bimini's reliance on BONY (like, we directly relied on you) and highlight that we did not have access to the document to make our own assessment") and (e-mail dated June 18, 2009 from M. Wickersham to D. McIndoe and G. Cope) ("I've marked up the letter a bit . . . . I wanted to retain Bob's passion and tone but make it more comprehensible and actionable.").[5]

Cauley then fired off the final draft of the letter to BNYM on June 19, 2009, as revised by Hunton. Exh. 19. In final form, Cauley argued that Bimini had incurred "material costs" in relying to its detriment on BNYM's earlier advice and that BNYM "had helped to put Bimini in an even shakier financial position." Cauley asked Grose in the letter to speak with in-house counsel and "help them understand that BoNY should not completely reverse its stance." *Id.*

### E. <u>**BNYM Backs Down and Permits the Bimini Offer to Proceed**</u>

As soon as it received Cauley's letter, BNYM began backing down and sought to

---

[4] The original draft of Cauley's letter stated: "While we have managed to avoid bankruptcy to this date, <u>we will need to restructure our trust preferred debt if we are to survive</u>." Exh. 18. (emphasis added). Hunton edited this language to read: "While we have managed to avoid bankruptcy so far, <u>we now need to cancel our trust preferred debt (our TruPS) if we are to survive</u>." *Id.* (emphasis added). Thus, Hunton strengthened the language to convey an immediate need to effect the transaction and to actually <u>cancel</u> the TruPS, rather than simply restructure the debt obligations, as Cauley himself had characterized the more limited remedy that Bimini allegedly required. *See also* Exh. 80 ("We revised your letter in such a way to maximize the chance that BoNY will act on your requests.").

[5] *See also* Exh. 81 (e-mail dated June 18, 2009 from G. Cope to D. McIndoe and M. Wickersham) ("Do we have any grounds to push back on Gardere and their analysis? This is a raw deal for Bimini when trustee's counsel tells you twice that 2/3 is enough, once verbally and once in writing, and then tells you it doesn't work after you invest the time and money to prepare the documents and reach out to the holders. I'm sure the estoppel argument will not work with them, so where does that leave us?"). As it turned out, however, Cauley's estoppel argument did have the intended effect.

reassure Bimini that the cash tender could go through, notwithstanding that Bimini had not defaulted. As documented by Wickersham of Hunton: "Bob [Cauley] jubilantly told me that in response to Bob's letter, the BNY person in charge of PreTSL XX said that the cash offer could go through and that he would speak with Gardere." Exh. 21 (draft e-mail from M. Wickersham to D. McIndoe); *see also id.* ("Gardere, with additional pressure from BNY, is trying really hard to find a way to make this work, as we had hoped and thought.").[6]

Grose, the relationship manager at BNYM, and Gardere also quickly sought to appease Cauley. On June 22, 2009, only three days after Cauley sent his letter, Elison asked Grose to reach out to the representatives of PreTSL XX to discuss the requirements for the Bimini transaction, including the need for an Issuer Order and Officer's Certificate from PreTSL XX. *See* Exh. 82. The next day, Grose sent a copy of Cauley's letter to the representative of PreTSL XX at Maples Finance and PreTSL XX's counsel, Sidley & Austin LLP ("Sidley"), stating: "please note the below correspondence from Bimini's CEO. I've since spoken with him [Cauley] and assured him we are not trying to pull the rug from under them, but that we do have additional requirements now that we did not necessarily recognize last fall during their initial attempt." *Id.* (emphasis added). In response to an e-mail that same day from Mark Koontz of Sidley, inquiring whether BNYM had any information on the proposed offer, Grose replied: "No, not officially. . . . this one has garnered some attention and ruffled some feathers on both sides, so we're just trying to keep everybody satisfied by keeping the ball rolling." Exh. 83.

Also on June 23, 2009, Grose sent an e-mail to Elison, copied to Koontz of Sidley, in advance of a call with Hunton, confirming that in order to proceed with the proposed transaction,

6 Despite Wickersham's acknowledgment to Gardere back in May that no default had occurred, on June 19, 2009, the same date as Cauley's letter, Elison sent Wickersham his mark up of Hunton's draft of the Consent Solicitation. Elison, among other things, replaced each of the references to the inapplicable Section 5.16(a) that Hunton had invoked with references to the equally inapplicable Section 5.16(b). Exh. 20.

the Trustee would need an Issuer Request, an Officer's Certificate and an Opinion of Counsel from PreTSL XX's counsel that complied with the requirements of Section 11.1 of the Indenture. Exh. 34. Koontz responded, however, that no Issuer Request, Officer's Certificate or Opinion of Counsel (as defined in the Indenture) was required based on the assumption that the transaction fell within Section 5.16(b). *See id.* Then, on July 2, 2009, Koontz sent an e-mail to Grose asking whether the Bimini TruPS were in default, since he did not recall the issue coming up on the earlier call with Bimini. Exh. 33. Grose falsely represented in his reply to Koontz that the Bimini TruPS **were** in default. *Id.* Grose's response is all the more remarkable given that only a few days earlier he had asked Elison: "can we even do this with them NOT being in deferral/default??" Exh. 31.

Thus, as a result of this affirmative misrepresentation, PreTSL XX's counsel was incorrectly led to believe that the transaction fell within Section 5.16(b), and that none of the requirements for release of collateral mandated by Section 2.10 of the Indenture applied. Instead of requiring an Issuer's Request and an Officer's Certificate from PreTSL XX, and an Opinion of Counsel from PreTSL XX's counsel, the only documentation required by BNYM was an opinion from Bimini's own counsel, which the record clearly establishes can most charitably be characterized as an overzealous advocate for its client. *See* Exh. 35.

**F. The Unsuccessful Search for a Default Under Section 5.16(b)**

Having pointed Hunton in the direction of Section 5.16(b), Gardere continued to collaborate with Hunton in an effort to concoct some semblance of an appearance of compliance with that provision's clear requirement of a default. On June 18, 2009, for example, Elison e-mailed Wickersham: "While we return to our documents, could you please take a look at the underlying Bimini Indenture. If we take the view that Bimini is a 'defaulted Collateral Security' is there any provision in that Indenture that you think could be used to justify that conclusion?"

Exh. 22 (emphasis added).

This advice from Gardere spurred Hunton to discuss with Bimini whether there was any way to "trip a relatively minor covenant" in the underlying indenture governing the Bimini TruPS that would qualify as a default so as to satisfy the requirement of Section 5.16(b). *See* Exh. 23.[7] Hunton, however, was unable to find a "relatively innocuous way" to trip a little "d" default." Hunton's inability to find a "solution" that would permit the cash offer under the terms of the Indenture is detailed in an e-mail prepared by Hunton's Wickersham to David McIndoe of Hunton.[8] As set forth in the e-mail, Wickersham expressly advised Elison of Gardere that Hunton had been unable to find a "default" for purposes of Section 5.16(b). Exh 21, at HW 00030875.

Wickersham's e-mail then continued by explaining that Bimini's offer would be going forward even though neither Hunton nor Gardere had "figured out a way to fit this offer into the Indenture." *Id.* ("We agreed that I would remove the specific reference to 5.16(a) or (b) in the offer letter so that it could go out soon even if we [Hunton] and they [Gardere] hadn't already figured out a way to fit this offer into the Indenture.").

### G. <u>The Hunton Draft Memo: "One-time Interpretation and Opportunity"</u>

In connection with the opinion that Hunton had been requested to provide, McIndoe and Wickersham by June 24, 2009 began drafting an internal memorandum (the "Hunton Memo") at the request of Jack Molenkamp and Amy Williams, two members of the Hunton Opinion

---

[7] *See also id.* (e-mail dated June 22, 2009 from D. McIndoe to M. Wickersham) ("It would be great if we could show some other covenant default, or something in which we could default, but cure before the grace period ended."); Exh. 72 (e-mail dated June 22, 2009 from M. Wickersham to R. Cauley) ("Assuming that Gardere/BoNY requires that the CDO Indenture support the envisioned transaction, based on our conversation with Gardere . . . there's a good chance that they will need your circumstances to fit into 'defaulted' language. To accomplish this with minimal adverse secondary effects, you might be able to trip a relatively minor covenant.").

[8] Wickersham testified that he drafted the e-mail to McIndoe but never sent it because he probably ended up speaking with McIndoe directly. Exh. 84 (Wickersham Dep. Tr. at p. 164).

Committee, which was submitted to them for review. *See* Exhs. 38 and 39.

The Hunton Memo went through a significant number of iterations. *See* Exhs. 39-58. Earlier drafts of the Hunton Memo, including the draft with Molenkamp's comments dated June 29, 2009, contain a section entitled "One-time Interpretation and Opportunity," explaining that BNYM would not be permitting other issuers of TruPS to repurchase their securities under Section 5.16. Exh. 47 at 8 (emphasis added). Most significantly, the "key facts" identified by Hunton as the basis for BNYM's acceptance of the transaction did not include compliance with the Indenture.[9]

Bimini's recognition that this was a one-time concession by BNYM, rather than a transaction authorized under the terms of the Indenture, is also evidenced by Cauley's e-mail dated July 23, 2009 to Michael Ludlow of Hexagon Securities LLC, copied to Wickersham. After learning that BNYM was permitting a different repurchase transaction by another issuer, Cauley inquired: "What happened to the idea (put forth by BONY) that these cash tenders were not really permitted by the docs, and they just let ours go as a concession to the fact we had already done one and had lined up the holders." Exh. 59. In his reply, Wickersham explained that the issuer in the other repurchase transaction had actually defaulted and confirmed that "Gardere is pulling back even as we speak from permitting reasoning such as we provided for the Bimini offer." *Id.* (e-mail dated June 23, 2009 from M. Wickersham to R. Cauley and M. Ludlow) ("Unlike Bimini, FirstFed is in default on all of its series.").[10]

---

[9] This section was deleted from the final version of the Hunton Memo at the direction of both Molenkamp and Williams, who were the two members of Hunton's Opinion Committee to whom the Memo was addressed, and who had final authority to decide whether an opinion favorable to Hunton's client could be issued. Thus, the members of Hunton's Opinion Committee simply deleted the section of the earlier drafts that exposed the fact that there was no legal justification for the Opinion; rather the Opinion was the product of overzealous advocacy by Bimini's counsel and the turning of a blind eye by the Trustee and its counsel.

[10] *See also* Exh. 71 (handwritten notes of M. Wickersham of telephone conversation with S. Elison on June 18, 2009) ("SE [Stephen Elison]: our [Gardere's] current read is that only Defaulted Securities can be moved out. [But

## H. The Hunton Memo: "defaulted Collateral Security" *Most Likely* Means a Security in Which the Issuer Is Financially Distressed and "imminently about to default"

In the final version of the internal Hunton Memo, dated July 14, 2009, Hunton in its "very creative" effort to find a way to treat the fully performing and non-defaulted Bimini TruPS as a "defaulted Collateral Security," concluded as follows: "Most likely, 'defaulted Collateral Securities' are those in which the issuers of such securities are in a distressed situation such that the issuers (a) have defaulted on a security but the applicable grace period has not run or (b) are imminently about to default." Exh. 26 at 4 (emphasis added).

The only claimed support offered by Hunton for this putative "most likely" interpretation is the inclusion of the concept of a "DS Avoidance Event" in the definition of "Defaulted Security." *Id.* Hunton's analysis, however, makes no sense and bears no relation to the plain and ordinary meaning of the term "defaulted" as used in Section 5.16(b) and in the context of the Indenture taken as a whole. To begin with, the term "Defaulted Security" appears in Section 2.17 of the Indenture, not in Section 5.16(b). Pursuant to Section 2.17(a), the Holders of the Income Notes, including Plaintiff, have the option to purchase a "Defaulted Security" at a price in accordance with the formula set forth therein. Exh. 1 (Indenture at pp. 52-53). Accordingly, as explained in Plaintiff's Memorandum in Support of Motion for Summary Judgment at pages 18-19, the defined term "Defaulted Security" was intended to be more expansive than "defaulted" in the ordinary sense of the word and included the concept of a "DS Avoidance Event," *i.e.*, an event to avoid an actual defaulted security.[11]

---

there may be flexibility due to BMNM's particular situation] (brackets in original). SE will go back to BONY's internal counsel and discuss Other fuzzy language may need to be drawn upon.").

[11] As Howe explained during his deposition: "Big 'D' default is a broader concept and it includes things that are sort of problematic but not an actual default. So the most notable being if an issuer defers their interest, the transaction was designed so that we immediately begin or the transaction immediately begins to redirect cash flow to protect the senior most tranches against a potential eventual default, which is different than an actual default." Exh. 85 (Howe Dep. Tr. at pp. 215-16).

Furthermore, even under the expansive definition of a "Defaulted Security" applicable in the context of Section 2.17 of the Indenture, it is undisputed that a "DS Avoidance Event" had not occurred. McIndoe, the principal architect of the Hunton Memo, admitted during his deposition that there was no "DS Avoidance Event" with respect to the Bimini TruPS.[12]

In particular, a "DS Avoidance Event" had not occurred because Bimini had neither (i) entered into an insolvency proceeding nor (ii) "proposed or effected a distressed exchange or other debt restructuring in which [such issuer] has offered . . . a new security or package of securities that, in the reasonable judgment of the Rating Agencies, has the purpose of helping [such issuer] avoid default.[13] *See* Exh. 26 at 6; Exh. 1 (Indenture at p. 12). For the purpose of its analysis of whether the Bimini TruPS were a defaulted Collateral Security, however, Hunton concluded that a distressed exchange had been made, notwithstanding that Bimini never proceeded with the exchange offer, and with a wave of its magic wand replaced the requirement of approval by the Rating Agencies with the consent of the Requisite Noteholders (who were paid off by Bimini to consent).[14] *See* Exh. 25 (McIndoe Dep. Tr. at pp. 60-64).

---

[12] McIndoe testified:

> Q. And my question is: Did the Bimini TruPS fall under the portion of the definition of "DS Avoidance Event"?
> A. I just want to read one thing here. Not entirely.
> Q. Can you have a DS avoidance event if you're only part of one of the disjunctive definitions?
> A. No. You need to have – to have a "DS avoidance event," you must have met all of either prong one or prong two.
> Q. My question is: Did the Bimini TruPS meet all of prong one or prong two?
> A. It did not meet all of prong one or prong two.

Exh. 25 (McIndoe Dep. Tr. at p. 50).

[13] Bimini never pursued the process to come within a "DS Avoidance Event." *See* Exh. 23 (e-mail dated June 22, 2009 from D. McIndoe to M. Wickersham) ("Gardere should ask why doesn't Bimini go through the DS Avoidance Event path. Okay to signal that Bimini might do so, but that we view that route as a path of last resort. We can sight [sic] to concerns over (i) adequate consideration (requiring payment in kind) and (ii) the rating agency belief requirement.").

[14] Hunton's analysis therefore failed to adhere to the terms of the Indenture and effectively re-wrote Section 5.16(b) to contemplate not an actual "default"—as the clear language states—but rather to encompass an utterly subjective and amorphous possibility of a prospective default. Not only is there no legal basis for Hunton's conclusion, but the

## I. Hunton's Final Opinion Letter

On October 21, 2009, Hunton formally issued its opinion letter in the same form that BNYM's counsel had previously approved (the "Hunton Opinion"). *See* Exhs. 36, 37 and 63. McIndoe testified that the Opinion was predicated on Hunton's conclusion that the Bimini TruPS were "defaulted Collateral Securities." Exh. 25 (McIndoe Dep. Tr. at p. 60). But he also admitted that Hunton had undertaken no independent review of the factual predicate for that conclusion, and instead relied on Cauley's self-serving statement (which Hunton itself has re-worked and fortified) that the repurchase and cancellation of the Bimini TruPS was necessary to Bimini's survival.[15] *Id.* at pp. 84-85.

McIndoe also acknowledged that the Opinion contained no statement, as required by Section 11.1 of the Indenture, that all conditions precedent to the transaction and compliance with the terms of the Indenture had been satisfied. *Id.* at p. 572. No explanation has been offered as to why BNYM and its counsel accepted the Hunton Opinion notwithstanding this glaring omission.[16] *See id.* at p. 573. *See also* Exh. 21 ("we're going to end up being the bad guys if we can't get comfortable issuing a conditions-precedent-satisfied opinion").

---

Hunton Memo also failed to provide any factual support for the notion that Bimini was "imminently about to default," other than a footnote referring to the statement in Cauley's June 19, 2009 letter to BNYM and various telephone conversations with Noteholders in which Cauley allegedly represented that Bimini needed to repurchase its TruPS if it was to survive. Exh. 26 at p. 4 n.5. McIndoe testified that he relied entirely on the first two sentences of Cauley's letter to support the factual predicate that Bimini was in a distressed financial condition and about to default, even though Hunton itself had revised that language to more forcefully support that very conclusion. *See* n. 2 above; Exh. 25 (McIndoe Dep. Tr. at pp. 83-85) and Exhs. 18 and 80.

[15] McIndoe also testified that he was aware that Bimini had consulted with bankruptcy counsel back in 2008, prior to the initial cash tender offer. *See* Exh. 25 (McIndoe Dep. Tr. at p. 86). Of course, Bimini did not file for bankruptcy and its financial position improved during 2009, as discussed at pages 12-13.

[16] In an e-mail to Cope and Wickersham dated July 9, 2009, McIndoe pointed out that: "Every trustee wants to know that all of the conditions have been identified and that all of the conditions have been satisfied (even if the underlying facts are assumed). This is even more important when we aren't referencing a specific section of the indenture as the basis of the Trustee's authority. It's possible that Gardere is asleep at the switch, but we should be prepared to address the opinion request." Exh. 64. As it turned out, however, Gardere was either indeed "asleep at the switch" or BNYM simply did not care whether the transaction was permissible under the Indenture.

**J. Bimini Was In No Danger of Default in March 2009, and Its Financial Position Improved Dramatically Throughout 2009**

In March 2009, in connection with Bimini's preparation of its annual audited financial statements, Bimini's management prepared a memorandum for Bimini's independent auditors, Ernst & Young, regarding whether its auditor's report should contain a "going concern" qualification, which is essentially a statement that there is substantial doubt as to whether the company will survive for the next year. *See* Exh. 66 at BC0004244. In that memorandum, Bimini's management explained that, under even a worst case scenario, running at a negative cash from operations rate of $1.65 million per quarter, and even assuming that Bimini was unable to restructure or eliminate any of the payments required under its then-outstanding $100 million in TruPS, Bimini could nonetheless continue in business for at least four years before exhausting its working capital.[17] *Id.* at BC0004241.

Bimini's financial condition improved markedly throughout 2009, as reflected in the factual record and documented in the expert report of Z. Christopher Mercer on behalf of Plaintiff, dated October 6, 2010 ("Mercer Report"). Based on 15 separately highlighted and discussed data points, the Mercer Report concludes that there was not a reasonable probability that the Bimini TruPS would default in the reasonably foreseeable future as of the transaction closing date of October 21, 2009. Exh. 86 (Mercer Report at pp. 11-25).

Among the 15 factors supporting this conclusion were the following (in addition to Bimini management's own assurances to its auditors—and through them to its public shareholders—that it would remain viable as an operating entity for at least the next year): (i)

---

[17] In fact, after the "going concern" memorandum was released to Ernst & Young, and after Ernst & Young issued a "clean" auditor's report with no "going concern" qualification, Bimini did succeed in restructuring the $50 million in TruPS managed by Taberna Capital. As a result of that transaction, its financial condition—already strong enough to enable the company to survive for at least four years—became far more robust by recognizing a gain of a whopping $31.5 million. See Exh. 67.

Bimini had enough cash on hand to fund several years of any operating losses, with a cash balance at September 30, 2009 of $14,784,000 (*id.* at p. 11); (ii) Bimini's operating income steadily improved during 2009 (*id.* at p. 12); (iii) Bimini's equity increased from a deficit of $30.9 million at year-end 2008 to positive $5.8 million at September 30, 2009 (*id.* at p. 13); and (iv) in April 2009, Bimini redeemed $50 million of TruPS issued by Bimini Capital Trust I from Taberna Capital, resulting in a gain of $31.5 million as publicly reported by Bimini (*id.* at p. 13 and Exh. 67). Furthermore, in their communications to Bimini's outside auditors and shareholders, Bimini's management emphasized that the company could remain viable based on an alternative investment strategy.[18] *See* Exh. 86 (Mercer Report at pp. 14-15 and 21-23).

The sole basis for Bimini's argument that its undisputedly fully performing and <u>non</u>-defaulted TruPS should be deemed to be "defaulted Collateral Securities" within the meaning of Indenture Section 5.16(b) is that Bimini was in such dire financial circumstances that it <u>might</u> default on its payment obligations at some point in the future. In Plaintiff's separate motion for summary judgment, Plaintiff urges the Court to reject the tortured argument that the financial condition of an issuer of collateral is somehow relevant to a determination as to whether the collateral securities themselves are "defaulted' and, on that basis, to rule in Plaintiff's favor on the liability issue. The facts discussed above necessarily create material questions of fact regarding the true state of Bimini's financial condition at the time of its Tender Offer for the repurchase of its TruPS for less than half their face amount so as to defeat Bimini's motion for

---

[18] In an internal memo dated June 9, 2009, Cauley and Bimini's CFO, Hunter Haas, described a scenario in which Bimini could operate indefinitely even absent an additional equity raise or the elimination of the Bimini TruPS. Exh. 87, at BC0011905 ("Absent such an equity raise, we would continue to migrate the investment strategy away from dependence on access to repo funding and utilize structured products as the predominant investment vehicle (our alternative investment strategy). This strategy would be augmented over time as the cash derived from the monetization of the remaining OITRS assets [Bimini's former mortgage company] was deployed into the company's portfolio. <u>We anticipate this increase in our earnings potential would be enough to operate the company indefinitely</u> – although at a modest level.") (emphasis added).

summary judgment.[19]

**POINT I: PLAINTIFF HAS STANDING TO BRING DERIVATIVE CLAIMS IN THE RIGHT OF THE TRUSTEE AND ON BEHALF OF PreTSL XX**

**A. Plaintiff Has Standing to Bring Claims Derivatively in the Right of the Trustee**

Plaintiff has properly asserted derivative claims both in the right of the Trustee and on behalf of PreTSL XX for the benefit of the Trust Estate.[20] Indeed, this case, in which the Trustee knowingly breached the terms of the Indenture and engaged in misconduct by permitting the sale of a fully performing, non-defaulted Collateral Security at a significant discount, presents the quintessential situation where courts have recognized derivative standing.

The Defendants, as in their earlier motion to dismiss, simply ignore the well-established principle that noteholders may bring a derivative action in the right of the Trustee. This principle was clearly and effectively enunciated in *Campbell v. Hudson & Manhattan R. Co.*, 277 A.D. 731, 734-35 (1st Dep't 1951) as follows: "If a trustee under such an indenture acts in bad faith, or, abdicating its function with respect to the point in question, declines to act at all, bondholders for themselves and others similarly situated may bring a derivative action in the right of the trustee, rather than in their own individual rights as bondholders." This is exactly the circumstance at bar. *See also Gould v. J. Henry Schroder Bank & Trust Co.*, 78 A.D.2d 870,

---

[19] Following the consummation of the Tender Offer and the repurchase of its TruPS, Bimini recognized a gain of $9.6 million. Bimini then declared a dividend on November 9, 2009 of $0.50 per share and a special dividend of $6.50 per share to its shareholders, as Bimini was able to convert a substantial portion of its third-party debt into equity value for its shareholders. *See* Exhs. 62 and 69 (Bimini 2009 10-K at p. 84). Bimini's financial position posed no risk that it would default on its obligations under the TruPS held by PreTSL XX at any time in 2009, and by the time the repurchase was consummated in late October 2009, Bimini's financial position was robust enough that it was able to take the millions of dollars it had saved by short-changing the PreTSL XX junior Noteholders and transfer those millions to Bimini's management and its other equity owners. Thus, the debt obligation owed by Bimini to Plaintiff and other junior Noteholders in PreTSL XX was converted into a windfall for Bimini's shareholders in the form of unprecedented dividends.

[20] Plaintiff incorporates herein by reference the arguments regarding his standing to bring the derivative claims set forth in his Amended Consolidated Memorandum of Law in Opposition to Defendants' and Nominal Defendants' Motions to Dismiss the First Amended Complaint (Mem. in Opp. to Motion to Dismiss), a copy of which is Exh. 88, at pages 13-19.

870-71 (2d Dep't 1980) (recognizing bondholders' right to bring derivative actions arising out of alleged misconduct by indenture trustee); *Rabinowitz v. Kaiser-Frazer Corp.*, 111 N.Y.S.2d 539 (Sup. Ct. Kings Cty 1952).[21]

In this case, the First Amended Complaint alleges, and there is now a tsunami of evidence to support, that the Trustee acted in bad faith or abdicated its function with respect to the point in question, *i.e.*, permitting the removal of the Bimini TruPS from the Trust Estate at a substantially discounted price so as to deplete the value of the Trust Estate.

There is overwhelming evidence of bad faith on the Trustee's part. First, it is clear that the Trustee and its counsel at Gardere acceded to pressure from Bimini and the threat of litigation to allow the Tender Offer to go forward, even though Bimini had not, and BNYM knew it had not, defaulted. *See* Exh. 12 ("Bimini hasn't defaulted"). Almost as soon as the ink was dry on Cauley's letter sent to BNYM on June 19, 2009, BNYM backed down and assured him that the transaction could go through. Indeed, BNYM seemed to be operating under the fundamental misconception that Cauley was somehow its client and that it had to achieve Bimini's financial objectives rather than protect the rights of the Noteholders under the Indenture to whom it owed both contractual and fiduciary duties as Trustee.[22]

---

[21] The Delaware Chancery Court has also recognized the appropriateness of bondholder derivative actions in circumstances such as this case, where the facts alleged the Trustee's breach of its duty under the Indenture. *See Feldbaum v. McCrory Corp.*, C.A. No. 11866, 1992 WL 119095, at *7 (Del. Ch. June 2, 1992) (drawing an analogy between shareholder derivative actions in which demand to sue upon corporate directors is excused and excusing bondholders from compliance with a no action provision based on trustee's breach of its duty under the indenture).

[22] As Bimini's counsel documented on or about June 23, 2009: "Gardere, with additional pressure from BNY, is trying really hard to find a way to make this work, as we had hoped and thought." Exh. 21. *See also id.* ("Bob [Cauley] jubilantly told me [Mark Wickersham of Hunton] that <u>in response to Bob's letter</u>, the BNY person in charge of PreTSL XX said that the cash offer could go through and that he would speak with Gardere.") (emphasis added). And Grose, the BNYM relationship manager, wrote on June 23, 2009 to PreTSL XX's counsel: "we're just trying to keep everybody satisfied by keeping the ball rolling." Exh. 83. *See also* Exh. 82 (e-mail dated June 23, 2009 from C. Grose to D. Scott and M. Koontz) ("please note the below correspondence from Bimini's CEO. I've since spoken with him and assured him we are not trying to pull the rug out from under them . . . .").

Second, the record is replete with references to BNYM agreeing to allow the transaction solely as a one-time concession, not because it was permitted under the terms of the Indenture. In its draft memorandum, under the heading "One-time Interpretation and Opportunity," Hunton set forth the factors underlying the Trustee's willingness to make an exception in this case:

> the CDO Trustee is willing to accept the Section 5.16 Route in Bimini's case due to three key facts: a) about nine months ago, Gardere and the CDO Trustee permitted Bimini to make a cash tender offer for the TruPS; b) as recently as one month ago, Gardere orally reinforced, and Bimini relied on, that guidance; and c) Bimini has already received oral commitments by the Requisite Noteholders.

Exh. 47, at p. 8. Indeed, these three considerations echo the estoppel arguments made in Cauley's June 19, 2009 letter. *See also id.* ("Gardere has told us that it expects not to permit any other issuers of TruPS held by its clients' static CDOs to rely on the Section 5.16 Route").

Furthermore, in response to Cauley's question: "What happened to the idea (put forth by BONY) that these cash tenders were not really permitted by the docs, and they just let ours go as a concession to the fact we had already done one and had lined up the holders," Wickersham acknowledged "Gardere is pulling back even as we speak from permitting reasoning such as we provided for the Bimini offer." Exh. 59.

Grose confirmed in his deposition that BNYM, except in this case, was not permitting repurchase transactions to go forward in the absence of an actual default under the terms of the underlying indenture, stating:

> Q. What requirements had been adopted between his [Cauley's] last – or the initial attempt, last fall, and June 23rd?
>
> A. One thing that had changed initially when this process began and we received the first few offers, among which Bimini was one of them, we would accept the word of the issuer that they were going into default before disseminating an offer to the investors with the understanding that the security would have to have defaulted prior to the transaction going forward. By this point in time, we required that there be some sort of demonstration that there was -- that the security in question fell under that provision prior to the offer going out.

* * *

> Q. But I believe you said that there came a time when you stopped the reliance upon what the issuer said and you required something more than that, correct?
>
> A. Yes. There came a point in time when I would not even continue a conversation with one of these issuers unless they had gone into default per whichever governing document their security fell on.[23]

Exh. 89 (Grose Dep. Tr. at pp. 106-07, 113-14).

Third, Grose affirmatively misled PreTSL XX's counsel at Sidley by advising him on July 2, 2009 that Bimini had defaulted, when only a few days earlier he had asked his own counsel at Gardere: "can we even do this with them NOT being in deferral/default??" Exhs. 33 and 31. The result of this misstatement was to cause Sidley to believe that the requirement of Section 2.10 of the Indenture for release of collateral, including an Officer's Certificate and an Opinion of Counsel from PreTSL XX's own counsel, were inapplicable. But for this misrepresentation by BNYM's relationship manager, the opinion as to compliance with Section 5.16(b) would have been rendered by an independent source—Issuer's counsel—not by a law firm so zealously committed to serving its client's interest that it crossed the boundary between a contractually predicated opinion and mere pretense.

Fourth, the Trustee cannot hide behind the cover of the Hunton Opinion in light of its undisputed knowledge that the Bimini TruPS had not defaulted and that even the Trustee's own counsel considered the Opinion to be an exercise in creative writing. *See* Exh. 31 ("Hunton has to be very creative"). Indeed, it is astounding that rather than require compliance with the four corners of the Indenture, Elison continually prodded Hunton to be "very creative" so as to enable

[23] Grose also testified: "Then as the process evolved, because we did run into one who made an offer and then made their payment inside of their grace period, so as not to actually trip the event of default, and then realized that somebody could work the system that way, make it look like they are going to go into default, and then, ultimately, not trip their own default, but get an offer out in that interim period, which is one of the main – major things that had changed. By the end, we would have made them wait until after their grace period was over to see the default actually happen." Exh. 89 at pp. 110-11. Of course, unlike the situation described by Grose where there was a default that was cured during the grace period, here there was no default at all.

Bimini to circumvent the requirements of the Indenture. *See, e.g.*, Exhs. 20, 22 and 21 ("We discussed whether there was any other relatively innocuous way for BMNM to trip a little "d" default. Stephen [Elison] said that they would continue to consider it. I [Wickersham] have not been able to find one.").

Given this farrago of bad faith, duplicity and looking the other way on the part of the Trustee and its counsel, it is clear that Plaintiff has standing to bring claims derivatively in the right of the Trustee and that demand on the Trustee is excused. *See Campbell*, 277 A.D. at 734-35; *Gould*, 78 A.D.2d at 870; *see also Cruden v. Bank of New York*, 957 F.2d 962, 967-68 (2d Cir. 1992) (it would be "absurd to require the debenture holders to ask the Trustee to sue itself" pursuant to a no-action provision); *Rabinowitz*, 111 N.Y.S.2d at 543-44, 547 (recognizing demand futility where the complaint alleged that "[n]o demand upon the Trustee to institute or prosecute this action is necessary . . . for the reason that the Trustee is a defendant herein and is liable to the plaintiff and other debenture holders similarly situated"); *Feldbaum*, 1992 WL 119095, at *7.[24]

**B. Derivative Claims on Behalf of PreTSL XX**

Furthermore, and independently of Plaintiff's standing to bring claims derivatively in the right of the Trustee, Plaintiff has standing to bring derivative claims on behalf of PreTSL XX under New York law.[25] Defendants' arguments fixate on whether Plaintiff is a shareholder but ignore the economic reality that the Income Notes held by Plaintiff possess the defining characteristics of equity, as opposed to debt, and that PreTSL XX as the issuer of the Income

[24] Despite the fact that it was unnecessary to do so, both Plaintiff and, separately, his counsel, did discuss Mr. Howe's intention to assert claims based on the improper sale of the TruPS with counsel for BNYM in advance of filing the original Complaint. BNYM's counsel made it clear that, as Trustee, it would oppose this lawsuit. *See* Exhs. 90 and 91; Piliero Decl. ¶ 5.

[25] *See* Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 15-19.

Notes specifically and unequivocally recognized that the Income Notes constitute the "equity class" of the PreTSL XX CDO. Indeed, PreTSL XX and its counsel stressed in the offering documents that because the Income Notes possessed the attributes of an equity security, they would be treated as equity for federal income tax purposes. *See* Exh. 92 (Offering Circular at p. 138) ("*Tax Consequences of the Income Notes as Equity*").[26]

Furthermore, PreTSL XX has no shareholders with any beneficial or equity interest. Indeed, all of PreTSL XX's ordinary shares are owned by Maples Finance Limited, which holds such shares in a charitable trust, and has no beneficial interest in such shares. *See* Exh. 88 (Mem. in Opp. to Motion to Dismiss) at p. 17.

In sum, Plaintiff is the holder of a security issued by PreTSL XX that, as recognized by PreTSL XX and its counsel, has the attributes of equity. Courts have upheld derivative standing based on the characteristics and content of the security at issue, not based on whether the security is labeled a debenture, warrant or a share. *See Hoff v. Sprayregan*, 52 F.R.D. 243, 247 (S.D.N.Y. 1971) (sustaining derivative standing of holders of convertible debentures for purposes of Rule 23.1); *Entel v. Guilden*, 223 F. Supp. 129, 131-32 (S.D.N.Y. 1963) (upholding derivative standing of owners of corporate warrants). As stated by the court in *Entel*, 223 F. Supp. at 132:

> if equity content is poured into the mold of warrants by investors and investment bankers, the courts should not be reluctant to deny a measure of protection to holders of warrants which is adequate to sustain such use of the form. . . . The facts that warrants traditionally, albeit somewhat loosely, have been deemed more akin to options than to shares of stock and that only holders of the

---

26 Discovery has served to reinforce that the Income Notes, because they are subordinated to the Senior and Mezzanine Notes, and do not provide for a specified interest rate but represent the residual interest in the funds remaining in the Trust Estate, were treated as the equity in the deal. For example, in the tax information provided by PreTSL XX to the Noteholders, the Income Notes are described as the equity class. *See, e.g.*, Exhs. 2 and 3 ("EQUITY CLASS OF ISSUER: SUBORDINATE INCOME NOTES"). The Offering Circular also confirmed, based on the opinion of PreTSL XX's counsel at Sidley, that the holders of the Income Notes would agree to treat the Income Notes as equity for U.S. federal income tax purposes. Exh. 92 at p. 138 ("a U.S. Holder of an Income Note is required to include in income payments of 'interest' and 'principal' as distributions on equity of the Issuer"). *See also* Exh. 1 (Indenture, Section 2.4 at p. 36).

> latter class of security have usually instituted derivative suits cannot and should not bar this court from assessing the features of these warrants which render them essentially equity securities and the concomitant legal rights of their owners.

Here too, the Income Notes held by Plaintiff are essentially equity securities with the concomitant right of their owners to institute a derivative action.

### C. Plaintiff Can Fairly and Adequately Represent the Interests of the Trust Estate

Finally, Defendants' argument that Plaintiff cannot "fairly and adequately represent the interests" of the Trust Estate and its investors is without merit. Plaintiff is decidedly not, contrary to what Defendants intimate, seeking to advance his own economic interests to the detriment of other Noteholders. He is seeking to recover—for the benefit of the entire Trust Estate and all its Noteholders—the economic value of the Bimini TruPS that were improperly removed from the Trust Estate. The fact that Plaintiff has a financial interest in that lost income stream does not create any more of a conflict than exists in any class action litigation (which is conceptually indistinguishable from a derivative action for purposes of considering the issue of "adequacy of representation") where the named plaintiff has a stake in the litigation to the same extent as the class members he or she represents.[27]

Nor, as Defendants fallaciously argue, would Plaintiff's derivative claims somehow nullify the direction of the Requisite Noteholders or frustrate their "superior rights." These arguments are based on the false premise that the transaction was legitimate and authorized under the terms of the Indenture, and that the condition precedent of a defaulted Collateral

[27] Plaintiff is not seeking a recovery from PreTSL XX on his individual claims so as to create a potential conflict based on the incompatibility of the relief sought but rather is seeking recovery from the Trustee and Bimini. In the event the Court were to determine that a conflict does exist, the appropriate course to follow is not, as Defendants suggest, to dismiss the derivative claims, but rather to afford the Plaintiff an opportunity to elect whether to pursue the action in an individual or a representative capacity. *See Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 137 (S.D.N.Y. 1991) (dismissing derivative claims pending an election by plaintiff). Given that choice, if it had to be made (which we believe it does not), Plaintiff would elect to proceed on his derivative claims.

Security was satisfied. Since in fact the Tender Offer was not permitted under the terms of the Indenture, the Senior Noteholders had no "right" to consent to such an invalid transaction or to provide direction to the Trustee to sell a performing, non-defaulted Collateral Security.[28] Thus, the judicial decision Plaintiff seeks in this action would not be contrary to any "right" enjoyed by any of the Senior Noteholders who were "incentivized" to consent to the legally impermissible transaction. No such "right" ever existed.[29]

In sum, Plaintiff has derivative standing to enforce the terms of the Indenture in the right of the Trustee and on behalf of and for the benefit of the Trust Estate.

## POINT II: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BNYM FOR BREACH OF CONTRACT (FIRST AND SECOND CLAIMS FOR RELIEF)

Plaintiff has demonstrated in its separate motion for summary judgment as to liability that BNYM breached the Indenture by permitting the sale of a non-defaulted Collateral Security in contravention of the plain and unambiguous terms of the Indenture. Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Sum. Judgment Mem.") at pp. 16-22. It is undisputed that Bimini had not defaulted and that the Bimini TruPS were not a "Defaulted Security" as defined in the Indenture. *See* pages 1-2 above. Faced with these unassailable facts,

---

[28] Of course, a large majority of the Requisite Noteholders voted in favor of the transaction because they were directly paid to consent pursuant to the Consent Solicitation issued and approved by BNYM, which falsely presented the transaction as in accordance with the terms of Section 5.16(b) of the Indenture. *See* Exh. 60, at BC0001720-22.

[29] The only respect in which the derivative claims that Plaintiff asserts in this action could even arguably be in conflict with the interests of the Senior Noteholders who consented to the transaction and received special consideration for doing so is with respect to Plaintiff's claim seeking to rescind the transaction to which the Senior Noteholders consented. If we ignore the fact, discussed above, that Bimini's status as a non-defaulted Collateral Security meant that the Senior Noteholders actually had no "right" to consent to the transaction, the remedy of rescission requested by Plaintiff would appear to be disfavored by the consenting Senior Noteholders (although it is interesting to speculate that they might well enjoy the prospect of retaining the $3.3 million in "consent payments" they received from Bimini, and also once again having 100% of the value of the Bimini TruPS). Other than the prospect of undoing the transaction through rescission, there is not even a theoretical basis for claiming a conflict between Plaintiff's individual interests and those of all the other Noteholders. If the Court were to consider the pendency of a claim for rescission to be inconsistent with the assertion and maintenance of the derivative claims, Plaintiff will voluntarily dismiss the Eleventh Claim (for rescission) asserted in the Amended Complaint.

BNYM's fallback position is to argue that (i) the Requisite Noteholders approved the transaction and (ii) it relied in good faith on the Opinion of Hunton. As set forth below, these arguments are completely groundless.[30]

### A. The Requisite Noteholders Had No Right to Consent to a Tender in Violation of the Indenture

As noted, BNYM argues that the Requisite Noteholders were entitled to direct the Trustee to "take any action" with respect to a defaulted Collateral Security. Def. Joint Mem. at 21. The problem with this argument, of course, is that the Bimini TruPSs were not a defaulted Collateral Security for all of the reasons set forth in Plaintiff's motion for summary judgment, beginning with the fact that Bimini had not defaulted, and did not want to trip a covenant default. Thus, the Trustee's argument is based on a false factual premise, and, at a minimum, one that is sharply disputed. In the absence of the condition precedent of a defaulted Collateral Security for purposes of Section 5.16(b) of the Indenture, the Requisite Noteholders simply had no right or ability to approve the transaction or direct the Trustee to effect the sale of a Collateral Security in violation of the Indenture. *See* Exh. 1 (Indenture, Section 3.8(i) at p. 60). Accordingly, BNYM's defense of reliance on the consent of the Requisite Noteholders is misplaced, even leaving aside that Bimini paid off the Senior Noteholders to consent.

### B. The Trustee Did Not Rely in Good Faith on the Hunton Opinion

Initially, we note that, as an affirmative defense, BNYM bears the burden of proving its good faith reliance on Hunton's Opinion. *See, e.g., Markowski* v. *SEC,* 34 F.3d 99, 105 (2d Cir.1994); *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1997 WL 528283, at

[30] Plaintiff incorporates by reference the arguments contained in Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 25-27.

*22 (S.D.N.Y. Aug. 27, 1997). Moreover, it is well-settled that exculpatory clauses in trust agreements are to be strictly construed. *Morrissey v. Segal*, 526 F.2d 121, 127 (2d Cir. 1975).

BNYM's attempt to obtain summary judgment based on its claimed good faith reliance on the Opinion from Bimini's counsel fails for three independent reasons. *First,* it is unavailable as a matter of law because the Opinion of Counsel on which BNYM purports to rely does not satisfy the requirements of the Indenture provision under which BNYM seeks protection. *Second,* even if the Opinion of Counsel were not defective, the determination of the issue of "good faith" is quintessentially a jury question, unsuitable for resolution on a motion for summary judgment. *Finally,* if the Court is inclined to weigh the facts on this motion, there is overwhelming evidence in the record that BNYM did not allow this transaction to proceed because of any "good faith" reliance on an Opinion of Counsel in the course of exercising its duty to protect the rights of all the PreTSL XX Noteholders, including Plaintiff. Rather the record shows beyond dispute that BNYM allowed this transaction to proceed in the face of: (a) a flat misrepresentation by the BNYM relationship manager to the Issuer's counsel that the Bimini TruPS were in default, which misrepresentation was made within days of his correct advice to BNYM's outside counsel that no such default existed, and (b) a wholly inappropriate joint effort by BNYM's counsel and Bimini's counsel to contrive an argument on which BNYM could pretend to rely to authorize the Bimini repurchase as a "one-time" departure from the strictures of the Indenture.

1. ***The Hunton Opinion Does Not Satisfy the Requirements of the Indenture***

BNYM relies on Sections 6.1 and 6.2 of the Indenture, which afford the trustee protection under certain circumstances when it relies in good faith on the opinion of counsel. BNYM

ignores, however, the requirements of Indenture Section 11.1, which sets forth the requirements of an opinion of counsel on which a Trustee may rely in good faith.[31]

Because the Hunton Opinion was based on Bimini's compliance with a condition contained in Section 5.16(b), *i.e.*, that the Bimini TruPS were a "defaulted Collateral Security," Section 11.1 required that the Hunton Opinion include both (a) a statement that Hunton had read such condition and (b) a statement as to whether such condition had been satisfied.[32] In fact, it contained neither. BNYM's failure to require that Hunton identify the specific condition in Section 5.16(b) (or any condition in the Indenture) that permitted the transaction, and whether the condition had been satisfied, is fatal to a claim of good faith reliance. By not complying with Section 11.1, Hunton was able to obfuscate the basis for its Opinion, and allow the Trustee to attempt to ignore that the Trustee knew full well that the Bimini TruPS had not defaulted and that the Opinion lacked any basis in the Indenture. *See* Exh. 64 ("It's possible that Gardere is asleep at the switch"). Moreover, but for the misrepresentation that BNYM's relationship manager, Grose, made to counsel for PreTSL XX, that the Bimini TruPS were in default, any opinion provided to justify the transaction would have come from counsel for PreTSL XX, not an overzealous and "very creative" advocate such as Hunton.

Thus, BNYM could not blindly rely on Hunton's Opinion but was required to determine that the Opinion conformed to the requirements of Section 11.1. Having failed to do so, BNYM

---

[31] Section 11.1 provides, in relevant part that "[e]very certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include":

> (A) A statement that each signatory of such certificate or opinion has read or caused to be read such covenant or condition and the definitions herein relating thereto; and
> (B) A statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

Exh. 1 (Indenture at p. 99).

[32] The requirements of Section 11.1 by its terms apply to "[e]very . . . opinion with respect to compliance with a condition . . . provided for in this Indenture" and not just an "Opinion of Counsel," which is a defined term in the Indenture. *See* Exh. 1 (Indenture at p. 20).

is not entitled to rely on the Opinion. *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 477-78 (S.D.N.Y. 2005) (district court "conclude[d] as a matter of law that [defendant] breached its duty to examine the officers' and accountant's certificates it received . . . to ensure that those certificates conformed to the specific requirements of the indenture").

2. ***The Issue of Good Faith Reliance Is Unsuitable for Summary Adjudication***

Plaintiff's separate motion for summary judgment as to BNYM's liability is predicated on the purely legal issue of the interpretation of the term "defaulted Collateral Securities" in Indenture section 5.16(b). In contrast, BNYM's application for summary judgment asks the Court to determine, as a matter of law, that BNYM acted in good faith in relying on the Hunton Opinion. But that issue necessarily involves an evaluation of disputed factual issues, which makes it inappropriate for resolution on a motion for summary judgment. *See, e.g., In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 555-56 (S.D.N.Y. 2006) ("Whether Plaintiffs will be able to make a showing of bad faith is a question of fact for the jury that may not be summarily determined.") *See also Teachers Ins. & Annuity Ass'n of Am. v. Crimii Mae Svcs. L.P.*, No. 06-0392 (LAK), 2010 U.S. Dist. LEXIS 9219, at *24 (S.D.N.Y. Feb. 3, 2010) (defendants failed to demonstrate the absence of a genuine issue of material fact as to whether the special servicer acted in good faith).

BNYM argues strenuously—but with scant support in the evidentiary record—that it acted in good faith when it relied on the Hunton Opinion to permit the repurchase of fully performing collateral securities pursuant to an Indenture provision that, pursuant to its clear terms, limits such transactions to "defaulted Collateral Securities." Plaintiff argues—just as strenuously, but with considerably more evidentiary support—that BNYM did not and could not have relied in "good faith" on an Opinion of Bimini's Counsel that BNYM's own counsel helped to contrive, and which the Issuer would have insisted come from the Issuer's counsel (rather than

Bimini's counsel) if BNYM's own relationship manager had not falsely represented that the Bimini TruPS were in default. In the face of conflicting factual positions going to the issue of "good faith reliance," that issue is not for summary determination.

3. ***There Is Overwhelming Evidence of Bimini's Bad Faith***

If, despite the foregoing legal arguments, the Court is inclined to consider the conflicting evidence relating to whether BNYM can satisfy its burden of proving "good faith reliance" on the Hunton Opinion, we respectfully direct the Court's attention to the Fact Sections of this Memorandum, and to pages 4-10 and 13-15 of Plaintiff's Memorandum in support of his own motion for partial summary judgment, and to the exhibits referred to therein. Highlights of that evidence include the following:

- The "theory" underlying the Hunton Opinion was originated by BNYM's own counsel, Gardere. *See* Exh. 73 (e-mail dated June 29, 2009 from D. McIndoe to M. Wickersham) and Exh. 26 at 2.

- Elison was specifically informed that Bimini had not defaulted, either by missing a payment, deferring payment of interest, or tripping a covenant default, and he admitted in his deposition testimony that he was not aware of any default. *See* Exh. 21 and Exh. 28 (Elison Dep. Tr. at p. 30).

- Despite this fact, Gardere and BNYM became advocates for Bimini, as they collectively tried to find a way around the strictures of the Indenture, effectively abandoning their responsibilities to the Noteholders. *See* Exh. 21 ("Gardere, with additional pressure from BNY, is trying really hard to find a way to make this work, as we had hoped and thought.").[33] Elison even agreed with Wickersham that the offering "could go out soon even if we and they hadn't already figured out a way to fit the offer into the Indenture." *Id.*

- BNYM and Gardere not only willfully ignored that the undisputed facts did not fit within the plain language of the Indenture, but actually expected Hunton to be "very creative" in order to enable the transaction to go forward. Exh. 31.

[33] When questioned about this exhibit by BNYM's counsel, Wickersham confirmed that "what I was hearing and by that I mean what I took away from my conversation with Gardere, Stephen Elison in particular, was that BONY had asked him to try really hard to find a way to make this work." Exh. 30 (Wickersham Dep Tr. at pp. 204-06).

Other factual evidence exists in abundance that BNYM did not act in good faith when it purported to rely on the Opinion of Bimini's counsel to support a transaction that was so clearly impermissible under the terms of the indenture. Accordingly, this case is readily and importantly distinguishable from *Cruden v. Bank of New York*, in which the Court held that the defendant Trustees' good faith was not "put in question merely by virtue of the fact that the opinion relied upon may have been wrong" and that "the record discloses nothing beyond the 'incorrectness' of counsel's opinion to support an inference that the Trustees' reliance was not in good faith." 957 F.2d at 972. Here, in contrast, Grose and Elison, on behalf of BNYM, and Hunton, on behalf of Bimini, all knew that Bimini had not defaulted, and the record is replete with evidence that the transaction was permitted in spite of BNYM's, Gardere's and Hunton's recognition that the factual circumstances did not fit within the language of the Indenture. *See* Exh. 38 ("Gardere considers this a one-time approach—largely for our persistence, than for any obvious analytic rectitude"); Exh. 59 ("Gardere is pulling back even as we speak from permitting reasoning such as we provided for the Bimini offer.").

This case is factually much more analogous to *Chemical Bank & Trust Co. v. Prudence-Bonds Corp. (New Corp.)*, 207 F.2d 67, 78-79 (2d Cir. 1953), in which the plaintiff claimed reliance on a written opinion by defendant guarantor's counsel. The Court found no good faith reliance, however, since plaintiff's own counsel had advised it that "'this method of curing the default . . . is not expressly provided for in the Trust Agreement and is perhaps not the most satisfactory method from the Trustee's point of view.'" The Second Circuit was particularly mindful of the conclusion reached by plaintiff's counsel that it should proceed in any event because "the risk which you run in complying with the [defendant's] request is slight." The Court observed, in language that is also appropriate to an evaluation of BNYM's "good faith"

defense in this case: "So dubious a backing for so dubious a method favoring the guarantor, whose interest adverse to the bondholders was perfectly clear, can hardly be considered a good-faith reliance upon the opinion of the guarantor's counsel." *Id.*

Here, as in *Chemical Bank*, BNYM is seeking to rely on an opinion of the issuer's counsel, whose interests were adverse to those of the Noteholders, for a "dubious method" favoring Bimini that BNYM's own counsel, Gardere, damned with an even more "dubious backing." *See* Exh. 31 ("Hunton has to be very creative"). *See also Terrydale Liquidating Trust v. Barnes*, 611 F. Supp. 1006, 1026 n.35 (S.D.N.Y. 1984) (Plaintiff's claim of self-interested conduct by trustees overcame protection afforded to trustees by provision that the opinion of counsel shall be full and complete authorization for any action taken by trustees in good faith reliance on such opinion).

**POINT III: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BIMINI FOR TORTIOUS INTERFERENCE WITH CONTRACT (THIRD AND FOURTH CLAIMS FOR RELIEF)**

Defendants' motion must also be denied with respect to Plaintiff's claims for tortious interference with contract.[34]

First, contrary to Defendants' unsupportable assertion that there has been no breach of the underlying contract, there is overwhelming evidence that BNYM did breach the Indenture by permitting the removal of a non-defaulted, performing Collateral Security. As set forth above at pages 1-2 and in Pl. Sum. Judgment Mem. at pages 8-9, it is undisputed that Bimini had not actually defaulted. Thus, for all the reasons discussed in Plaintiff's Memorandum in Support of Motion for Summary Judgment, the Bimini TruPS were not a defaulted Collateral Security under

[34] Plaintiff incorporates by reference the arguments contained in Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 29-33.

the plain and unambiguous meaning of the Indenture and their repurchase by Bimini was not permitted under the terms of the Indenture. *See* Exh. 1 (Indenture, Section 3.8(i) at p. 60).

Second, the evidence in discovery convincingly demonstrates that Bimini did engage in intentional acts with the purpose of inducing the Trustee to breach the Indenture, including, most notably, the issuance of the "very creative" Opinion by its counsel divorced from the clear and straightforward meaning of the Indenture.

Furthermore, Defendants' argument that the Cauley letter "had no influence" is not borne out by the facts. On the contrary, the Cauley letter induced an immediate reaction from BNYM, which assured a "jubilant" Cauley that the transaction could go through notwithstanding the absence of any support under the terms of the Indenture.[35]

Moreover, the conduct alleged by Plaintiff in procuring the breach of the Indenture consists not only of the Cauley letter but also Hunton's Opinion, which was fundamental to the transaction and a condition to its consummation. In this regard, the conduct of Hunton is imputed to Bimini under basic principles of agency law. *See* Pl. Sum. Judgment Mem. at p. 22 n. 21. The Hunton Opinion not only failed to comply with the terms of the Indenture requiring confirmation that all conditions precedent had been satisfied, but it also lacked a good faith basis. As discussed above, Hunton knew that the Bimini TruPS had not actually defaulted and it knew that the Bimini TruPS were not a "Defaulted Security." *See, e.g.,* Exhs. 12 and 21. Moreover, Hunton helped draft the very language in Cauley's letter on which it sought to rely for the factual

---

[35] *See* Exh. 21 ("Bob [Cauley] jubilantly told me that in response to Bob's letter, the BNY person in charge of PreTSL XX said that the cash offer could go through and that he would speak with Gardere."). As Grose put it: "we're just trying to keep everybody satisfied by keeping the ball rolling." Exh. 83. Gardere followed suit, working with Hunton to try to find a way around the requirements of the Indenture. *See* Exh. 21 ("Gardere, with additional pressure from BNY, is trying really hard to find a way to make this work, as we had hoped and thought."). *See also* Exh. 84 (Wickersham Dep. Tr. at pp. 176-77) ("My impression was that Bob's letter had had a positive effect on the – on the overall – the transaction overall. . . . And that also we had just learned that the issuer's request and the opinion of counsel in that context was not going to be required. We had been – I think we had been concerned that that would be another obstacle to the transaction eventually getting done.").

predicate that Bimini needed to cancel its TruPS in order to survive (*see* note 4 above). Hunton's contorted interpretation of the term "defaulted Collateral Security" to encompass the possibility of a prospective default had no basis in any plain or reasonable reading of the Indenture. The issuance of the Hunton Opinion therefore constituted improper and impermissible interference by Bimini with the contractual rights of the Noteholders by misrepresenting that the Trustee was authorized to act.

Lastly, Bimini had no cognizable "economic interest" in the contract so as to trigger the heightened evidentiary requirement of proving malice, criminality or fraud, as argued by Defendants. *See* Exh. 88 (Mem. in Opp. to Motion to Dismiss at 31-33).

**POINT IV: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BNYM FOR BREACH OF FIDUCIARY DUTY (FIFTH AND SIXTH CLAIMS FOR RELIEF)**

Defendants' motion for summary judgment with respect to Plaintiff's claims for breach of fiduciary duty is nothing more than a reiteration of the arguments in their motion to dismiss, which were fully addressed in Plaintiff's opposition memorandum.[36] The factual record developed in discovery serves to reinforce that summary judgment is wholly inappropriate.

First, as in its motion to dismiss, BNYM cites cases for the proposition that the pre-default duties of an indenture trustee are defined by the terms of the indenture, while ignoring that the case law makes clear that "fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries." *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 11 (1st Dep't 1995). As set forth in *LNC Investments, Inc. v. First Fidelity Bank, Nat'l Assoc.*, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996): "an indenture trustee must avoid

[36] Plaintiff incorporates by reference the arguments contained in Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 20-25.

conflicts of interest and discharge its obligations 'with absolute singleness of purpose,' because of the inability of dispersed investors to enforce their rights."

Second, as conceded by the Trustee, it had a heightened fiduciary duty upon the occurrence of an Event of Default under the Indenture. As set forth in the Indenture: "If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs." Exh. 1 (Indenture, Section 6.1(a) at p. 78).[37]

The Events of Default set forth in Section 5.1(v) of the Indenture include a breach of any covenant by PreTSL XX and the continuation of such breach for 30 days after written notice by the Trustee. Exh. 1 (Indenture at p. 60). Thus, the sale of the Bimini TruPS in violation of Section 3.8(i) of the Indenture was a breach of a covenant and the Trustee is seeking to escape liability based on its own misconduct in causing the breach and its further misconduct in failing to provide notice of that breach to the Issuer, PreTSL XX. Indeed, Grose had the opportunity to inform counsel for PreTSL XX that Bimini had not defaulted and therefore the transaction was impermissible but instead affirmatively misrepresented that a default had occurred when he knew very well that it had not. *See* pages 5-6 above.

Third, while the Trustee's conduct should be governed by the post-default prudent person standard imposed on an ordinary trustee, here the factual record also supports the finding of a breach of the Trustee's duty of loyalty to the Noteholders. Simply stated, in response to the promissory estoppel arguments and threat of litigation asserted by Bimini, the Trustee and its

[37] *See LNC Investments*, 935 F. Supp. at 1347 (after an event of default "it is clear that the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture"). *See also AMBAC Indemnity Corp. v. Bankers Trust Co.*, 151 Misc.2d 334, 340 (Sup. Ct. N.Y. Cty 1991) (Baer, J.) ("After an event of default, [the indenture trustee] concedes, it would have fiduciary obligations.").

counsel notably and consistently sought to advance the interests of Bimini and its shareholders at the expense of the collective best interests of the Noteholders. The evidence is undeniable and there is lots of it. *See* pages 4-7. In particular, the evidence is compelling that both the Trustee and Bimini recognized that the Trustee was permitting the transaction to go through in response to pressure from Bimini, even though the Tender Offer did not fit within the requirements of the Indenture.[38]

This evidence goes beyond a mere lack of prudence or reasonable care and becomes a case of the Trustee making a decision, *i.e.*, a one-time concession based on persistence and pressure rather than "analytic rectitude," to benefit Bimini and its shareholders over the best interests of PreTSL XX and its Noteholders in breach of the Trustee's fiduciary duties.

**POINT V: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BIMINI FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (SEVENTH AND EIGHTH CLAIMS FOR RELIEF)**

As set forth above, the factual record amply supports a claim for aiding and abetting breach of fiduciary duty against Bimini.[39]

First, as discussed in Point IV above, the facts support the Plaintiff's claim for breach of fiduciary duty by the Trustee as the predicate for the aiding and abetting claim against Bimini.

Second, contrary to Defendants' argument, the evidence underscores that Bimini had actual knowledge of the breach of the Indenture. Hunton made it clear to Bimini that Gardere

[38] *See, e.g.*, Exh. 21 ("Gardere, with additional pressure from BNY, is trying really hard to find a way to make this work, as we had hoped and thought."); *id.* ("Bob [Cauley] jubilantly told me that in response to Bob's letter, the BNY person in charge of PreTSL XX said that the cash offer could go through and that he would speak with Gardere."); Exh. 47 at p. 8 (Hunton's specific acknowledgment that BNYM's allowance of the Bimini transaction was a "One-time Interpretation and Opportunity"); *id.* ("Gardere has told us that it expects not to permit any other issuers of TruPS held by its clients' static CDOs to rely on the Section 5.16 Route."); Exh. 59 ("What happened to the idea (put forth by BONY) that these cash tenders were not really permitted by the docs, and they just let ours go as a concession to the fact we had already done one and had lined up the holders."); *id.* ("Gardere is pulling back even as we speak from permitting reasoning such as we provided for the Bimini offer.").

[39] Plaintiff incorporates by reference the arguments contained in Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 34-36.

was invoking the requirement of a defaulted Collateral Security and Bimini recognized that this effectively prevented the repurchase. *See* Exh. 16 ("So you are telling me a cash tender is not doable"); Exh. 81 ("[t]his is a raw deal for Bimini").

Later in July, Cauley reiterated: "What happened to the idea (put forth by BONY) that these cash tenders were not really permitted by the docs, and they just let ours go as a concession to the fact we had already done one and had lined up the holders." Exh. 59. Hunton explained that the other situation in which a repurchase was permitted involved an actual default and that "Gardere is pulling back even as we speak from permitting reasoning such as we provided for the Bimini offer." *Id.* Thus, Bimini's assertion of reliance on advice of counsel fails given its awareness that this was a one-time concession without justification under the Indenture.

Third, there is plenty of evidence that Bimini provided the Trustee with "substantial assistance" for purposes of an aiding and abetting claim. The Cauley letter did have a causal effect on the Trustee's decision to go ahead with the transaction. *See* Exh. 21 ("Bob [Cauley] jubilantly told me that in response to Bob's letter, the BNY person in charge of PreTSL XX said that the cash offer could go through and that he would speak with Gardere."); Exh. 82 ("please note the below correspondence from Bimini's CEO. I've since spoken with him [Cauley] and assured him we are not trying to pull the rug from under them").

Furthermore, Hunton's Opinion as counsel to Bimini, with its "very creative" interpretation resulting in the finding of a make believe default in the absence of an actual payment default or breach of a covenant in the underlying indenture, provided the Trustee with "substantial assistance" in achieving the breach. Indeed, the Trustee now purports to have relied on the Opinion to justify its action in having accepted the removal of a fully performing, non-

defaulted Collateral Security from the Trust Estate. Accordingly, summary judgment must be denied with respect to Plaintiff's claims for aiding and abetting breach of fiduciary duty.

**POINT VI: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIMS AGAINST BIMINI FOR UNJUST ENRICHMENT (NINTH AND TENTH CLAIMS FOR RELIEF)**

Defendants' argument that Plaintiff's claims for unjust enrichment fail to state a claim is also without merit.[40] Bimini's argument that there is no claim for unjust enrichment when the subject matter of the dispute is governed by a contract sweeps with too broad a brush. Here there is no contract between Plaintiff and Bimini, and the Indenture itself does not address Plaintiff's rights or the manner of calculation of contractual damages with respect to Bimini. *See Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006) (Baer, J.) ("If in fact the [defendants] wrongfully obtained assets plaintiffs intended for BCI, thereby depriving plaintiffs of the value of their investment, plaintiffs' binding agreement with BCI should not preclude plaintiffs from proceeding in equity against the [defendant] entities.").

**POINT VII: DEFENDANTS' MOTION SHOULD BE DENIED WITH RESPECT TO PLAINTIFF'S CLAIM AGAINST BIMINI FOR RESCISSION/ILLEGALITY (ELEVENTH CLAIM FOR RELIEF)**

Defendants' arguments with respect to Plaintiff's claim for rescission should also be rejected.[41] First, it is well-established that a claim for damages and an equitable claim for rescission may be pleaded in the alternative. *See, e.g., Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, No. 03 Civ. 3748 (DAB), 2006 WL 278138, at *13 (S.D.N.Y. Feb. 2, 2006); *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 768 F. Supp. 115, 117 (S.D.N.Y. 1991).

---

[40] Plaintiff incorporates by reference the arguments contained in Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 36-38.

[41] Plaintiff incorporates by reference the arguments contained in Exh. 88 (Mem. in Opp. to Motion to Dismiss) at pp. 38-40.

Second, there is evidence in the record that in connection with the Tender Offer, Bimini misrepresented that the transaction was authorized under Section 5.16(b) since Bimini knew that it had not defaulted and knew that the Trustee was permitting the transaction even though "cash tenders were not really permitted" under the Indenture because PreTSL XX is a static CDO. Moreover, in order to create the appearance of compliance with the Indenture, Bimini misrepresented the extent of its financial distress, claiming it was imminently about to default in Cauley's June 19, 2009 letter while at the same time reassuring its outside auditors and shareholders regarding its long-term viability. *See* pages 12-13 above.

Lastly, the record demonstrates that Plaintiff did act promptly to assert his rights.[42]

## CONCLUSION

For the reasons set forth above, it is respectfully submitted that Defendants' joint motion for summary judgment should be denied in its entirety.

Dated: New York, New York
December 30, 2010

BUTZEL LONG, a professional corporation

By: s/Robert D. Piliero
Robert D. Piliero
Robert Sidorsky
380 Madison Avenue
New York, New York 10017
Tel.: (212) 818-1111
(piliero@butzel.com)

*Attorneys for Plaintiff R. DAVIS HOWE*

[42] Howe testified at his deposition that during late 2008 and into 2009 he discussed with Sidley the interpretation of a defaulted Collateral Security and that in the summer of 2009 he was advised by the placement agent for PreTSL XX that "Sidley and Bank of New York had, in fact, talked about it and, in fact, Bank of New York was now reading the document as Sidley interpreted it and that there would not be any discounted repurchases. So, you know, I'm going into this believing that, in fact, by pressing the Bank of New York and getting Sidley involved, we've closed that hole." Exh. 85 (Howe Dep. Tr. at pp. 81-82; *see also* pp. 67-68 and 73-75). Furthermore, when Howe became aware in October 2009 that the transaction was going forward, he did contact BNYM directly, as did Beth Gunn of Wolf River Capital Management, the investment fund of which Howe is a principal. *See* Exh. 93 (e-mail dated Oct. 22, 2009 from B. Gunn to C. Grose at 011299) ("Can you tell me where in the indenture there is an allowance for the requisite noteholders to release a piece of collateral from lien of the Indenture? Bimini was neither a defaulted security or a Defaulted Security."), Exh. 90 (e-mail dated Oct. 27, 2009 from D. Howe to C. Grose and J. Lynch) and Exh. 91.