UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R. DAVIS HOWE, individually and derivatively,<br><br>     Plaintiff,<br><br>-against-<br><br>THE BANK OF NEW YORK MELLON, as Indenture Trustee, BIMINI CAPITAL MANAGEMENT, INC., and HEXAGON SECURITIES LLC,<br><br>     Defendants,<br><br>and THE BANK OF NEW YORK MELLON, as Indenture Trustee, and PREFERRED TERM SECURITIES XX, LTD.,<br><br>     Nominal Defendants. | 09 Civ. 10470 (HB)<br><br>ECF CASE |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**

        BUTZEL LONG,
         a professional corporation
        Robert D. Piliero (piliero@butzel.com)
        Robert Sidorsky (sidorsky@butzel.com)
        380 Madison Avenue
        New York, New York 10017
        Tel.: (212) 818-1110
        Fax: (212) 818-0494

        *Attorneys for Plaintiff R. Davis Howe*

## **TABLE OF CONTENTS**

STATEMENT OF FACTS ................................................................................................. 1

    POINT I   PLAINTIFF HAS STANDING TO BRING DERIVATIVE CLAIMS ................. 1

    POINT II   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S
    CLAIMS FOR BREACH OF CONTRACT .................................................................. 1

        A.   The Trustee Breached the Indenture and Its Defenses Should Be Rejected ............ 1

        B.   Section 5.16(b) Did Not Permit the Sale of the Bimini TruPS ................................ 6

    POINT III  SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S
    CLAIMS FOR TORTIOUS INTERFERENCE ............................................................. 10

CONCLUSION ................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**Cases**

*Cooperatieve Centrale Raiffei-Sen-Boerenleenbank, B.A. ("Rabobank") v. Brookville CDO I Ltd.*, No. 08 Civ. 9565, 2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008) ...................................... 6

*Craig v. Bank of New York*, 59 Fed. Appx. 388 (2d Cir. 2003) ........................................................ 6

*Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992) ............................................................. 6

*Newmont Mines v. Hanover Ins. Co.*, 784 F.2d 127 (2d Cir. 1986) ................................................ 9

*Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp.2d 460 (S.D.N.Y. 2005) ...................... 4

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) ..................... 9

*United States Trust Co. of New York v. Executive Life Ins. Co.*, 602 F. Supp. 930 (S.D.N.Y. 1984) ................................................................................................................................. 9

*Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427 (S.D.N.Y. 2007) ....................................................... 10

Plaintiff R. Davis Howe ("Plaintiff"), in his individual capacity and derivatively, respectfully submits this Reply Memorandum of Law in further support of Plaintiff's motion seeking summary judgment, both individually and derivatively, with respect to the liability of defendant and nominal defendant The Bank of New York Mellon ("BNYM" or the "Trustee") for breach of contract and the liability of defendant Bimini Capital Management, Inc. ("Bimini") for tortious interference with contract.[1]

## STATEMENT OF FACTS

The material facts as to which there is no genuine issue to be tried are set forth in Plaintiff's Rule 56.1 Statement, which is incorporated herein by reference. Plaintiff also incorporates by reference the facts set forth in his opening Memorandum on this Motion and in his Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment ("Pl. Mem. in Opp.") at 1-13.

**POINT I   PLAINTIFF HAS STANDING TO BRING DERIVATIVE CLAIMS**

Plaintiff has already demonstrated that he is entitled to bring claims derivatively in the right of the Trustee and on behalf of PreTSL XX in his Consolidated Memorandum in Opposition to Defendants' Motion to Dismiss (Exh. 88 at 13-19) and in Pl. Mem. in Opp. at 14-20, which are incorporated herein by reference.

**POINT II   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT**

    **A.   The Trustee Breached the Indenture and Its Defenses Should Be Rejected**

The evidence is undisputed that <u>the Bimini TruPS were not in default</u>. Yet both the

---

[1] Defendants suggest that Plaintiff's decision to limit his application for summary judgment to these claims somehow suggests that Plaintiff's other claims are infirm. That suggestion ignores that the limited purpose of a summary judgment motion is to dispose of claims as to which there is no genuine factual dispute and as to which the moving party is entitled to judgment as a matter of law. Although Plaintiff will at the conclusion of this litigation also be entitled to the entry of judgment in his favor, individually and derivatively, with respect to the remainder of the claims he has asserted, that event must await a jury's determination with respect to certain elements of those other claims as to which (unlike the facts at issue on this motion) there is a genuine dispute.

Trustee and Bimini persist in arguing that the Trust Indenture allowed Bimini to repurchase this fully performing asset out of the Trust Estate at a 55% discount on the ground that it was a "defaulted" Collateral Security. Proper interpretation of the Indenture reveals that this argument is indeed as oxymoronic as it sounds.

Initially, the Defendants ask the Court to ignore the central issue on this motion—the proper contract interpretation of the term of "defaulted Collateral Security" in Section 5.16(b) of the Indenture—and instead to focus on the fact that the Senior Noteholders consented to the transaction.  But those consents would only be relevant if the transaction were otherwise permissible under the Indenture, which it was not.  Unless and until Defendants can demonstrate that the Bimini TruPS was a "defaulted Collateral Security" within the meaning of Section 5.16(b) (which they cannot), the Requisite  Noteholders had no right or ability to consent to its removal from the Trust Estate.  Exh. 1 (Indenture, Section 3.8(i), at p. 60); *see* Pl. Mem. in Opp. at 20-21.[2]

BNYM also attempts to sidestep the central issue of whether the Bimini repurchase transaction was permissible under the Indenture by asserting, as an affirmative defense, that it was entitled to rely in good faith on the opinion letter from Bimini's counsel, Hunton & Williams LLP (the "Hunton Opinion").  The record demonstrates, however, that BNYM's failure to shoulder its burden on this issue is abject for at least four independent reasons.

*First*, BNYM argues that Section 11.1 does not apply to the Hunton Opinion, but only to

---

[2]  Defendants' illogical cart-before-the-horse argument is especially ludicrous when it is recognized that Bimini made a number of unsuccessful attempts to persuade the Requisite Noteholders to vote in favor of the repurchase of its TruPS at a deep discount, and only succeeded in securing their consent by agreeing to pay them an "incentive" fee that they did not have to share with any of the other Noteholders The repurchase transaction approved by the Trustee permitted Bimini to repurchase its TruPS for $0.45 on the dollar, which was paid into the Trust Estate for the benefit of all the PreTSL XX Noteholders, but allowed Bimini to pay the consenting Requisite Noteholders an additional $0.15 on the dollar (equal to about $3.3 million) that they were permitted to retain and not share with the Trust Estate for the benefit of the other PreTSL XX Noteholders.  *See* Exh.62.

opinions and certifications requested by the Issuer (PreTSL XX), by ignoring the relevant portion of Section 11.1, which states:

> <u>Every</u> certificate or <u>opinion</u> with respect to compliance with a condition or covenant provided for in this Indenture shall include:
>
> (A)   A statement that each signatory of such certificate or opinion has read or caused to be read such covenant or condition and the definitions herein relating thereto; and
>
> (B)   A statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

Exh. 1 (Indenture, Section 11.1, at p. 99) (emphasis added).

Manifestly, the Hunton Opinion does not contain either of the two required statements**.** Exh. 63.[3]   Accordingly, the Hunton Opinion cannot, as a matter of law, form the basis for the "good faith reliance" defense to which BNYM clings in its desperate effort to avoid liability in this case.

*Second*, BNYM attempts to avail itself of the arguably more robust protection afforded to the Trustee by Section 6.1(b)(ii), which applies in the absence of an Event of Default.  That argument fails for the simple reason that the Trustee's own action in permitting the transaction to proceed in flat violation of Section 3.8(i) of the Indenture constituted a default, which would have ripened into an Event of Default as defined in Section 5.1(v) but for the Trustee's own failure to provide notice of the default. *See* Pl. Mem. in Opp. at 31.  The Trustee can hardly be heard to claim that no Event of Default occurred when the Trustee was itself the defaulting party under the Indenture, but simply refused to blow the whistle on itself.  Nor was the Trustee's default in permitting the transaction to occur in violation of Indenture Section 3.18(i) its only

---

[3]  This was not an inadvertent omission. David McIndoe of Hunton acknowledged in his deposition that Hunton's Opinion did not contain a statement that all conditions precedent to the transaction and compliance with the terms of the Indenture had been satisfied.  Exh. 25 (McIndoe Dep. Tr. at p. 572).  Moreover, in an internal e-mail, McIndoe recognized that the Indenture required that the Hunton Opinion contain a statement that "all of the conditions have been identified and that all of the conditions have been satisfied," and that such a statement would have to be included unless BNYM's counsel, "Gardere is asleep at the switch." Exh. 64.

default. Section 6.1(b) (ii) required the Trustee to "examine the certificates and opinions to determine whether or not they conform to the requirements of the Indenture." Here, as noted above, the Trustee failed to ensure that the Hunton Opinion met the requirements of Section 11.1.[4] Again, the Trustee prevented its default in this respect from ripening into an Event of Default by the simple act of not providing notice of its own misconduct.

*Third*, no provision of the Indenture specifically authorizes the Trustee to accept and rely on the opinion of counsel for an entity that is not a party to the Indenture, and which has a direct interest in the transaction as to which the Trustee's action is requested. In fact, BNYM initially followed the correct procedure by asking for an opinion from counsel for the Issuer. *See* Exh. 34, at BNYM 019704 (e-mail dated June 23, 2009 from C. Grose to S. Elison). A few days later, however, after learning that counsel for the Issuer had taken the position that no Issuer's Certification or Issuer's Opinion of Counsel would be needed if the transaction was self-effectuating─*i.e.,* if the language of the Indenture clearly permitted the transaction─Grose affirmatively misrepresented to PreTSL XX's counsel, Sidley & Austin LLP ("Sidley"), that the Bimini TruPS had defaulted. This false statement caused Sidley to believe that the Bimini TruPS could be sold without an Issuer's Opinion. *See* Exh. 33. *See also* Exh. 84 (Wickersham Dep. Tr. at pp. 176-77). But for Grose's misrepresentation, the permissibility *vel non* under the Indenture of the Bimini repurchase transaction would have been the subject of an opinion by independent counsel of the Issuer, rather than by counsel for the non-party that wished to repurchase its fully performing debt for 45 cents on the dollar.

*Fourth*, Plaintiff has demonstrated through ample, admissible and undisputed evidence in the record, consisting mainly of documents produced by the Defendants themselves, and the

---

[4] *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp.2d 460, 477-78 (S.D.N.Y. 2005) (district court "conclude[d] as a matter of law that [defendant] breached its duty to examine the officers' and accountant's certificates it received . . . to ensure that those certificates conformed to the specific requirements of the indenture").

testimony of their own representatives, that the Trustee and its counsel knew beyond a doubt that the Hunton Opinion was not supported by the terms of the Indenture.  *See* Pl. Mem. in Opp. at 15-18 and 26-28.

In particular, it was the Trustee's counsel, Gardere Wynne Sewell ("Gardere"), that advised Bimini and Hunton to pursue the route of Section 5.16(b), including marking up the draft Consent Solicitation to insert the references to Section 5.16(b) (Exh. 20, at BNYM 019325), despite having already been informed by Hunton that Bimini "hasn't defaulted" (Exh. 12).  Thus, the Trustee's counsel knowingly and actively instigated and colluded with Hunton to cause the breach.[5]  The transaction was, from first to last, a case study in turning a blind eye to legal requirements in the service of accommodation to persistence and threats.[6]  As bluntly reported by Bimini and Hunton, BNYM and its counsel recognized that the transaction was a one-time concession.[7]

In sum, rather than requiring adherence to the terms of the Indenture, the Trustee and its counsel urged Hunton to embark on what Gardere acknowledged was an exercise in "very creative" legal interpretation, with no foundation in the plain language and carefully constructed

---

[5]  *See* Exh. 73 (Hunton's McIndoe paraphrased the observation of Molenkamp, the senior member of Hunton's Opinion Committee, about the sequence of events as "'gardere messed around for a few months, came up with a theory, we're running with it'").  After Bimini's CEO, Robert Cauley, sent his complaint letter to BNYM on June 19, 2009, Gardere, "with additional pressure from BNY," continued "trying really hard to find a way to make this work," even after Mark Wickersham of Hunton told Stephen Elison of Gardere that Hunton had been unable to find a "relatively innocuous way" to trip a default and had not "figured out a way to fit this offer into the Indenture." Exh. 21, at HW 00030875 (emphasis added).

[6]  *See* Exh. 38 (e-mail dated June 30, 2009 from J. Molenkamp to M. Wickersham and A. Williams) ("It is troubling then, that Gardere considers this a one-time approach—largely for our persistence, than for any obvious analytic rectitude.").  *See also* Exhs. 18 and 19.

[7]  Exh. 47 at 8 (Hunton draft internal memorandum dated July 7, 2009) ("Gardere has told us that it expects not to permit any other issuers of TruPS held by its clients' static CDOs to rely on the Section 5.16 Route."); Exh. 59 (e-mail dated July 23, 2009 from R. Cauley to M. Ludlow) ("What happened to the idea (put forth by BONY) that these cash tenders were not really permitted by the docs, and they just let ours go as a concession to the fact we had already done one and had lined up the holders."); *Id*. (e-mail dated July 23, 2009 from M. Wickersham to R. Cauley and M. Ludlow) ("Gardere is pulling back even as we speak from permitting reasoning such as we provided for the Bimini offer.").

provisions of the Indenture.  *See* Exh. 31.  On this record, BNYM's claims of "good faith reliance" is itself independent and egregious bad faith.[8]

### B.     Section 5.16(b) Did Not Permit the Sale of the Bimini TruPS

It is well settled that Trust Indentures "are carefully structured documents with intricately interwoven and balanced duties and rights.  They spell out the parties' obligations in exquisite detail. They exert minute control over . . . the Trustee."  C*ooperatieve Centrale Raiffei-Sen-Boerenleenbank, B.A. ("Rabobank") v. Brookville CDO I Ltd.*, No. 08 Civ. 9565, 2008 WL 5170178, at *12 (S.D.N.Y. Dec. 10, 2008).  Defendants' interpretation of the Indenture in this case is at loggerheads with this structure designed to protect the rights of all of the PreTSL XX Noteholders.  A brief review of the structure of the Indenture demonstrates this point.

The Indenture defines a "Defaulted Security" to include both Collateral Securities that have in fact actually defaulted and those that were issued by entities that are in financial distress and are therefore in danger of causing their Collateral Securities to default.  Exh. 1 (Indenture at p. 10).  Consistent with the blanket prohibition of Section 3.8(i), the sale or transfer of a "Defaulted Security" out of the Trust Estate is subject to strict control and scrutiny by the Issuer and the Trustee.  Pursuant to Section 2.17(a), if a Collateral Security is a "Defaulted Security," the Income Noteholders have the first right to purchase it, but <u>only</u> for a price equal to its par value, less any amounts already distributed to the Holders of the Senior Notes and Mezzanine Notes.[9]  Section 2.17 therefore effectively protects both the Senior and the Mezzanine Noteholders by ensuring that any sale of the collateral outside of the Trust Estate is for not less

---

[8] *Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992) and *Craig v. Bank of New York*, 59 Fed. Appx. 388 (2d Cir. 2003) are therefore inapplicable.  *See Chemical Bank & Trust Co. v. Prudence-Bonds Corp. (New Corp.)*, 207 F.2d 67, 78-79 (2d Cir. 1953) (rejecting defense of good faith reliance on opinion of counsel).

[9] Furthermore, Section 2.10 provides that subject to Section 2.17, the Trustee shall release collateral from the Lien of the Indenture only upon receipt of an Issuer Request accompanied by an Officer's Certificate and an Opinion of Counsel.  Exh. 1 (Indenture at p. 48).

than its par value.  *See* Exh. 1 (Indenture, Section 2.17(a), at pp. 52-53).[10]

The sole even arguably relevant alternative to Section 2.17, and the protection it affords to <u>all</u> the PreTSL XX Noteholders, is contained in the penultimate sentence of Section 5.16(b), which applies only in the case of a "defaulted Collateral Security"—in which event the security can be sold if a super-majority (66 2/3%) of the Requisite Noteholders vote to do so.  Defendants seek to capitalize on the fact that the Indenture does not define the term "defaulted" to argue that it applies not only to Collateral Securities that have actually defaulted, but also to Collateral Securities that are in danger of defaulting.[11]  Defendants implausibly argue that the term "defaulted Collateral Security" means essentially the same thing as "Defaulted Security" but that, for some wholly unarticulated reason, the strict controls imposed by Section 2.17 do not apply.  To argue, as Defendants do, that Section 5.16(b) permits a fully performing, non-defaulted Collateral Security, such as the Bimini TruPS, to be sold at a substantial discount from par is utterly irreconcilable with Section 2.17, and the precise and detailed limitations on the transfer of a "Defaulted Security" out of the Trust Estate.

---

[10]  In addition to the protection afforded by Section 2.17, the economic interests of the Senior and Mezzanine Noteholders, and their priority rights *inter se* and vis a vis the Income Noteholders, are also protected by the carefully crafted provisions relating to how the interest payments that are generated by the Collateral Securities are distributed through the PreTSL XX waterfall, as set forth in Section 8.4 of the Indenture.  This occurs through a series of "Coverage Tests," the operations of which are described in the Indenture.  Exh. 1 (Indenture, §8.4 at pp. 91-94).  Simply stated, the Coverage Tests apply a series of "coverage ratios" that are designed to ensure that funds available for distribution to Noteholders are re-directed through the waterfall if the applicable Coverage Test is not met, so as to protect the interests of the applicable class of Noteholders in order of priority. Thus, although a "Defaulted Security," as defined in the Indenture, can only be disposed of at par, as long as it remains in the collateral pool, it impacts the coverage ratio, and therefore whether the Coverage Test is met, so as to re-direct the flow of interest to protect the Senior Noteholders against an eventual default.

[11]  Defendants' position in this regard is not aided one whit by the testimony of its expert, John Costango.  Def. Joint Mem. in Opp. at 18.  The "defaulted" language referenced by Mr. Costango, which includes the term "actually defaulted," is consistent with Plaintiff's interpretation of the meaning of defaulted (and also constitutes inadmissible parol evidence).  In this case, it is clear from both the dictionary definition and the structure of the Indenture that "defaulted" means actually defaulted, and that Collateral Securities that might default or are problematic are covered by the specific categories within the definition of a "Defaulted Security."  Accordingly, there was no need here to add additional verbiage to the plain and straightforward meaning of the word "defaulted."

Furthermore, the Bimini TruPS <u>did not even fall within the broad definition of a "Defaulted Security,"</u> and were not listed as "Defaulted Securities" in any of the quarterly reports issued by BNYM to the Noteholders.  *See* Exh. 29 (Grose Dep. Tr. at p. 77).  Thus, BNYM never classified the Bimini TruPS as a "Defaulted Security" and David McIndoe of Hunton confirmed in his deposition testimony that the Bimini TruPS did not fall within the definition of a "Defaulted Security."  Exh. 25 (McIndoe Dep. Tr. at pp. 45, 50).  Hunton therefore played fast and loose with the defined terms in the Indenture to read the term a "defaulted Collateral Security" to mean something <u>like</u> a "DS Avoidance Event," but not <u>actually</u> a "DS Avoidance Event," and then made the leap that the Bimini TruPS could be sold at a discount pursuant to Section 5.16, even though a <u>real</u> "DS Avoidance Event" would have required a disposition pursuant to the strict limitations of Section 2.17 of the Indenture.[12]

The overall structure of the Indenture reflects a logical progression of measures to preserve the value of the collateral in the Trust Estate while protecting the interests of all classes of Noteholders in the order of their priority.[13]  Defendants seek to turn this intricate and carefully constructed structure on its head, by arguing, against all logic, that a fully performing Collateral Security that has <u>not</u> actually defaulted can be sold out of the Trust Estate for <u>less than par</u>, even though a Collateral Security that is defined as in danger of defaulting <u>can only be sold at par</u>.  The only way for Defendants to make this argument is to misinterpret the term "defaulted

---

[12] In his testimony, McIndoe "reasoned" that an analogy to a "DS Avoidance Event" was appropriate even though not a single one of the elements of that contractually defined term was satisfied with respect to the Bimini TruPS: no bankruptcy proceeding had been commenced; no "exchange offer" had been made; and the Rating Agencies had not been consulted.  *See* Exh. 1 (Indenture at page 12).  As to the last,  McIndoe simply "reasoned" that the independent judgment of Rating Agencies as to the fairness of the exchange offer (that had never been made in any event) could be replaced by the consent of two thirds of the Senior Noteholders—who were being paid $3.3 million by Bimini for their consents.  Exh. 25 (McIndoe Dep. Tr. at p. 63).

[13] It is also consistent with the static nature of the PreTSL XX CDO, which is intended to make it impossible to remove performing collateral from the Trust Estate at a discount to par.  *See* Exh. 26 at 6 ("the CDO was intended to be static").

8

Collateral Security" so that it applies to fully performing, non-defaulted collateral.  That makes no sense.[14]

Defendants' open-ended interpretation based on the possibility of a prospective default bears no relation to the plain and unambiguous meaning of a "defaulted Collateral Security" read in light of the Indenture taken as a whole.  What's more, it is a recipe for chaos in the financial market, as issuers of collateral securities would clamor to repurchase them at a discount, just like Bimini did, by claiming to be in a distressed financial situation, with no objective standard to determine what constitutes a default.  It would also create an amorphous stealth class of "defaulted Collateral Securities," based on anticipatory defaults, which fall outside the defined categories of a "Defaulted Security," and would therefore not be reported to the Noteholders by the Trustee and not factored into the calculation of the coverage ratios for purposes of determining the distribution of funds through the waterfall.  Yet these performing Collateral Securities could be sold at a substantial discount to par and removed from the Trust Estate to the detriment of the Noteholders.  In short, this utterly opportunistic and "very creative" interpretation advanced by Defendants turns the fundamental structure of the Indenture upside down and should be summarily rejected.[15]

It follows from this explanation of the structure of the Indenture, which is unequivocally evidenced by the terms of the contract, that Defendants' arguments have no merit.  The PreTSL XX Noteholders are not "powerless to act in the face of an impending default." Def. Joint Mem. in Opp. at 16.  Quite to the contrary, the Indenture creates a "carefully structured" and

---

[14] *See Newmont Mines v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (the "cardinal principle for the construction and interpretation" of "all contracts" is that "the intentions of the parties should control" and "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided") (citations omitted).

[15] *See United States Trust Co. of New York v. Executive Life Ins. Co.*, 602 F. Supp. 930, 939 (S.D.N.Y. 1984) ("Indenture Trustees do not have the power to compromise with the borrower or to vary the terms of the indenture."), (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1052 (2d Cir. 1982)).

"intricately interwoven" plan designed to protect the rights of all the PreTSL XX Noteholders by requiring that Collateral Securities that fall within the broadly defined categories of a "Defaulted Security" can only be sold at par and that an actually defaulted Collateral Security can be sold or disposed of at a discount with the consent of the Requisite Noteholders. Defendants' request to have the Court turn this structure upside down should be denied.

**POINT III  SUMMARY JUDGMENT SHOULD BE GRANTED ON
              PLAINTIFF'S CLAIMS FOR TORTIOUS INTERFERENCE**

Plaintiff's motion for summary judgment should be granted with respect to its claims for tortious interference with contract against Bimini for the reasons set forth in Pl. Mem. in Support at 22-25 and Pl. Mem. in Opp. at 28-30, which are incorporated herein by reference. As set forth therein, and in Point II above, Plaintiff has shown an underlying breach of the Indenture. Plaintiff has also demonstrated that Bimini and Hunton intentionally procured the breach through, *inter alia*, the Cauley letter (Exh. 19) and the Hunton Opinion (Exh. 63). *See* Pl. Mem. in Opp. at 29-30. Bimini's conduct was clearly improper since it knew the transaction "was not really permitted by the docs" (Exh. 59) (July 23, 2009 e-mail from R. Cauley to M. Ludlow) and that the extent of its financial distress had been grossly exaggerated for the purpose of arguing that the Bimini TruPS were a defaulted Collateral Security.[16] *See* Pl. Mem. in Opp. at 12-13.

Thus, each element of a claim for tortious interference with contract is satisfied in this case. *See Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007).

**CONCLUSION**

For the reasons set forth above, it is respectfully submitted that Plaintiff's motion for summary judgment should be granted.

---

[16] Bimini argues that Mr. Cauley "is not a lawyer" and lacked an independent understanding of what the Indenture legally permitted (Def. Joint Mem. in Opp. at n.13). Hunton, however, reviewed and revised the Cauley letter to make it more "actionable" (Exh. 79) and issued the Hunton Opinion, such that Bimini is bound by the conduct of its agent.

10

Dated: New York, New York
January 14, 2011

        BUTZEL LONG, a professional corporation

        By:     s/ Robert D. Piliero_____
             Robert D. Piliero
             Robert Sidorsky
             380 Madison Avenue
             New York, New York 10017
             Tel.: (212) 818-1111
             Fax:  (212) 818-0494
             (piliero@butzel.com)
             (sidorsky@butzel.com)

*Attorneys for Plaintiff R. DAVIS HOWE*