UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
R. DAVIS HOWE, individually and derivatively,

                Plaintiff,

       -against-

THE BANK OF NEW YORK MELLON, as Indenture
Trustee, BIMINI CAPITAL MANAGEMENT, INC.,
and HEXAGON SECURITIES LLC,

                Defendants,

and THE BANK OF NEW YORK MELLON, as
Indenture Trustee, and PREFERRED TERM
SECURITIES XX, LTD.,

                Nominal Defendants
------------------------------------------------------------------------X

**OPINION & ORDER**

**09 Civ. 10470 (HB)**

**Hon. HAROLD BAER, JR., District Judge:**

      Plaintiff R. Davis Howe alleges that defendants caused the loss of $13.2 million in principal of trust preferred securities from the investment assets of nominal defendant Preferred Term Securities XX, Ltd. ("PreTSL XX") and the resulting diminished cash flow that would have inured to the benefit of PreTSL XX from the $24 million in collateral securities that Plaintiff alleges were wrongfully removed from the PreTSL XX collateral pool. Before the Court are cross motions for summary judgment. For the following reasons, the motions are GRANTED in part and DENIED in part.

**Factual Background**[1]

**A. The Parties**

      Nominal defendant Preferred Term Securities XX, Ltd. ("PreTSL XX" or "Issuer") is a limited liability company incorporated under the laws of the Cayman Islands (PCS ¶ 3) and is governed by an Indenture dated December 15, 2005 ("the Indenture") among PreTSL XX, as Issuer, Preferred Term Securities XX, Inc., as Co-Issuer, and the defendant and nominal defendant Bank of New York Mellon ("BNYM" or "Trustee" or "Indenture Trustee"), as Indenture Trustee. (PCS ¶ 5; Pl.'s Ex. 1.) PreTSL

---

[1] This section is intended for background purposes, and additional facts are discussed where relevant throughout the opinion. References to "PCS" refer to Plaintiff's Counter-Statement to Joint Statement of Undisputed Material Facts of Defendant and Nominal Defendant The Bank of New York Mellon and Defendant Bimini Capital Management, Inc. References to "DRO" refer to the Responses and Objections of Defendant and Nominal Defendant The Bank of New York Mellon and Defendant Bimini Capital Management, Inc. to Plaintiff's Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to Be Tried.

XX sold notes to investors and used proceeds to purchase various securities pursuant to an Offering Circular of December 16, 2005. (PCS ¶¶ 6, 8.) PreTSL XX is a "static Collateralized Debt Obligation" because a Collateral Security can only be sold or otherwise removed from the PreTSL XX Trust Estate pursuant to the express terms of the Indenture. (DRO ¶¶ 9, 10.)

Defendant Bimini Capital Management, Inc. ("Bimini") is a publicly traded real estate investment trust ("REIT") that issued trust preferred securities with a face value of $50 million through Bimini Capital Trust II, of which PreTSL XX purchased $24 million worth ("the TruPS"). (DRO ¶ 4; PCS ¶ 10.)

Plaintiff R. Davis Howe ("Plaintiff") is an individual and citizen of the state of Tennessee. (PCS ¶ 1.) Plaintiff is the beneficial owner of $10,380,444 in aggregate principle amount of income notes issued under the Indenture. (PCS ¶ 13.)[2]

### B. The Events

In the years following Bimini's issuance of the TruPS to PreTSL XX, Bimini alleges that it faced financial difficulties as a result of disruptions in the financial and credit markets. (Defs.' Mot. Summ J. 6-7.) In an effort to restructure its debt, Bimini made an offer to repurchase the TruPS from PreTSL XX in September 2008, but the offer failed to receive the consent of the Requisite Noteholders.[3] (PCS ¶ 62; Defs.' Mot. Summ. J. 8.) Subsequently, counsel and officers for BNYM and Bimini discussed whether under the Indenture Bimini could enter into an exchange offer or cash offer with PreTSL XX and whether Bimini had defaulted on certain securities; the nature and context of these conversations is in dispute. (PCS ¶¶ 73-97; DRO ¶¶ 16-36.)

On June 19, 2009 Robert Cauley ("Cauley"), Chariman and CEO of Bimini, sent a letter (the "Cauley Letter") to Chris Grose, the relationship manager at BNYM. (PCS ¶¶ 80-81; DRO ¶ 22; Pl.'s Ex. 19; Defs.' Ex. 22.) In his letter, Cauley stated that he was outraged after learning that BYNM might reverse its position on whether the Indenture permits the cash repurchase because he had relied on previous correspondence and incurred material costs in preparation for the repurchase. (Pl.'s Ex. 19; Defs.' Ex. 22.)

On July 14, 2009, after completing multiple drafts, the nature and context of which are in dispute, Hunton & Williams, LLP ("Hunton"), counsel for Bimini, issued an internal memorandum (the "Hunton Memo"), concluding that the "Indenture authorizes the disposition of the TruPS in a

---

[2] Hexagon Securities LLC ("Hexagon") is another named defendant that was dismissed on December 3, 2010.
[3] "Requisite Noteholders" is a defined term under the Indenture. (Pl.'s Ex. 1, Indenture, at 24.)

private cash tender offer by Bimini."[4] (Pl.'s Ex. 26.) On October 21, 2009, Hunton issued an opinion letter (the "Hunton Opinion") to BNYM, stating that "we are of the opinion that the Trustee is authorized under the Indenture to act at the direction of the Requisite Noteholders in taking the actions necessary to effectuate the Offer."[5] (Pl.'s Ex. 63; Defs.' Ex. 52.)

In September 2009, after several failed attempts, Bimini submitted a revised tender offer to repurchase the TruPS and provided for "consent payments" (cash payments to each holder of the Senior Notes who consented to the Tender Offer). (DRO ¶ 42; Pl.'s Ex 60.) Purportedly relying on the Hunton Opinion, BNYM submitted the tender offer to the Requisite Noteholders for approval, and on or about October 15, 2009, over 90% of the Requisite Noteholders consented to the tender offer. (PCS ¶¶ 122, 126, 128.) Plaintiff contends that the consent was a nullity because the transaction was not permitted by the Indenture. (PCS ¶ 24.)

The transaction closed on October 21, 2009 with the transfer of the TruPS to Bimini in exchange for $10.8 million in cash. (PCS ¶ 130.) Bimini paid approximately $3.3 million in consent payments directly to the consenting Senior Noteholders. (DRO ¶ 42; Pl.'s Ex. 62.) Following the transaction Bimini recognized a gain of $9.6 million. (DRO ¶ 46.)

## Procedural History

Plaintiff filed the Amended Complaint on February 22, 2010 alleging the following eleven causes of action: **breach of contract** against BNYM (Count 1, individually and Count 2, derivatively in the right of BNYM as trustee and on behalf of PreTSL XX); **tortious interference with contract** against Bimini and Hexagon (Count 3, individually and Count 4, derivatively); **breach of fiduciary duty** against BNYM (Count 5, individually and Count 6, derivatively); **aiding and abetting breach of fiduciary duty** against Bimini and Hexagon (Count 7, individually, and Count 8, derivatively); **unjust enrichment** against Bimini and Hexagon (Count 9, individually and Count 10, derivatively); and **rescission/illegality** against Bimini (Count 11, derivatively only).

BNYM, Bimini, Hexagon and PreTSL XX filed three separate motions to dismiss, which were fully briefed on May 7, 2010. On December 3, 2010, the Court dismissed Hexagon with prejudice pursuant to Rule 41 (a)(1)(A)(i) of the Federal Rules of Civil Procedure. The Court reserved judgment on the remaining issues while awaiting motions for summary judgment.

---

[4] It is undisputed that the TruPS were at all times a performing Collateral Security, but Defendants, relying on the Hunton Memo, dispute that the TruPS were a "defaulted Collateral Security" within the meaning of Section 5.16(b) of the Indenture. (DRO ¶26, Pl.'s Ex. 26.)

[5] The quoted language that appeared in the Hunton Opinion was suggested in an email by Stephen Elison of Gardere Wynne Sewell LLP, counsel for BNYM. (Pl.'s Ex. 36; Pl.'s Ex. 37.)

The remaining parties filed cross motions for summary judgment on December 10, 2010, which were fully briefed on January 14, 2011. Plaintiff's motion for summary judgment against BNYM is for breach of contract and against Bimini is for tortuous interference with contract. BNYM, Bimini and PreTSL XX ("Defendants") filed a consolidated motion for summary judgment that reiterated and incorporated their arguments from the motions to dismiss, except for the "no action" issue. Trial is scheduled to begin on April 4, 2011. This Opinion addresses the motions for summary judgment, which have subsumed the motions to dismiss.

## Discussion

### 1. Standard of Review

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all inferences against the moving party. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court may bifurcate issues of liability and damages and grant summary judgment as to one but not the other. *See, e.g.*, *Cent. Irrigation Supply v. Putnam Country Club Associates*, LLC, 27 A.D.3d 684, 685, 812 N.Y.S.2d 633, 634 (N.Y. App. Div. 2006) (affirming the lower court's holding that granted summary judgment with respect to liability and not damages); *Karetsos v. Cheung*, 670 F. Supp. 111, 114-15 (S.D.N.Y. 1987) (denying defendant's motion for summary judgment as to liability, but granting the motion to limit damages to recovery of expenditures and restitution).

### 2. No Action Clause[6]

BNYM argues that Plaintiff's action is barred by the "no action" clause of § 5.6 of the Indenture. The "no action" clause prohibits noteholders from instituting a proceeding unless they satisfy certain conditions precedent, which Defendants argue Plaintiff has failed to do. Plaintiff argues

---

[6] BNYM raised this issue in its motion to dismiss, but Defendants did not raise it again in the motion for summary judgment. Nevertheless, I discuss it here.

that the application of the "no action" clause is limited by its own terms to claims relating only to an Event of Default, and therefore it does not bar the instant action.

It is well established that a "no action" clause bars claims by an individual bondholder who fails to comply with the conditions precedent recited therein. *See, e.g.*, *Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.*, Not Reported in F. Supp. 2d, 2004 WL 1444868 (S.D.N.Y. 2004), at *5; *Victor v. Riklis*, No. 91 Civ. 2827, 1992 WL 122911 (S.D.N.Y. May 15, 1992). Courts strictly construe a "no action" clause in accordance with its terms. *See Metropolitan West*, 2004 WL 1444868, at *5; *Cruden v. Bank of New York*, 957 F.2d 961 , 968 (2d Cir. 1992). Where a "no action" clause relates to an Event of Default by its own terms, it does not bar a plaintiff from seeking a remedy for a claim outside the scope of the "no action" clause, including seeking "damages for mismanagement of the trust collateral and a failure to safeguard plaintiff's rights." *Metropolitan West*, at *4.

The "no action" clause in the Indenture states:

> … no Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for any other remedy hereunder, unless:
> (i)  such Holder has previously given written notice to a Responsible Officer of the Indenture Trustee of a continuing Event of Default ….

(Pl.'s Ex. 1, Indenture § 5.6, at 75.)

In *Metropolitan West*, the plaintiff, a junior noteholder, brought suit against the indenture trustee and investment manager for breach of the indenture and for breach of fiduciary duty. *Metropolitan West*, 2004 WL 1444868, at *2. The indenture contained a "no action" clause that was nearly identical to that of the Indenture in the instant case.[7] This Court held in *Metropolitan West* that where a "no action" provision applies by its terms to claims relating to an Event of Default, "such clauses do not prevent noteholders from bringing extra-contractual tort claims or breach of contract claims that are not of the type to which the 'no action' provision, by its terms, applies." *Id.* at *5 (citing *Cruden*, 957 F.2d at 961). Similarly, here the "no action" clause by its own terms refers to a continuing Event of Default and provides direction to noteholders implicitly contingent upon a situation involving such an Event of Default. Absent more specific language to the contrary, this Court will not presume that the parties intended to limit the noteholders' rights to sue on claims arising out of the Trustee allegedly taking extra-contractual action or breaching its fiduciary duties to the noteholders. Therefore, the "no action" clause does not serve to bar Plaintiff's claims.

---

[7] The "no action" clause in *Metropolitan West*, provided, in relevant part, "no Holder of any Note shall have any right to institute Proceedings ... unless: (a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;…" *Metropolitan West*, at *4.

**3. Derivative Claims (second, fourth, sixth, eighth, tenth and eleventh claims for relief)**

Plaintiff seeks to sue derivatively on behalf of BNYM and PreTSL XX. Defendants argue that Plaintiff's derivative claims should be dismissed with regard to both BNYM and PreTSL XX because Plaintiff lacks standing to sue derivatively, failed to make the required demand or plead that demand was futile, and cannot fairly and adequately represent the interests of the Trust Estate and its investors. For the following reasons, Plaintiff's status here as a noteholder is insufficient as a matter of law to establish standing to sue derivatively.

It is well settled that "the right to sue derivatively is an attribute of ownership, justified on the theory that the plaintiff in such a suit seeks to recover what belongs to the corporation, because as a co-owner, it also belongs to him." *Brooks v. Weiser*, 57 F.R.D. 491, 494-95 (S.D.N.Y. 1972). Pursuant to Rule 23.1, a complaint in a derivative action "must allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later on devolved on it by operation of law." Fed. R. Civ. P. 23.1(b)(1).

It is undisputed that Plaintiff was not a shareholder of BNYM or PreTSL XX at the time of the transaction at issue. Plaintiff was a holder of PreTSL XX's Income Notes at the time of the tender offer and argues that this is sufficient to establish standing to sue derivatively (a) on behalf of BNYM because he alleges that BNYM acted in bad faith in selling the TruPS, and (b) on behalf of PreTSL XX because PreTSL XX is a static investment vehicle that does not have shareholders with any beneficial or economic interest who have the incentive to sue derivatively, whereas the noteholders have a "residual interest in the income generated by PreTSL XX." Both of these arguments fail.

*A. Derivative suit on behalf of BNYM*

Plaintiff argues that bondholders have standing to bring derivative claims when the trustee under an indenture acts in bad faith. Plaintiff relies on *Campbell v. Hudson & Manhattan R. Co.*, 277 A.D. 731 (1st Dep't 1951) and *Birn v. Childs Co.*, 37 N.Y.S.2d 689 (Sup. Ct. N.Y. Country 1942), both of which are inapposite. The "bad faith" requirement is limited to the trustee's commitment to bring the actions vested in it against third parties. *See Campbell*, 277 A.D. at 734-35. The question is not whether the trustee has ever acted in bad faith with regards to a trust indenture, but whether the trustee "unreasonably refuse[d]" to bring suit against those who have harmed the trust beneficiaries. *Birn*, 37 N.Y.S.2d at 697. Here, Plaintiff has made no showing that BNYM acted in bad faith with regards to a refusal to sue for a breach of the Indenture. Plaintiff's allegations that BNYM acted in bad faith are limited to BNYM's "permitting the removal of the TruPS from the Trust Estate at a substantially discounted price so as to deplete the value of the Trust Estate." (Pl.'s Opp'n Mot. Summ. J. 15.)

6

Therefore, Plaintiff's claim that BNYM acted in bad faith with respect to the Indenture does not afford him standing to sue on behalf of BNYM.

Additionally, the cases cited by plaintiff make clear that bondholders may not bring derivative suits in order to vindicate "their own individual rights as bondholders." *Campbell*, 277 A.D. at 735. Rather, such suits must be brought on behalf of and for the benefit of all bondholders. Plaintiff has not shown for purposes of establishing standing how a challenge to the validity of the tender offer is in the interest of all bondholders when 90% of the Requisite Noteholders voted in favor of the tender offer.[8] Accordingly Plaintiff cannot as a matter of law assert standing on behalf of BNYM.

> B. *Derivative suit on behalf of PreTSL XX*

The threshold question is whether the Court must apply the law of New York or the law of the Cayman Islands to determine whether the Plaintiff has standing to bring derivative claims on behalf of PreTSL XX, a company incorporated under the laws of the Cayman Islands. Under New York law, claims related to corporate affairs (i.e. involving the rights and liabilities of corporations) are governed by the internal affairs doctrine. *Atherton v. F.D.I.C.*, 519 U.S. 214, 224 (1997). This doctrine provides that the rights of shareholders of a foreign company (including the right to sue derivatively) are determined by the law of the place where the company is incorporated. *Id. See also In re BP BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 309-11 (S.D.N.Y. 2007) (applying British law to a derivative action on behalf of a British company); *Winn v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) (holding that under New York choice of law rules, the law of the Cayman Islands applied to a derivative claim on behalf of a Cayman corporation). PreTSL XX is an entity incorporated under the laws of the Cayman Islands. It follows that under the internal affairs doctrine, this Courts must apply Cayman Islands law to the question of derivative standing. Plaintiffs do not dispute that Cayman Islands law limits shareholder derivative suits to situations not applicable here.[9] Hence, Defendants argue that Plaintiff cannot bring derivative claims on behalf of PreTSL XX.

Plaintiff offers two arguments as to why the Court should not apply Cayman Islands law, but rather apply New York law to determine standing. Plaintiff argues that the internal affairs doctrine is

---

[8] Although Plaintiff's position is that the consent was a nullity, the vote nevertheless demonstrates the position of the Requisite Noteholders with respect to the transaction.

[9] Under Cayman Islands law, the claims against BNYM and/or Bimini would have to be brought by PreTSL XX itself. (PreTSL XX's Mot. Dismiss, Ex. A, Galatopoulos Decl. ¶¶ 9.1, 11-14.) "Under English law, derivative claims are owned and controlled by the company, not its shareholders, and [a] shareholder is not permitted to bring a derivative action on behalf of the company." *Winn v. Schafer*, 499 F. Supp. 2d 390, 393, 396 (S.D.N.Y. 2007) ("Because Cayman Islands law is silent in the area of shareholder derivative actions, English common law provides the relevant applicable law in this case."). There are several exceptions to this rule, but plaintiff does not argue that any of them applies: (1) if the conduct infringed on the shareholder's personal rights; (2) if the conduct would require a special majority to ratify; (3) if the conduct qualifies as a "fraud on the minority"; or (4) if the conduct consists of ultra vires acts. See *id.*

not applicable under these circumstances because (1) the Indenture contains a choice of law provision specifying that New York law applies, and (2) Plaintiff's right to sue does not fall within the scope of the internal affairs doctrine.

Plaintiff's first argument fails because the Indenture's choice of law provision does not control the relationship between PreTSL XX and its shareholders with respect to derivative standing. Section 11.11 of the Indenture states that it shall be "construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof." (Pl.'s Ex. 1, Indenture § 11.11, at 102.) Plaintiff cites no law to support his contention that a choice of law provision can govern standing, which is a constitutional issue and governed by the laws of the state of incorporation. Notwithstanding § 11.11, the internal affairs doctrine requires the application of Cayman Islands law to determine standing. *See In Re BP p.l.c. Deriv. Litig.*, 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007); Am. Deriv. Compl., *In Re BP p.l.c.*, No. 06-cv-6168, 2007 WL 515603, at ¶ 11(b) (S.D.N.Y. Jan 31, 2007).

Plaintiff's second argument gives the court some pause. Plaintiff argues that its derivative claims do not affect the internal affairs of PreTSL XX because PreTSL XX is not a traditional corporate entity with shareholders who have an economic interest in the corporation. Plaintiff argues that PreTSL XX is a "static investment vehicle – without any management role in investment decisions or trading discretion – and serves as a mere conduit and vessel for the distribution of income through the Indenture waterfall. As a matter of economic reality, PreTSL XX was created, exists and is overseen by the Trustee for the sole benefit of its Noteholders." (Pl.'s Opp'n Mot. Dismiss at 17.) All of PreTSL XX's Ordinary shares are held in charitable trust by Maples Finance Limited, the "Share Trustee", which derives no benefit other than its fees from its holding of the Ordinary Shares. (Pl.'s Opp'n Mot. Dismiss at 17; Ex. 6, Offering Circular, at 37.) Plaintiff contends that the Noteholders are the "true equity owners" because they have a residual interest in the income generated by PreTSL XX. Plaintiff also notes that the Offering Circular treats the Income Notes as equity for U.S. federal income tax purposes. (Pl.'s Opp'n Mot. Dismiss at 18; Ex. 6, Offering Circular, at 138.)[10]

Despite Plaintiff's attempts to distinguish "traditional" corporate entities from PreTSL XX, a static investment vehicle, he cites no law to support his contention that where a Share Trustee derives no economic benefit other than fees, the Noteholders' interest morphs into an equity interest for the purposes of derivative standing. As the Share Trustee receiving fee payments, Maples Finance Limited has the incentive to ensure that PreTSL XX continues to host investment assets. Even if the

---

[10] It is important to note that Plaintiff is not alleging any counts against PreTSL XX directly, but PreTSL XX is a nominal defendant because it serves as the conduit for the assets that Plaintiff alleges was wrongfully removed by BNYM and Bimini.

Share Trustee had no economic interest, this Court is loathe to create a rule that allows bondholders to circumvent the established internal affairs doctrine and substitute New York law for the law of another state merely because the bondholders derive a residual economic interest in the corporate entity.

Moreover, even if this Court were to hold that the internal affairs doctrine is not applicable, Plaintiff would still lack standing to sue derivatively under New York law. Under New York law, in order for a bondholder to bring a derivative suit against a corporation, the bonds in question must be convertible into the equity of that corporation. *Compare Hoff v. Sprayregan*, 52 F.R.D. 243 (S.D.N.Y. 1971) (finding that holders of convertible bonds had standing to bring derivative suit against the issuer of said bonds), *with Brooks v. Weiser*, 57 F.R.D. 491 (S.D.N.Y. 1972) (holding that in order for a holder of convertible bonds to bring derivative suit, such bonds must be convertible into equity of the entity being derivatively sued by the bondholder), *and Dorfman v. Chemical Bank*, 56 F.R.D. 363 (S.D.N.Y. 1972) (holding that a debenture holder and creditor of a solvent corporation lacks standing to bring derivative suit on behalf of that corporation). Despite Plaintiff's argument that the noteholders are the "true equity owners" because they derive residual economic benefit from PreTSL XX, Plaintiff cannot show that he holds any sort of convertible bond or ownership interest in PreTSL XX.

In sum, Plaintiff lacks standing to bring its derivative claims, and this Court need not reach the issues of whether Plaintiff satisfied the demand requirements or can fairly and adequately represent the interests of the Trust Estate and its investors. Accordingly, this Court grants Defendants' motion for summary judgment as to the second, fourth, sixth, eighth, tenth and eleventh claims for relief, effectively dismissing all of Plaintiff's derivative claims.

**4. Breach of contract action against BNYM (first claim for relief)**

The parties cross move for summary judgment on the breach of contract claim.[11] "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (citation omitted). Plaintiff argues that § 3.8(i) of the Indenture prohibited the transfer of the TruPS and that BNYM breached the Indenture when it sold the TruPS with a par value of $24 million at a reduced price of $10.8 million. For the following reasons, this Court holds that the transfer of the TruPS was not permitted under the Indenture, and grants summary judgment for Plaintiff as to liability for breach of contract.

The Indenture prohibits the transfer of any assets unless expressly provided therein. § 3.8(i) of the Indenture provides that:

---

[11] Plaintiff's motion is for summary judgment as to liability alone, i.e. whether BNYM breached the Indenture.

9

> So long as any Notes are Outstanding, the Issuer shall not …
> (i) except as expressly permitted by this Indenture, sell transfer, exchange or otherwise dispose of any of the properties or assets of the Issuer, including those included in the Trust Estate;…

(Pl.'s Ex. 1, Indenture §3.8, at 60.)  Defendants argue that the disposition of the TruPS was authorized pursuant to § 5.16(b), which provides that "the Indenture Trustee may dispose of a defaulted Collateral Security at the direction of the Requisite Noteholders."  (Pl. Exh. 1, Indenture §5.16(b), at 78.)  Plaintiff disputes that the Requisite Noteholders had the authority to approve the tender offer because the TruPS were not "defaulted Collateral Securities" pursuant to the requirements of § 5.16(b).  Defendants argue that the Indenture grants the Requisite Noteholders the authority to approve the transfer and that, pursuant to § 6.1(b), BNYM properly relied on an Opinion of Counsel, the Hunton Opinion, and therefore did not breach the Indenture.

    *A.  The Rights of the Requisite Noteholders and the Trustee under the Indenture*

The first issue is whether the Indenture permits the Noteholders to direct the Trustee to dispose of Collateral Securities that the Trustee, relying in good faith on a legal opinion, believes are defaulted, even if the Collateral Securities are not actually in default.  Defendants argue that § 6.1(b) permitted BNYM to allow Bimini to reacquire the TruPS regardless of whether the Collateral Securities were defaulted.  Their argument proceeds as follows.  § 8.8 provides the Requisite Noteholders with superior rights under the Indenture.  § 6.14 stipulates that if a default occurs on any Collateral Security, the Requisite Noteholders have the right to direct the Trustee with respect to any action to be taken by the Trustee, and § 5.16(b) permits the Trustee to dispose of defaulted Collateral Securities at the direction of the Requisite Noteholders.  Here, the Requisite Noteholders directed BNYM to permit Bimini to reacquire the TruPS.  § 6.1(b) permits that in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee.  Here, Defendants argue that BNYM relied in good faith on the Hunton Opinion, which stated that the TruPS were defaulted Collateral Securities.  Also § 6.14 provides that BYNM "will be fully protected with respect to any action taken by it in reasonable good faith at the direction of the Requisite Noteholders."  Therefore, assuming BNYM's good faith reliance, Defendants argue that the Indenture permitted BYNM to authorize the TruPS to be transferred to Bimini as long as the Requisite Noteholders (or the Trustee) determined that the TruPS were defaulted, regardless of whether the TruPS were actually defaulted. (Tr. Oral Arg., June 9, 2010, at 30:5-10.)

Defendants' argument is fatally flawed because all of the provisions referenced, which grant Senior Noteholders superior rights with respect to directing the Trustee, contain clauses presupposing that Collateral Securities are defaulted. For instance, § 5.16(b) of the Indenture provides that "the Indentured Trustee may dispose of a *defaulted Collateral Security* at the direction of the Requisite Noteholders." (Pl.'s Ex. 1, Indenture §5.16(b), at 78 (emphasis added).) Similarly, § 6.14 begins with "[i]f a default occurs on any Collateral Security…" (Pl.'s Ex. 1, Indenture §6.14, at 84.) The Indenture does not explicitly allow the Noteholders or Trustee to approve disposing of non-defaulted Collateral Securities simply because the Noteholders or the Trustee believe that the Collateral Securities are in default. Therefore, the Noteholders may not direct the Trustee to dispose of Collateral Securities that the Trustee, relying in good faith on a legal opinion, believes are defaulted, even if the Collateral Securities are not actually in default.

    B. *The Interpretation of "defaulted Collateral Securities"*

Given that the rights of BNYM and the Noteholders to dispose of Collateral Securities are subject to the Indenture's requirement that Collateral Securities must be defaulted, the second issue is whether the TruPS were defaulted Collateral Securities pursuant to §5.16(b).[12] This issue turns on what the parties intended by the term "defaulted."

Contracts are interpreted to conform with the intent of the parties evidenced by the language contained therein. *See Brass v. Am. Film Tech, Inc.*, 987 F.2d 142, 148 (2d Cir. 1993). Courts should construe contract language to conform with the purpose of the agreement. *Kass v. Kass*, 91 N.Y.2d 554, 567, 696 N.E.2d 174, 181 (1998). The meaning of a word may be ascertained by consideration of similar words associated with it. *Popkin v. Security Mut. Ins. Co. of New York*, 367 N.Y.S.2d 492, 495 (1st Dep't 1975).

When determining the meaning of "defaulted Collateral Securities", both parties refer to the plain meaning in the context of the purpose of—and other language contained within—the Indenture. The Indenture does not define "defaulted Collateral Security", but it does define capital "D" "Defaulted Security." "Defaulted Security" includes a "D S Avoidance Event" which occurs when the issuer of a Collateral Security has proposed or effectuated a distressed exchange or other debt restructuring in which it has offered a new security that, in the reasonable judgment of the Rating Agencies, has the purpose of helping such issuer avoid default. (Pl.'s Ex. 1, Indenture, at 6.)

---

[12] It is undisputed that over 90% of the Requisite Noteholders voted in favor of tendering the TruPS to Bimini for $10.8 million. The relevant inquiry is thus whether the TruPS were "defaulted Collateral Securities" pursuant to § 5.16(b) of the Indenture, such that the Requisite Noteholders had the authority to direct the Trustee to approve the tender offer.

Plaintiff argues that the word "defaulted" unambiguously means "defaulted," that is an "omission or failure to perform a legal or contractual duty; esp. the failure to pay a debt when due." (Pl.'s Mot. Summ. J. 17 (quoting *Black's Law Dictionary* (9th ed. 2009)).) Plaintiff alleges that the TruPS had not defaulted because there had been no failure to make a payment or breach of a covenant, which Defendants do not dispute,[13] and therefore the transfer of the non-defaulted Collateral Securities of the TruPS violated § 5.16(b). (Pl.'s Mot. Summ. J. 17.) Plaintiff argues that the parties' choice to define "Defaulted Security" and not define "default" or "defaulted Collateral Security" indicates an intent to distinguish the broader meaning of "Defaulted Security" from the plain meaning of "default." (Pl.'s Mot. Summ. J. 19.) Plaintiff buttresses this argument by alleging that the Indenture was intended to "make it difficult to remove collateral from the Trust Estate since 'the CDO was intended to be static.'" (Pl.'s Mot. Summ. J. 18 (quoting Pl.'s Ex. 26, Hunton Memo, at 6); Pl.'s Ex. 15.)

Defendants argue that "default" does not have a common meaning in the context of CDO indentures. Relying on the Hunton Memo, Defendants argue that "default" "should be read to include circumstances as broad, if not broader, than those included in the term 'Defaulted Security'" because the purpose of § 5.16(b) is to provide the Requisite Noteholders the "authority to provide direction to the Indenture Trustee when a Collateral Security might impair their interest." (Defs.' Opp'n Mot. Summ. J. 14-15.) Defendants argue that "defaulted Collateral Securities" is sufficiently broad as to encompass those securities that are "immanently about to default." (Pl.'s Ex. 26, Hunton Memo, at 4.) Defendants allege that Bimini was "a distressed issuer making an exchange offer that would allow that party to avoid an ultimate default," and concludes that the TruPS constituted "defaulted Collateral Securities." (Defs.' Opp'n Mot. Summ. J. 5-6 (quoting Pl.'s Ex. 12, McIndoe. Trs., at 61:3-63:13).)

Defendants' arguments are not persuasive. First, neither Defendants' briefs nor the Hunton Memo cite any case law to support the position that the word "defaulted" means anything other than "defaulted." If the parties had intended "defaulted" to mean something as broad as "immanently about to default" they would have specified such an understanding as they did with capital "D" "Defaulted Security." Second, Defendants' argument that the purpose of § 5.16(b) is to provide Requisite Noteholders with the "authority to provide direction to the Indenture Trustee when a Collateral Security *might impair their interest*" (emphasis added) is not supported by the Indenture. § 5.16(b) is primarily about breaches of representations or warranties, which if material constitute an Event of Default under § 5.1(v); § 5.16(b) does not provide for Noteholder rights generally. The language of §

---

[13] Defendants do not dispute that the TruPS were at all times a performing Collateral Security, but only dispute the proposition "to the extent it implies a legal conclusion that the Bimini TruPS were not a "defaulted Collateral Security" within the meaning of Section 5.16(b) of the Indenture." (DRO ¶26, Pl.'s Ex. 26.)

5.16(b) explicitly refers to "defaulted Collateral Securities" and provides no indication that the Noteholders have any authority to conclusively interpret said phrase.[14]  Furthermore, §6.1 of the Indenture limits BNYM's ability to act unless such action is authorized under the Indenture.[15] Therefore, the TruPS were not defaulted Collateral Securities under the Indenture, and it follows that BNYM's transfer of the TruPS constitutes a breach as a matter of law.  Accordingly, this Court grants Plaintiff's motion for summary judgment as to liability for the first claim for relief and denies Defendants' motion for summary judgment for that claim.[16]

  5. **Tortious Interference action against Bimini (third claim for relief)**

The parties cross move for summary judgment on the tortious interference claim.  Under New York law in order to sustain a claim for tortious interference with contract a plaintiff must show: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff."  *Albert v. Losken*, 239 F.3d 256, 274 (2d Cir. 2001) (*citing Findley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)), *see also Vinas v. Chubb Corp*., 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007).

There is no dispute that the Indenture is a valid contract and that Bimini had knowledge of the Indenture.  The disputes lie in (a) whether Bimini intentionally and improperly procured the breach and, if so (b) whether Bimini is entitled to the economic interest defense.

  *A. Whether Bimini intentionally and improperly procured the breach*

Plaintiff argues that Bimini intentionally and improperly procured the breach in two instances. First, on June 19, 2009 Robert Cauley ("Cauley"), Chariman and CEO of Bimini, sent a letter (the "Cauley Letter") to Chris Grose, the relationship manager at BNYM.  In his letter, Cauley stated that he was outraged after learning that BYNM might reverse its position as to whether the Indenture permits the cash repurchase because he had relied on previous correspondence and incurred material costs in preparation for the repurchase.  (Pl.'s Mot. Summ. J. 23-24; Pl.'s Ex. 19.)  Plaintiff alleges that this letter constitutes an improper procurement of a breach because Cauley knew the transaction was not permitted by the Indenture.  (Pl.'s Reply Mot. Summ. J. at 10; Pl.'s Ex. 59, e-mail from Cauley

---

[14] Defendants' argument that the Requisite Noteholders have "superior rights" under § 8.8 is unpersuasive because § 8.8 provides a payment structure; it does not provide Noteholders a right to supersede any part of the Indenture.
[15] § 6.1(b) of the Indenture provides, "[e]xcept during the continuance of an Event of Default: (i) the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee."  (Pl.'s Ex. 1, Indenture § 6.1, at 78.)
[16] Plaintiff did not move for, nor is it entitled to, summary judgment as to damages because genuine issues of material fact are in dispute as to whether Plaintiff was actually damaged, and if so, by how much.

(July 23, 2009).)  Defendants argue that the Cauley Letter is insufficient to support a finding that Bimini tortuously interfered with the Indenture or influenced BNYM's decision to act.  (Defs.' Mot. Summ. J. 25.)

Second, on October 21, 2009, Hunton issued the Hunton Opinion, based on the Hunton Memo, which concluded that the TruPS were defaulted Collateral Securities under the Indenture.  Plaintiff alleges that Hunton's conduct was improper because the attorney knew that his legal conclusion was wrong on the basis of conversations that took place during the drafting of the Hunton Memo.  Plaintiff argues that Hunton's act is attributable to Bimini under the principles of agency law because Hunton had actual authority to act on Bimini's behalf.  (Pl.'s Mot. Summ. J. 22, n.21.)  Defendants argue that the Hunton Opinion was not improper because the author analyzed the Indenture and, relying on representations that Bimini was financially distressed, concluded that the TruPS were defaulted Collateral Securities.

There are genuine issues of material fact in dispute, e.g., did Bimini have the requisite intent to procure the breach, whether the Cauley letter in fact caused BNYM to breach, whether Hunton acted in bad faith in drafting the Hunton Memo and issuing the Hunton Opinion, and whether BNYM acted in bad faith by relying on the Hunton Opinion.  Accordingly, this Court denies Plaintiff's motion for summary judgment for the third claim for relief and denies Defendants' motion for summary judgment for that claim.

### B. The Economic Interest Defense

Where a defendant has an "economic interest" in the contract, a plaintiff must demonstrate that any interference with the contract was "either malicious or involved conduct rising to the level of criminality or fraud."  *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y. 2007) (*citing Masefield AG v. Colonial Oil Indus.*, 2006 WL 346178, at **5-6 (S.D.N.Y. 2006)); *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F Supp. 2d 436, 463 (S.D.N.Y. 2003).  The defense is applicable when a third party "acts to protect its own legal or financial stake in the breaching party's business."  *Vinas*, 499 F. Supp. 2d at 431 (quoting *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422 (2007); *Imtrac Indus. v. Glassexport Co.*, No. 90 Civ. 6058, 1996 WL 39294, at *7 (S.D.N.Y. Feb. 1, 1996).

This defense has been applied in situations where the "legal or financial stake" is akin to a form of ownership.  *See e.g., Foster v. Churchil*, 87 N.Y.2d 744 (1996) (applying the economic interest defense where defendant was a significant stockholder in the breaching party's business); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988) (applying the defense to a defendant and

14

breaching party had a parent-subsidiary relationship). However, courts have held that the defense is applicable in situations where defendant does not have an ownership interest in the breaching party's business. *See, e.g.*, *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 179 A.D.2d 592, 592-593 (N.Y. App. Div. 1992) (defendant was the breaching party's creditor); *Don King Productions, Inc. v. Smith*, 47 Fed. Appx. 12, 15-16 (2d Cir. 2002) (defendant had a managerial contract with the breaching party).[17]

Defendants argue that Bimini is entitled to the economic interest defense because Bimini alleges that the repurchase of the TruPS was necessary for Bimini to avoid defaulting on the TruPS and facing potential bankruptcy. (Def.'s Mot. Summ. J. 26.) Plaintiff disputes that Bimini had a sufficient "legal or financial stake" in the contract to afford it the economic interest defense because Bimini's interest was in its own survival and not in that of BNYM, the allegedly breaching party. (Tr. Oral Arg., June 9, 2010, at 53:6-18.)

In *Don King Productions, Inc. v. Smith*, the defendant, a boxing manager, induced a boxer to breach a promotion contract with the plaintiff, a promotion company. 47 Fed. Appx. 12, 15-16 (2d Cir. 2002). The Second Circuit stated in *Don King Productions* that "[s]uch economic interest ... is not limited to that of the breaching party, but can include that of the [defendants'] as well. 47 Fed. App. 12 at 15-16. The Second Circuit affirmed the jury verdict when the district judge had instructed the jury that the defendant "could make out the affirmative defense of justification by showing that he was acting to protect the economic interest of [the breaching party] alone, *or of [the defendant] alone,* or of both." *Id.* at 15.

---

[17] Plaintiff erroneously argues that the economic interest defense is not available when a defendant interferes with a valid, existing contract, but only when a defendant interferes with a prospective contract. (Pl.'s Opp'n Mot. Dismiss 31-33.) Plaintiff inappropriately relies, in part, on *Island Rehabilitative Services Corp. v. Maimonides Medical Center*, 19 Misc.3d 1108(a), 2008 WL 786507, at *8 (Sup Ct. Kings County 2008) ("This defense is not applicable, however, where the contract is valid and enforceable and known to the defendant that intentionally seeks its breach for its own economic advantage.") The *Island* Court held that the economic interest defense was not available to the defendant who sought to breach a contract between his competitor and a third party because the defendant intentionally sought to breach the contract for his own economic advantage. *Id.* at *8. *Island* does not stand for the proposition, as Plaintiff contends, that the defense is not available in situations involving an existing contract, but rather that where "interference is related to only a prospective or speculative contract, 'more culpable conduct' is required." *Id.* at *9 (citing *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 621 (1996)).
  Contrary to Plaintiff's argument, courts have applied the defense in numerous cases involving valid, existing contracts. *See e.g., Don King Productions, Inc.*, 47 Fed. Appx. at 15-16; *American Protein Corp.*, 844 F.2d at 63; *Foster*, 87 N.Y.2d 744; *Ultramar Energy Ltd.*, 179 A.D.2d at 592-593. New York law recognizes the torts of interfering with both *prospective* and *existing* contracts, but affords greater protection to the latter. *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 425-26 (2007) (explaining that tort law strives to balance individual interests in contract rights with the public's interest in unfettered competition). Hence, the law requires that a plaintiff demonstrates that a defendant has a higher level of culpable conduct for a claim of interference with an existing contract when the defendant can show that it has an economic interest in the contract.

Here, Bimini alleges that if it had not repurchased the TruPS, it would have defaulted on the TruPS, which presumably would have affected BNYM's business as the Indenture Trustee as well as Bimini's self-interest in avoiding bankruptcy. The parties dispute the degree of Bimini's financial troubles and whether the repurchase of the TruPS was necessary for Bimini to avoid defaulting and facing bankruptcy. The resolution of these material facts in dispute is necessary to determine whether Bimini in fact had a sufficient economic interest so as to justify its interference, save Plaintiff's opportunity to show that Bimini's conduct was malicious or amounted to criminality or fraud.[18]

### 6. Breach of Fiduciary Duty against BNYM (fifth claim for relief)

Defendants move for summary judgment on the fiduciary duty claim. Plaintiff alleges that the Indenture Trustee breached its fiduciary duty to Plaintiff and the Issuer "separate and apart from the terms of the Indenture" by permitting the tender offer. (Am. Compl. ¶¶ 73, 80.) Defendants argue that neither the law nor the Indenture imposes a fiduciary duty on BNYM with respect to Plaintiff and that Plaintiff's fiduciary duty claim is duplicative of the breach of contract claim.

To plead a breach of fiduciary duty claim under New York law, a plaintiff is required to allege "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Deblasio v. Merrill Lynch & Co.*, No. 07-318, 2009 U.S. Dist. LEXIS 64848, at *86 (S.D.N.Y. July 27, 2009) (internal quotation omitted). Prior to an event of default, the duties owed by an indenture trustee to a beneficiary are generally limited to the duties imposed by the indenture. *Elliott Assocs. V. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 70-71 (2d Cir. 1988); *LNC Investments, Inc. v. First Fidelity Bank, Nat'l Assoc.* 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996). However, courts have imposed an extra-contractual obligation pre-default, which requires that, "an indenture trustee must avoid conflicts of interest and discharge its obligations 'with absolute singleness of purpose,' because of the inability of dispersed investors to enforce their rights." *LNC Investments, Inc. v. First Fidelity Bank, Nat'l Assoc.* 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996) (quoting *Dabney v. Chase Nat'l Bank,* 196 F.2d 668, 669-71 (2d Cir. 1952)); *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 70-71 (2d Cir. 1988) ("so long as the trustee fulfills its obligations under the express terms of the Indenture, it owes the debenture holders no additional, implicit pre-default duties or obligations except to avoid conflicts of interest.").

---

[18] Defendants erroneously argue that because Plaintiff has failed to plead malice, criminality or fraud, the tortious interference claim must be dismissed. However, plaintiff does not have to show that Bimini acted with malice, criminality or fraud unless Defendants can show that Bimini had an economic interest. *See Vinas*, 499 F. Supp. 2d at 434 (denying a motion to dismiss a tortious interference claim where defendant could not show at that stage that it was entitled to the economic interest defense).

16

Following an event of default, the duties of a trustee are to act prudently "but only in the exercise of those rights and powers granted in the indenture." *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 11, 632 N.Y.S.2d 520 (1st Dep't 1995). It is recognized that post-default, an indenture trustee's obligations "more closely…resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture". *Id.* at 12, 632 N.Y.S.2d at 527.

Plaintiff, as a noteholder of the PreTSL XX Income Notes, is a beneficiary of the Indenture, and BNYM, as Indenture Trustee, owed pre-default duties to Plaintiff to avoid conflicts of interest. Plaintiff alleges that BNYM breached its pre-default duty to avoid conflicts of interest by advancing its own interests at the expense of the note holders when it allowed Bimini to repurchase the TruPS at 45% of the par value. Plaintiff alleges that BNYM was motivated to protect its financial self-interest when pressured by the Cauley letter. Although BNYM acted at the direction of the Requisite Noteholders, Plaintiff's allegations of a breach of pre-default duties are sufficient to withstand a motion for summary judgment.

Plaintiff further argues that the transfer of the TruPS triggered BNYM's higher fiduciary duties post-default. It is undisputed that no Event of Default under the Indenture ever occurred. Nevertheless, Plaintiff argues that after BNYM breached the Indenture by allowing Bimini to repurchase to the TruPS, BNYM's failure to send notice to PreTSL XX prevented the trigerring of an Event of Default pursuant to § 5.1(v) of the Indenture. Plaintiff argues that BNYM "should not be permitted to rely in its defense on the non-occurrence of a condition that was of its own making and is part and parcel of the misconduct at issue." (Pl.'s Opp'n Mot. Dismiss 23.) Plaintiff cites no law to support this proposition. Even if this Court were to recognize the post-default duties, Plaintiff fails to sufficiently allege how BNYM breached those duties. Plaintiff's allegation that BNYM breached the Indenture by selling the TruPS may have given rise to the duties, but is insufficient for this Court to draw the inference that BNYM failed to act prudently following its approval of the transaction.

Defendants also argue that the fiduciary duty claim should be dismissed as duplicative of the breach of contract claim. "A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *William Kaufman Organization, Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 173 (1st Dep't 2000) (affirming the dismissal of a claim for breach of fiduciary duty as duplicative of a claim for breach of contract). Plaintiff's claim for breach of fiduciary duty arises out of the same facts as the claim for breach of contract, but Plaintiff alleges that BNYM further breached its fiduciary duty by:

> obtaining the consent of the Requisite Noteholders by means of the Offer and Request for Direction, as supplemented and amended, which was false and misleading in that it

17

> (a) misrepresented that the Tender Offer was based upon and authorized by the terms of Section 5.l6(b) of the Indenture when in fact no default had occurred with respect to the Collateral Security and (b) contained material omissions of fact in failing to disclose any information regarding the nature of the purported default, the manner of its determination, or the financial condition of [Bimini].

(Am. Compl. ¶ 74.) Because these allegations are separate and distinct from the allegations of breach of contract, this claim is not duplicative of the breach of contract claim.

There are material facts in dispute regarding whether BNYM breached its pre-default duty, and therefore Defendants' motion for summary judgment as to the fifth claim is denied.

### 7. Aiding and Abetting Breach of Fiduciary Duty against Bimini (seventh claim for relief)

Defendants move for summary judgment on the claim for aiding and abetting breach of fiduciary duty. To sustain a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege: (1) a breach of fiduciary duty; (2) knowledge of the breach by the aider and abettor; (3) substantial assistance by the aider and abettor in achieving the breach; and (4) that plaintiff suffered damage as a result of the breach. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003).

Plaintiff has sufficiently alleged facts to support a claim for breach of fiduciary duty (*see supra*). The parties dispute whether Bimini had knowledge that the tender offer was in violation of the Indenture and whether Bimini substantially assisted the breach by issuing the Cauley Letter and by providing $3.3 million directly to consenting Senior Noteholders as an inducement to consent to the sale. Accordingly, there are genuine issues of material fact in dispute that preclude summary judgment, and Defendants' motion is denied as to this claim.

### 8. Unjust Enrichment against Bimini (ninth claim for relief)

Defendants move for summary judgment on the unjust enrichment claim. "To state a claim for unjust enrichment under New York law, a plaintiff must allege that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch, Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (internal quotation and citation omitted); *see also Hughes v. BCI Intern. Holdings, Inc.*, 452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006). However, the existence of a valid, written agreement precludes recovery for unjust enrichment for events arising out of the same subject matter. *See U.S. East Telecomms, Inc. v. U.S. West Comm Servs., Inc.*, 38 F.3d 1289, 1296 (2d Cir. 1994).

The Defendants argue that the existence of the Indenture precludes Plaintiff's recovery for unjust enrichment against Bimini.  The Defendants rely principally on two cases: *American Medical Ass'n v. United Healthcare Corp.*, Not Reported in F. Supp. 2d, 2007 WL 683974 (S.D.N.Y. 2007) and *Law Debenture v. Maverick Tube Corp.*, Not Reported in F. Supp. 2d, 2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008), *affd sub nom. Law Deb. Trust Co. of New York v Maverick Tube Corp.*, 595 F3d 458 (2d Cir. 2010), both of which are distinguishable from the case at bar.

In *American Medical*, various medical associations and physicians challenged the payment practices for out-of-network medical services of a group of health insurance companies.  2007 WL 683974 (S.D.N.Y. 2007), at *1.  The medical associations and physicians sought recovery, in part, for unjust enrichment and to enforce the terms of the underlying contracts between the health insurance companies and insurance beneficiaries.  *Id.*, at *11.  This Court held that health insurance contracts precluded recovery for unjust enrichment because the contracts governed the terms of reimbursement for the medical services.  *Id.*  Unlike in *American Medical* where the underlying contracts governed the terms of reimbursement for medical services between insurance companies and beneficiaries, the Indenture here does not contain any terms relating to the transfer of the TruPS between BNYM and Bimini.  That transaction was extraneous to the Indenture; thus the Indenture cannot serve to bar the claim.

In *Law Debenture*, plaintiff Law Debenture brought an action alleging, in part, that defendant Tenaris S.A. was unjustly enriched when it allegedly procured a breach of an indenture agreement between defendant Maverick Tube Corporation and certain holders of convertible indenture securities.  2008 WL 4615896 (S.D.N.Y. 2008), at *1.  The Court held that Maverick Tube Corporation had not breached the indenture agreement and dismissed the unjust enrichment claim on the grounds that "there can be no argument that Tenaris has been unjustly enriched by causing, aiding, and abetting Maverick Tube's [non-breaching actions]." *Id.*, at *13.  *Law Debenture* is distinguishable because, here, BNYM breached the Indenture when it sold the TruPS, and Plaintiff can cognize a claim that Bimini caused, aided and abetted BNYM's breach of the Indenture.

The present case is similar to *Hughes v. BCI Intern. Holdings, Inc.*, 452 F. Supp. 2d 290 (S.D.N.Y. 2006).  In *Hughes*, the plaintiffs entered into a series of agreements with BCI International Holdings, Inc. ("BCI") to receive promissory notes and warrants.  *Id.* at 298.  The plaintiffs alleged that a third party to the contract wrongfully obtained assets that plaintiffs intended for BCI, thereby depriving plaintiffs of the value of their investment.  *Id.* at 304.  This Court held that the existence of an agreement between the plaintiffs and BCI did not preclude plaintiffs from proceeding in equity

19

against the third party because the agreements did not set forth plaintiffs' rights and obligations with respect to the third party. *Id.* Similarly, here the Indenture does not set forth Plaintiff's rights with respect to Bimini, a third party to the Indenture. As this Court stated in *Hughes*, to bar Plaintiff from asserting a claim for unjust enrichment "would subvert the 'logic of [this] equitable doctrine ... which is designed to prevent unjust enrichment where the absence of an enforceable contract otherwise prevents recovery from [the culpable] parties.'" *Id.* (citing S*eiden Associates, Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 41 (S.D.N.Y. 1991)).

There are material facts in dispute regarding whether equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover. Therefore, Defendants' motion for summary judgment is denied as to the ninth claim.

### Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED as to count 1 and DENIED as to counts 2, 3 and 4.[19] Defendants' motion for summary judgment is GRANTED as to counts 2, 4, 6, 8, 10 and 11, and DENIED as to counts 1, 3, 5, 7 and 9. The Clerk of the Court is instructed to close all open motions in this matter. The parties shall refer to my individual practices for details on the required trial submissions and shall deliver copies of such submissions directly to Chambers by 5:00 p.m. on March 24, 2011. Trial is set to begin on Monday, April 4, 2011 at 10:00am.

**SO ORDERED.**

New York, New York
March 4, 2011

**HAROLD BAER, JR.**
**United States District Judge**

---

[19] All enumerated counts refer to the claims for relief alleged by Plaintiff in the Amended Complaint, as set forth in the Procedural History section of this Opinion.